**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------------------X
ALLSTATE INSURANCE COMPANY, ALLSTATE
INDEMNITY COMPANY, ALLSTATE PROPERTY &
CASUALTY INSURANCE COMPANY, and ALLSTATE
FIRE & CASUALTY INSURANCE COMPANY,

|  |  |
|---|---|
| Plaintiffs, | Index No. |
| -against- | 23-CV-6194 |

ACCELERATED SURGICAL CENTER OF NORTH
JERSEY LLC, BAILEY OUTPATIENT MEDICAL
SERVICES P.C., BARNERT SURGICAL CENTER, LLC,
BEDFORD MEDICAL SERVICES P.C., ELMWOOD PARK    **COMPLAINT**
MEDICAL GROUP P.C., IRFAN A. ALLADIN MD, P.C.
D/B/A PAIN MEDICINE OF NEW YORK, MOLNAR
MEDICAL SERVICES P.C., RIDGEWOOD DIAGNOSTIC
LABORATORY LLC, RIVERSIDE MEDICAL SERVICES
P.C., TREMONT MEDICAL SERVICES, P.C., TRISTATE
MULTISPECIALTY MEDICAL SERVICES PC, IRFAN
AHMAD ALLADIN, M.D., EUGENE SETH GORMAN,
M.D., SAM RAHAT A/K/A RAHAT-MUQTADIR,
KRISTAPPA SANGAVARAM, M.D., ALLAN M.
WEISSMAN, M.D., ALEXANDR ALEXEEVICH ZAITSEV,
M.D., JOHN DOES 1-2, AND ABC CORPS. 1-2,

Defendants.
------------------------------------------------------------------------------------X

## TABLE OF CONTENTS

Background and Introduction ...................................................................................................4

The Parties ..............................................................................................................................18

Jurisdiction and Venue...........................................................................................................24

I.      The Defendants' Fraudulent Schemes Are
        Enabled by Professional Licensing Violations ...............................................25

II.     The Defendants' Awareness of the Illegality of their Conduct
        Based on Extensive History of Fraud Actions .................................................66

III.    The Defendants' Fraudulent Scheme to Bill for
        Unnecessary ASC Facility Fees.......................................................................83

III.    The Defendants' Fraudulent Scheme to Bill for
        Unnecessary Pain Management Injections ........................................................89

V.      The Defendants' Fraudulent Scheme to Bill for
        Unnecessary Manipulation Under Anesthesia (MUA) .....................................96

VI.     The Defendants' Fraudulent Scheme to Bill for
        Unnecessary ROM Testing, MMT, and ALM.................................................101

VII.    The Defendant Providers' Failure to Verify Their Claims .............................104

VIII.   The Defendants' Fraudulent Scheme to Bill in
        Violation of the Fee Schedule ........................................................................108

IX.     The Defendants' Fraudulent Scheme to Bill for
        Unnecessary Drug Testing..............................................................................110

X.      The Defendants' Fraudulent Scheme to Bill for
        Services Rendered by Independent Contractors ...........................................125

XI.     The Defendants' Expansive Network of
        Interrelationships and Self-Referrals ............................................................130

FIRST CLAIM FOR RELIEF .............................................................................153

SECOND CLAIM FOR RELIEF .........................................................................156

THIRD CLAIM FOR RELIEF.............................................................................157

FOURTH CLAIM FOR RELIEF .......................................................................................162

FIFTH CLAIM FOR RELIEF .........................................................................................164

SIXTH CLAIM FOR RELIEF.........................................................................................166

SEVENTH CLAIM FOR RELIEF ...................................................................................167

EIGHTH CLAIM FOR RELIEF .....................................................................................170

The Plaintiffs Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, and Allstate Fire & Casualty Insurance Company ("Plaintiffs" or, collectively, "Allstate"), by and through their attorneys, Short & Billy, P.C, for their Complaint in this action, hereby allege as follows:

## BACKGROUND AND INTRODUCTION

1.  The State of New York has provided for No-Fault automobile insurance as a form of coverage designed to be useful to the consumer and to provide medical coverage, lost wages, and other benefits to people injured in automobile accidents so that they can recover from their injuries with minimal disruption in their lives.  For approximately twenty years, commencing with its inception in 1974, the No-Fault system functioned to the benefit of the consumer at premiums that were generally affordable.

2.  Since the mid-1990s, however, New York's No-Fault coverage has been targeted by perpetrators of fraud.  An increasingly large number of such persons have gone into business with the purpose of abusively billing the New York No-Fault system.  The New York Court of Appeals has commented that the No-Fault system has been targeted by and is permeated with fraud.  As the Court of Appeals explained in *Matter of Medical Society of New York v. Serio*, that fraud has included staged accidents, billing for unnecessary services, and organized crime involvement.  100 N.Y.2d 854 (2003).

3.  As the New York State Department of Financial Services (formerly the New York State Insurance Department) ("DFS") explained in its March 15, 2016 Health Care Insurance Fraud Report to the Governor, health care fraud has serious adverse impacts on patients/consumers, insurers, and the public.  This fraud includes medical providers that bill for services that were not provided or that were unnecessary, and constituted the majority of all

4

health care fraud in New York.  The 2016 Report noted that insurers are required to investigate fraud and to have a plan for the investigation and initiation of civil actions.  Even in 2016, DFS reported that No-Fault insurance fraud cost the public in New York "hundreds of millions of dollars" in insurance costs.

4. The problem has persisted in New York and across the country, as set forth in the March 15, 2022 DFS Report titled "Investigating and Combating Health Insurance Fraud," which called it a "costly and pervasive drain on the national healthcare system."  The 2022 Report cites an estimate of the National Health Care Anti-Fraud Association that "losses due to healthcare fraud are in the tens of billions of dollars each year," and No-Fault fraud has accounted for the vast majority of those losses in New York.  Indeed, DFS found that reports of suspected No-Fault fraud "accounted for 92% of all healthcare fraud reports received in 2021 and at least 90% of all healthcare fraud reports received since 2017."  The 2022 Report also reiterated the requirement that insurers engage in fraud detection activities, including by a full-time Special Investigations Unit (SIU), and that they plan for the investigation and initiation of civil actions.

5. DFS has also specifically expressed its concern with schemes that bring patients across state lines and that involve billing in excess of the New York fee schedule.  DFS has found that this practice raises the potential for billing abuse and for depletion of the insured's coverage.

6. As DFS stated on October 10, 2017, "certain providers have assumed a practice of charging the prevailing fee, or more, in their geographical location outside of New York, which exceeds New York limits and is believed to lead to inflated claims, depleted coverage, increased litigation and higher premiums."  DFS further expressed its concern that "New York residents

eligible for No-Fault benefits for their physical injuries often are influenced to seek healthcare services from non-New York providers that engage in such practice."

7. Pursuant to its obligations under Article 4 of the New York Insurance Law, Allstate has filed this action to remedy a pattern of serious fraud that has a significant impact on the public, consumers and itself. Allstate is not alone.  As detailed herein, other insurers have sued the very same Defendants for their blatant violations of the law and efforts to defraud the No-Fault system.  Despite notice of their improper activities, the Defendants have continued with their schemes and improper billing.

8. The abusive practices set forth herein not only drive up the cost of insurance; they also place in peril the quality of health care available to the public.  The Defendants consist of a group of individuals, ambulatory surgery centers (ASCs), and medical provider entities that have worked in concert to submit inflated and fraudulent claims to Allstate.  In many cases, they have billed for fictitious services that were never rendered as billed, and/or for services that have been rendered incompetently and/or without regard to the welfare of the patients.  All of the Defendants have billed abusively and/or assisted in the abusive billing.  Many of the claims were for services that were not only unnecessary, but which also placed the patients at unnecessary risk.  Indeed, in many cases, the practices of the Defendants have endangered the welfare or safety of their patients.

9. Again and again, the Defendants have transported patients across state lines to New Jersey, with the transportation paid for by the Defendant ASCs Accelerated and Barnert (each as defined herein), in order to bill abusively.  The billing has been substantial and improper, threatening in many cases to exhaust all coverage of the injured parties.  No disclosure is made to

the patients that the Defendants will submit abusive billing that could exhaust their coverage, leaving no money for anything else if all the claims of the Defendants were paid as billed.

10. In the words of DFS, providers such as the Defendants in this case have repeatedly "influenced" New York residents to have unnecessary health care services in New Jersey. Again and again, New York residents have been brought to New Jersey, without their knowing why they were sent there, and without having ever been told the actual reason: so that the Defendants could submit excessive billing that will more quickly deplete their No-Fault benefits. The Defendants never disclosed to New York residents how much more of their benefits would be depleted by having the services performed in another State.

11. The No-Fault system is designed to provide compensation for health care expenses and to process claims quickly. As a consequence, the submission of bills for facially valid services will often result in a payment from a No-Fault insurer. The Defendants have taken advantage of this feature of the No-Fault system in order to submit and receive payment for fraudulent billing. In this regard, the Defendants' practices have been relentless.

12. The Defendants have engaged in patterns of making referrals for, and/or billing for, unnecessary services in an attempt to increase their billing. In claim after claim, unnecessary services have been repeatedly billed to the Plaintiffs by the Defendants. They have engaged in an illegal referral network in which the patients were referred not by need, but in order to enrich the Defendants.

13. The Defendant ASCs Accelerated and Barnert are at the center of the abusive billing in which the Defendants engaged and/or assisted. In general, the Defendant ASCs have billed "facility fees" to Allstate for manipulation under anesthesia ("MUA"), epidurals and other pain management injections and procedures, and arthroscopic surgery.

14. The Defendant ASCs Accelerated and Barnert are New Jersey ambulatory surgery center ("ASCs").  Under New Jersey law, ASCs can be owned by laypersons.  Both Accelerated and Barnert have been owned by a combination of laypersons and healthcare providers.

15. Although they are ASCs licensed by the State of New Jersey and located and operating in New Jersey, the Defendant ASCs Accelerated and Barnert have sought huge numbers of patients from New York, despite the fact that there are numerous ASCs in New York, as well as numerous office-based surgery practices ("OBSPs") in New York.

16. Accelerated and Barnert obtain patients from New York in large part through a referral network that includes the owners of Accelerated and Barnert, as well as healthcare providers with which these owners have relationships.  Rather than having the procedures done at ASCs (or, where appropriate, at OBSPs) in New York, the owners and affiliated referring providers repeatedly refer and/or bring the patients to New Jersey.

17. In general, the Defendant ASCs Accelerated and Barnert pay to transport their respective patients from New York to Accelerated and Barnert in New Jersey.

18. Most of the Defendant ASCs' billing is for facility fees rather than services.  The doctors separately bill for actually performing the surgical or other procedures, and other providers bill for supporting services and supplies, including anesthesia.  These facility fee charges are added to the other billing, thus tremendously inflating the cost not only to the Plaintiffs, but to the injured parties' available insurance benefits.  The vast majority of the facility fees Accelerated and Barnert billed were based on services that need not and should not be provided in an ASC.  These services could have and should have been provided at an OBSP in New York.  However, the patients were brought to New Jersey, so that Accelerated and Barnert could bill for, and so that their owners could benefit from, a facility fee in addition to the

charges billed for by the referring and related providers and surgeons, who share in the profits from such fees through sham ownership in one or both of the Defendant ASCs, and/or by kickbacks or other illicit compensation.  These facility fees, which constitute the vast majority of the Defendant ASCs' billing, are unnecessary and should never have been billed to the Plaintiffs.

19. Accelerated and Barnert obtain patients from New York through this referral network in part by granting ownership interests and/or "investor" status to healthcare providers who refer patients to and render services at the ASCs.  It is unclear whether any of these provider-owners actually invested any money in Accelerated or Barnert, and their main contribution is to provide patients for which the Defendant ASCs could bill for unnecessary facility fees.  Upon information and belief no such ownership or investment opportunity is offered to healthcare providers who do not refer or bring patients to the respective Defendant ASCs.  For most of the Defendants, this ownership and the shares are a fraudulent sham disguising an illegal referral relationship.

20.  The referral network is an elaborate system of interrelated persons and entities.  The nature and degree of these relationships, some or all of which are undisclosed to patients, are illegal under New York and New Jersey law.

21. For example, the Defendant Aladdin holds the largest ownership share in Accelerated (47.04%) and is the majority owner of Barnert (69.02%), and Alladin also serves as the Medical Director for both of the Defendant ASCs.  Allstate has also been billed by Alladin's wholly-owned providers, the Defendants Alladin PC and Bailey, for services purportedly rendered by Alladin.  Patients of both Alladin PC and Bailey have frequently been sent to New Jersey for surgical or other procedures performed by Alladin and/or his PCs' purported employees at both of the Defendant ASCs, Accelerated and Barnert.

22. The Defendants Riverside and Tristate, which have referred many patients to the Defendant ASCs and billed for unnecessary pain management injections as well as anesthesia, were nominally owned until 2019 by the Defendant Weissman, who is or was also one of the part owners of the Defendant ASC Barnert.  Some of the referrals by Riverside reflected that the treating provider was the Defendant Gorman, who is or was also a part owner of the Defendant ASC Accelerated.  In reality, Riverside and Tristate are owned and controlled by the Defendant Zaitsev, a significant partner (9.99%) in both Accelerated and Barnert, who recruited Weissman to form Riverside and Tristate as replacements for Zaitsev's troubled predecessor entities, non-parties Metropolitan Interventional Medical Services P.C. ("MIMS") and Interstate Multi-Specialty Medical Group, P.C. ("Interstate") in New York and New Jersey, respectively.

23. Prior to the revocation and surrender of his New Jersey and New York medical licenses in 2021, the Defendant Sangavaram was recruited by the Defendant Zaitsev in 2019 to replace Weissman as the nominal or paper owner of Riverside and Tristate.  Sangavaram eventually became the nominal owner of at least six (6) PCs secretly owned by Zaitsev: the Defendants Bedford, Elmwood, Molnar, Riverside, Tremont, and Tristate.  Sangavaram has also referred the patients of these Zaitsev PCs to the Defendant Ridgewood, for unnecessary drug testing and other clinical laboratory services, often purportedly rendered in connection with surgical or other procedures at the Defendant ASCs.  Sangavaram's ownership of these entities has been a complete sham.

24. The Defendant Zaitsev is a central figure in the fraud and in the web of concealed interrelationships.  He is or was a significant partner (9.99%) in both of the Defendant ASCs Accelerated and Barnert, and he is also the Managing Member and a part owner of the Defendant Ridgewood, which has received referrals from the Defendants and related providers, including

not limited to the numerous provider entities under Zaitsev's true ownership or control. In many cases, the patients' testing samples are collected at the Defendant ASCs.

25. At all relevant times, Zaitsev has been the true owner of the Defendants Bedford, Elmwood, Molnar, Riverside, Tremont, and Tristate, and he has exerted control over their operations in order to direct these providers to make referrals of patients to the Defendant ASCs, and to Ridgewood. Zaitsev is also the true owner of related non-party Crosstown Medical, P.C. ("Crosstown"), which is nominally owned by related non-party William J. Focazio, M.D. ("Focazio"). Like the other providers under Zaitsev's control, and has also made and/or facilitated referrals of patients to the Defendant ASCs, and to Ridgewood.

26. Several of the Defendants, including the Defendant ASCs Accelerated and Barnert, have engaged in or assisted schemes to bill for unnecessary MUA. This is a service that should be rarely used. It involves the administration of anesthesia to the patient and therefore subjects the patients to the risks of anesthesia, including death. Unnecessary MUA was performed on patients without regard to diagnosis, symptoms, necessity or utility in furtherance of treatment. MUA has been performed in circumstances where it could cause harm to the patients. The Defendants have billed for treatment of a pelvic ring fracture on patients who had no such fracture.

27. Many of the procedures for which the Defendant ASCs have billed could have been performed at an OBSP in New York, where the billing would be less costly and preserve the injured parties' insurance benefits. Furthermore, many of these procedures should not have been billed as ambulatory surgery at all.

28. Allstate has been billed substantial amounts by the Defendants and related providers for pain management injection procedures, especially trigger point injections (TPI) and epidural

steroid injections (ESI), rendered at the Defendant ASCs in New Jersey, notwithstanding that they could be performed in a New York office setting or OBSP, in which case no ASC facility fees could have been charged.  On top of the unnecessary facility fees, the Defendants and related providers have further inflated the costs (and dangers) of these procedures by needlessly subjecting patients to anesthesia and other sedation beyond local anesthesia, even though TPI and ESI typically require only local anesthesia, if any.  The Defendants and related providers have thus brought patients to another State and administered injections in an ASC, exposing them to the added dangers and expenses of excessive anesthesia, without any conceivable basis other than to charge for facility fees and anesthesia, which are unnecessary and improperly billed.

29.  The Defendants have also billed excessively under the fee schedules.  Until the New York DFS took action to curtail the practice, the Defendants inflated billing even further by taking advantage of a higher fee schedule in New Jersey, even though the same procedures could have been performed in New York at lower cost to the patients, preserving their No-Fault benefits.

30.  To be clear, the Defendants have not brought the New York patients far from their homes to Accelerated and Barnert because they provide services that cannot be provided in New York, or because they provide a higher quality of medicine.  The patients are not brought to another State in order to receive better care.  They are brought to another State like pawns to be taken advantage of.  Excessive billing is submitted which can reduce their coverage for any other No-Fault benefits.  Numerous unnecessary services are provided.  Numerous patients are put at unnecessary risk of anesthesia.  The patients are brought to Accelerated and Barnert to benefit the Defendants financially, in many cases to the detriment of the patients.

31. On December 19, 2013, the New Jersey Department of Health and Senior Services ("NJDOH") determined, by its 35-page Statement of Deficiencies, that the Defendant Accelerated committed a number of violations of New Jersey law and regulation governing licensed ASCs. These violations ranged from failures of facility emergency and other safety protocols, to inadequate personnel sanitation and inoculation practices. It was documented that Accelerated had consistently mishandled Fentanyl, Ketamine, and other controlled dangerous substances, and that it had failed to adhere to policies for the proper sterilization of surgical instruments and medical equipment. Underscoring the close and improper relationship between Accelerated and Barnert, the NJDOH found that at least one patient of the later-formed Accelerated had been transferred to "Barnert Rehab" without proper documentation, and the ASC operated by Accelerated was even initially referred to as "Barnert ASC Surgical II, LLC" in licensing documents.

32. Indeed, it appears that Accelerated and Barnert, which operate exclusively at the same address, 680 Broadway in Paterson, NJ, are used interchangeably, possibly in order to reduce each Defendant ASC's billing volume as a means to avoid detection of the fraudulent schemes alleged herein. Additionally, the forms used by at least two frequent providers of anesthesia at the Defendant ASCs, non-parties MEDICSURG, P.C. ("MEDICSURG") and University Anesthesia Services, P.C. ("University Anesthesia"), use checkboxes to indicate at which ASC it provided services, and Accelerated and Barnert are the only two options on the form.

33. While the minor shareholders of the two Defendant ASCs differ, the vast majority of the ownership in each is held by the same core group of individuals, including the Defendants Alladin, Zaitsev, and Rahat. The other owners of Accelerated and Barnert, those holding a stake

of 5% or less, are frequently added to and removed from the Defendant ASCs' official ownership records filed with the State of New Jersey.  The minor shareholders consist of a rotating cast of surgeons, anesthesiologists, and chiropractors, who provide referrals of patients to the Defendant ASCs, which in turn generate revenue for Accelerated and Barnert in the form of unnecessary billing for facility fees.  These owner-providers receive their shares in the Defendant ASCs, and distributions thereon, not because of any necessary or significant capital investment, but rather as compensation for those referrals to Accelerated and Barnert.

34. The Defendant Weissman was deposed on September 14, 2017 by counsel for plaintiff No-Fault insurers in a civil action formerly in New Jersey Superior Court, and he testified that he was then a part owner and "minor partner" of Accelerated.  *See Travelers Indem. Co., et al. v. Highland Med. Grp, P.C., et al*., No. MRS-L-002987-15 (N.J. Super. Sept. 14, 2017).  Weissman did not even know the entity he supposedly owned.  Official records obtained from the NJDOH indicate that Weissman has only ever been a part owner of Barnert, and he has never been among the registered owners or officers of Accelerated.

35.  Weissman also testified in *Travelers v. Highland* that he could not identify all of the other owners of this ASC, but that he did know three of them by name: the Defendants Alladin, Rahat, and Zaitsev.  Weissman also denied that he ever paid anything to become a partner in the ASC.

36.  The Defendant Sangavaram has been disciplined by the New Jersey State Board of Medical Examiners for his professional malfeasance.  In connection with a 2007 Consent Order, and following a criminal complaint from the Attorney General, Sangavaram's license was suspended for "charging excessive fees for anesthesia and for wrongful discharge of a pain management patient."  The 2007 Consent Order also recited that Sangavaram had owned and

14

served as the medical director for an unlicensed ASC named Wyckoff Surgical Center, LLC, and that he had been the medical director for two more ASCs: Saddle Brook Surgical Center and Advanced Center for Pain Management.

37. During the period of probation and supervision by the Board, and as reflected in the 2014 Consent Order finally removing the suspension (while ordering further supervision), it was determined that Sangavaram had persisted through at least 2011 in committing serious professional violations:

> Deficiencies noted included, but were not limited to, [Sangavaram's] continuing to order an excessive number of office visits and an excessive number of procedures; his giving multiple injections on the same office visit; the absence of documentation regarding prescription renewal, medication contract, or pain scale; and his illegible consent forms. The [Board-appointed] physician consultants concluded that the patients treated before and after April 19, 2007 were treated in the same manner, with the same multiple treatment concerns.

38. More recently, Sangavaram's medical license was not merely suspended but revoked altogether by the New Jersey State Board of Examiners, for his failure to abide by the monitoring and supervision conditions of the 2014 Consent Order. The Attorney General of New Jersey had investigated Sangavaram's compliance with the 2014 Consent Order and found that he had concealed from his Board-appointed "lifetime practice monitor" the fact that he had been rendering pain intervention services for the Defendant Tristate, having treated "over 330 patients" of Tristate "between June 30, 2020 and March 2, 2021," in New York as well as New Jersey. Under the terms of the 2021 Consent Order, the Board ordered, *inter alia*, that Sangavaram's medical license and registration to prescribe controlled dangerous substances (CDS) be revoked as of August 28, 2021, and that he may not reapply for licensure in the State of New Jersey for a period of forty-five (45) months, during which time he must not practice medicine in any State.

39. Following the latest disciplinary Consent Order from the New Jersey State Board of Examiners, on October 22, 2021, the New York State Board for Professional Medical Conduct raised disciplinary charges against Sangavaram, noting that the conduct recited in the 2021 New Jersey Consent Order would also constitute misconduct under New York law. The Statement of Charges specifically referenced the determination of the Attorney General of New Jersey that Sangavaram had failed to cooperate with the compliance and oversight program embodied in the earlier 2014 Consent Order. Sangavaram's license to practice medicine in New York was subsequently revoked by the November 12, 2021 Surrender Order of the State Board, with an effective date of November 22, 2021.

40. One of the schemes by which the Defendants have generated hundreds of thousands of dollars in additional, fraudulent billing has consisted of illegal referrals to the Defendant Ridgewood for unnecessary clinical laboratory services, including unwarranted and excessive drug testing. Ridgewood has received routine referrals of patients from the Defendant PCs, including at least four (4) of the six (6) secretly owned by Zaitsev, Ridgewood's Managing Member, often with the patients' testing samples collected at the Defendant ASCs.

41. Virtually all of the patients of these Zaitsev PCs who received an injection under anesthesia at the Defendant ASCs also received comprehensive and unnecessary drug testing from Ridgewood, pursuant to a pre-determined protocol devised by Zaitsev to maximize his revenues, and utterly without regard for the patients' histories or needs. In most or all cases, the patient's sample was collected at an ASC on the date of a procedure – purportedly in order to evaluate the safety of the procedure and accompanying anesthesia – but the results of the drug testing were not provided until after the surgeries had been performed and could not possibly have been necessary in order to provide the surgery. Ridgewood has billed for drug testing of

the same patient more than once within a short timeframe, and it has even billed in instances where same-day drug testing was performed at the ASC and billed for by the referring provider, including the Defendants Riverside and Tristate which are owned and controlled by Zaitsev.

42.  The Defendants' practices are against the interests of the very patients/assignors they purport to treat.  Inflating billing for fictitious services depletes the patients' $50,000 accident coverage limits, reducing what would be left for other expenses including lost wages.  MUA subjects the patients to the risks of anesthesia, including death.  As such, the practices the Defendants have engaged in are not only fraudulent, against the interests of the consumer and the general public, they are against the interests of the very patients/assignors these Defendants claim to be treating and/or testing.  The Defendants engaged in a brazen scheme that is tantamount to an assault against the well being of the patients, the premium paying public, the insurers including the Plaintiffs and the public of the State of New York.

43.  The Defendants have engaged in a massive fraudulent scheme and have been paid during the six (6) years preceding this Complaint an amount totaling at least $1,096,864.26 by the Plaintiffs alone.  During the same period, Allstate received No-Fault billing from the Defendants totaling at least $17,293,256.75.

44.  This action is brought to recover payments made by Allstate for No-Fault claims that were intentionally misrepresented, medically unnecessary, submitted pursuant to an improper referral arrangement, billed for by sham entities and/or never rendered as billed.  The Plaintiffs also seek a declaratory judgment that the Plaintiffs are not required to pay any No-Fault claims of the Defendants because of their improper licensing, ownership and/or billing practices and the Defendants' self-referral practices.

45.  As a result of Defendants' actions alleged herein, the Plaintiffs were defrauded in an amount totaling at least $1,096,864.26, the exact amount to be determined at trial, in payments which the Defendants received for fraudulent and improper billing.  The Plaintiffs seek to recover the payments they have made for services that the Defendants never rendered, or were not entitled to bill for or that they knew or should have known were not medically necessary or were so improperly performed as to be useless and of no value.  The Plaintiffs also seek a declaration that that they are not required or obligated to pay for No-Fault claims submitted by the Defendants.

## The Parties

**Plaintiffs**

46.  The Plaintiff Allstate Insurance Company is a corporation organized under the laws of the State of Illinois and is authorized to conduct business in the State of New York.  Allstate Insurance Company maintains offices in the State of New York including an office in Nassau County.

47.  The Plaintiff Allstate Indemnity Company is a corporation organized under the laws of the State of Illinois and is authorized to conduct business in the State of New York.  Allstate Indemnity Company maintains offices in the State of New York including an office in Nassau County.

48.  The Plaintiff Allstate Fire & Casualty Insurance Company is a corporation organized under the laws of the State of Illinois and is authorized to conduct business in the State of New York.  Allstate Fire & Casualty Insurance Company maintains offices in the State of New York including an office in Nassau County.

49. The Plaintiff Allstate Property & Casualty Insurance Company is a corporation organized under the laws of the State of Illinois and is authorized to conduct business in the State

of New York.  Allstate Fire & Casualty Insurance Company maintains offices in the State of New York including an office in Nassau County.

50. The Plaintiffs Allstate Insurance Company, Allstate Indemnity Company, Allstate Fire & Casualty Insurance Company and Allstate Property & Casualty Insurance Company are referred to herein as the "Plaintiffs" or, collectively, "Allstate."

**Individual Defendants**

51. The Defendant Irfan Ahmad Alladin, M.D. ("Alladin") is a resident of the State of New Jersey and is licensed by the States of New York and New Jersey to practice the profession of medicine.  Alladin has been registered with the New Jersey Department of Health ("NJDOH") as a part owner of the Defendant ASC Accelerated since July 30, 2010, and as a part owner of the Defendant ASC Barnert since February 14, 2012.  Alladin is the owner of the Defendant PCs Irfan A. Alladin MD, P.C. d/b/a Pain Medicine of New York, and Bailey Outpatient Medical Services P.C.  Alladin is also the "Medical Director" of the Defendant ASCs Accelerated and Barnert.

52. The Defendant Eugene Seth Gorman, M.D. ("Gorman") is a resident of the State of New Jersey and is licensed by the State of New York to practice the profession of medicine.  Gorman was registered with the NJDOH as a part owner of the Defendant ASC Accelerated from February 18, 2015 until February 18, 2021.  Gorman has purportedly rendered medical services for which the Defendants Riverside Medical Services P.C. and Tristate Multispecialty Medical Services P.C. have billed the Plaintiffs, including services provided at the Defendant ASCs Accelerated and Barnert.

53. The Defendant Sam Rahat a/k/a Rahat-Muqtadir ("Rahat") is a resident of the State of New Jersey. Rahat has been registered with the NJDOH as a part owner of the Defendant ASC Accelerated since July 30, 2010, and as a part owner of the Defendant ASC Barnert since February 14, 2012. Rahat is also the Administrator and Chief Executive Officer of both of the Defendant ASCs Accelerated and Barnert.

54. The Defendant Kristappa Sangavaram, M.D. ("Sangavaram") is a resident of the State of New Jersey and was licensed by the States of New York and New Jersey to practice the profession of medicine until his licenses were revoked by the New Jersey Board of Examiners as of August 28, 2021, and by the New York State Board for Professional Misconduct as of November 22, 2021. Sangavaram is or was the nominal owner of the Defendants Bedford Medical Services P.C., Elmwood Park Medical Group P.C., Molnar Medical Services P.C., Riverside Medical Services P.C., Tremont Medical Services, P.C., and Tristate Multispecialty Medical Services P.C., and he has purportedly rendered medical services for which each of these Defendants has billed the Plaintiffs, including services provided at the Defendant ASCs Accelerated and Barnert.

55. The Defendant Allan M. Weissman, M.D. ("Weissman") is a resident of the State of New Jersey and is licensed by the State of New York to practice the profession of medicine. Weissman was registered with the NJDOH as a part owner of the Defendant ASC Barnert Surgical Center, LLC from April 1, 2014 until February 18, 2019. Weissman was formerly the record owner of the Defendants Riverside Medical Services P.C. and Tristate Multispecialty Medical Services P.C. from their respective dates of incorporation until April of 2019, and he has rendered medical services for which Riverside and Tristate have billed the Plaintiffs, including services provided at the Defendant ASC Accelerated.

56. The Defendant Alexandr Alexeevich Zaitsev, M.D. ("Zaitsev") is a resident of the State of New Jersey and is licensed by the State of New York to practice the profession of medicine. Zaitsev has been registered with the NJDOH as a part owner of the Defendant ASC Accelerated since June 11, 2015, and as a part owner of the Defendant ASC Barnert since December 1, 2012. Zaitsev is a part owner and the Managing Member of the Defendant Ridgewood Diagnostic Laboratory LLC. Zaitsev is also a secret owner of the Defendant PCs Bedford Medical Services P.C., Elmwood Park Medical Group P.C., Molnar Medical Services P.C., Riverside Medical Services P.C., Tremont Medical Services P.C., and Tristate Multispecialty Medical Services P.C.

**Entity Defendants**

57. The Defendant Accelerated Surgical Center of North Jersey LLC ("Accelerated") is a limited liability company organized under the laws of the State of New Jersey and is owned in part by the Defendants Alladin, Rahat, Zaitsev, and Gorman. The Defendant Rahat is also the Administrator and Chief Executive Officer of Accelerated. Accelerated was formed in New Jersey on June 18, 2009 and is licensed under New Jersey law to operate an ASC located at 680 Broadway, Suite 203, Paterson, New Jersey 07514.

58. The Defendant Bailey Outpatient Medical Services P.C. ("Bailey") is a professional corporation ("PC") organized under the laws of the State of New York and is owned by the Defendant Alladin. Bailey was incorporated in New York on June 14, 2017.

59. The Defendant Barnert Surgical Center, LLC ("Barnert," and with Accelerated, the "Defendant ASCs") is a limited liability company organized under the laws of the State of New Jersey and is owned in part by the Defendants Alladin, Rahat, Zaitsev, and Weissman. The

Defendant Rahat is also Barnert's Administrator, Chief Executive Officer, and Executive Director.  Barnert was formed in New Jersey on July 18, 2011 and is licensed under New Jersey law to operate an ASC located at 680 Broadway, Suite 202, Paterson, New Jersey 07514.

60.  The Defendant Bedford Medical Services P.C. ("Bedford") is a PC organized under the laws of the State of New York and is or was nominally owned by the Defendant Sangavaram.  Bedford was incorporated in New York on June 11, 2020.  At all relevant times, Bedford has actually been owned and controlled by the Defendant Zaitsev.

61.  The Defendant Irfan A. Alladin MD, P.C. d/b/a Pain Medicine of New York ("Alladin PC") is a PC organized under the laws of the State of New York and is owned by the Defendant Alladin.  Alladin PC was incorporated in New York on January 10, 2013.

62.  The Defendant Elmwood Park Medical Group P.C. ("Elmwood") is a PC organized under the laws of the State of New Jersey and is or was nominally owned by the Defendant Sangavaram.  Elmwood was incorporated in New Jersey on October 1, 2018, and it was registered to do business as a foreign corporation in New York as of March 10, 2020.  At all relevant times, Elmwood has actually been owned and controlled by the Defendant Zaitsev.

63.  The Defendant Molnar Medical Services P.C. ("Molnar") is a PC organized under the laws of the State of New Jersey and is or was nominally owned by the Defendant Sangavaram.  Molnar was incorporated in New Jersey on March 5, 2018, and it was registered to do business as a foreign corporation in New York as of March 10, 2020.  At all relevant times, Molnar has actually been owned and controlled by the Defendant Zaitsev.

64.  The Defendant Ridgewood Diagnostic Laboratory LLC ("Ridgewood") is a limited liability company organized under the laws of the State of New Jersey and is owned at least in part by the Defendant Zaitsev, who is also Ridgewood's Managing Member.  Ridgewood was

formed in New Jersey on July 22, 2014, and it was registered to do business as a foreign limited liability company in New York as of December 26, 2019.

65. The Defendant Riverside Medical Services P.C. ("Riverside") is a PC organized under the laws of the State of New York and is or was nominally owned by the Defendant Sangavaram. Riverside was incorporated in New York on August 9, 2018 in the name of its initial nominal owner the Defendant Weissman. At all relevant times, Riverside has actually been owned and controlled by the Defendant Zaitsev.

66. The Defendant Tremont Medical Services, P.C. ("Tremont") is a PC organized under the laws of the State of New York and is or was nominally owned by the Defendant Sangavaram. Tremont was incorporated in New York on August 29, 2019. At all relevant times, Tremont has actually been owned and controlled by the Defendant Zaitsev.

67. The Defendant Tristate Multispecialty Medical Services, P.C. ("Tristate") is a PC organized under the laws of the State of New Jersey and is or was nominally owned by the Defendant Sangavaram. Tristate was incorporated in New Jersey on April 13, 2018 in the name of its initial nominal owner the Defendant Weissman, and it was registered to do business as a foreign corporation in New York as of March 10, 2020. On that same date in 2020, Tristate also registered "Tri State Medical Urgent Care" as an assumed name in New York. At all relevant times, Tristate has actually been owned and controlled by the Defendant Zaitsev.

68. The Defendants Alladin PC, Bailey, Bedford, Elmwood, Molnar, Riverside, Tremont, and Tristate are referred to herein as the "Defendant PCs."

**ABC Corporations and John Doe Defendants**

69. ABC Corp. 1-2 are additional management companies and/or billing companies, whose names are not yet known to Allstate, that contracted with one or more of the Defendants to provide management and/or billing services and/or made improper referrals and conspired to and did assist in the fraudulent and unlawful conduct alleged in this Complaint.  They also conspired to and did assist in the fraudulent and unlawful conduct alleged in this Complaint.  These entities will be added as Defendants when their names and the extent of their participation become known through discovery.

70. John Does 1-2 are additional individuals, whose names are not yet known to Allstate, who are true owners of one or more of the Defendants and/or who contracted with one or more of the Defendants to provide management and/or billing services and/or who made improper referrals and conspired to and did assist in the fraudulent and unlawful conduct alleged in this Complaint.  These individuals will be added as Defendants when their names and the extent of their participation become known through discovery.

## Jurisdiction and Venue

71. Subject matter jurisdiction over this action is conferred upon this Court by 28 U.S.C. §§ 1331 and 1332.

72. Supplemental jurisdiction over Allstate's state law claims is proper pursuant to 28 U.S.C. § 1367.

73. Whereas a substantial part of the relevant events or omissions alleged herein were carried out within the Eastern District of New York, venue is proper pursuant to 28 U.S.C. § 1391(b)(2).

74. Each of the Defendant PCs has conducted business in the State of New York during the relevant time period by (a) operating from clinics or other facilities located in New York, and (b) billing for medical services in connection with New York claimants under New York No-Fault insurance policies issued by Allstate.

75. The Defendant ASCs Accelerated and Barnert have conducted business in New York by (a) billing for facility fees in connection with New York patients covered by New York No-Fault insurance policies issued by Allstate, (b) arranging for and receiving referrals for surgical services from financially related and other providers located and/or treating such patients in New York, and (c) paying to transport such patients from New York to their facilities in New Jersey.

76. The Defendant Ridgewood has conducted business in New York by (a) billing for clinical laboratory services in connection with New York patients covered by New York No-Fault insurance policies issued by Allstate, (b) arranging for and receiving referrals for clinical laboratory services from financially related and other providers located and/or treating such patients in New York, and (c) collecting patient's testing samples in or from New York.

77. The Defendants have therefore engaged in purposeful activities in New York by conducting business in New York, and by seeking and collecting payments under New York's No-Fault laws.

78. The Defendants' activities in and contacts with New York were purposely sought and transacted to take advantage of the benefits available under New York's No-Fault laws.

I.     **The Defendants' Fraudulent Schemes are
       Enabled by Professional Licensing Violations**

79. In order to protect the public, the States of New York and New Jersey have created extensive licensing regulations for health care professionals and entities. The Defendants in this

25

case have engaged in numerous violations of these requirements in order to perpetrate and conceal their extensive fraudulent conduct and illegal financial and referral relationships. The Defendants submitted fraudulent and abusive billing to the Plaintiffs for payment under the No-Fault insurance program. Several of the Defendants have made numerous misrepresentations as to their proper license and its scope, including misrepresentations as to the ownership of the Defendant PCs and the Defendant ASCs.

80. New York and New Jersey also protect patients and the public against the practice of "self-referral" by prohibiting certain referrals between financially related providers. *See* N.Y. Pub. Health L. §§ 238-a & 238-d; N.J.S.A. § 45:9-22.5. The Defendants herein have routinely violated these self-referral provisions.

A.    Licensing Violations by the Defendant PCs and Ridgewood

81. A proper license and providing service within the scope of that license is a prerequisite to payment under the No-Fault program.

82. The State of New York regulates the practice of medicine and the practice of other professions. It restricts the practice of medicine and the ownership of medical professional corporations to licensed physicians. The State does so in order to protect consumers and the public health. Only licensed physicians, subject to the regulation and oversight of the State, are permitted to practice medicine. The only professional corporations permitted to provide physician medical services are professional corporations which are owned exclusively by physicians. The use of the title "physician" or "surgeon" by one who is not a physician is prohibited. The practice of medicine by one who is not a physician is a felony pursuant to Education Law §6512. The sale of a medical license is also a felony under Education Law

§ 6512. This statutory framework is designed to protect the public and ensure that medical services are provided by licensed physicians. The State of New Jersey has similar requirements and protections.

83. The Defendant Zaitsev is not only the owner and Managing Member of the Defendant Ridgewood; he is also the true, secret owner of the Defendant PCs Bedford, Elmwood, Molnar, Riverside, Tremont, and Tristate, as well as related non-party Crosstown (the "Zaitsev PCs"). Each of the Zaitsev PCs has been nominally owned at relevant times by a licensed doctor other than Zaitsev, including the Defendants Sangavaram and Weissman.

84. On paper, the Zaitsev PCs Bedford, Elmwood, Molnar, Riverside, Tremont and Tristate have been owned by the Defendant Sangavaram, with at least two – Riverside and Tristate – having had the Defendant Weissman as their prior owner on paper before Sangavaram permitted his name to be used to continue the sham ownership. This ownership has been fraudulent.

85. The Zaitsev PCs have been owned on paper by medical doctors who were not their true owners. This sham ownership has assisted Zaitsev and other Defendants in concealing referrals made by the Zaitsev PCs to financially related entities, including potentially lucrative referrals for ASC and clinical laboratory services to the Defendants Accelerated, Barnert, and Ridgewood, each of which has also been owned by Zaitsev.

86. In litigation with GEICO, the Defendant Weissman provided an affirmation in which he made numerous admissions concerning the improper ownership and control of Riverside and Tristate, as well as their improper referrals to Ridgewood as well as ASCs in New Jersey, all of which have been under common control with and financially related to Tristate and Riverside. *See GEICO v. Zaitsev*, No. 20-CV-3459, ECF No. 90-3 (E.D.N.Y. Feb. 10, 2021) (the

27

"Weissman Affirmation"). Weissman indicated in his Affirmation that he had worked for a prior entity, owned initially by another doctor and then by the Defendant Zaitsev. Zaitsev told him that it was problematic to own these pain medicine PCs and the Defendant Ridgewood. Zaitsev told Weissman that this provided an opportunity for him. Weissman responded that he has concerns about owning entities in which Zaitsev would have an interest, which would then make referrals to Ridgewood where Zaitsev was an owner.

87. To solve this problem, Zaitsev proposed, through his accountant, that two new professional corporations would be incorporated in Weissman's name: Tristate in New Jersey and Riverside in New York. Tristate and Riverside would take over all of the operations of Zaitsev's prior practices, including all leases at the clinic locations in New York and New Jersey, and would retain all of their physicians, physician assistants, nurse practitioners, and office staff.

88. Weissman stated that he did not pay any money to become the nominal owner of Tristate and Riverside. According to the Weissman Affirmation:

> [Tristate] was incorporated in New Jersey on April 13, 2018 and Riverside was incorporated in New York on August 9, 2018. Based on documents I have reviewed, during the time when I was listed as the owner of the professional entities, [Tristate] never filed for authority to practice in New York as a medical professional corporation and Riverside was never incorporated in New Jersey as a medical professional corporation, despite the fact that both [Tristate] and Riverside treated patients in both states and submitted bills to insurance companies for services performed in both states.

89. There was a funding agreement with an entity called Financial Vision, whereby Financial Vision was supposed to provide some kind of funding to Tristate and Riverside. According to Weissman, he was never given a copy of the agreement. He said it was his expectation that Financial Vision would provide funding for the initial expenses, and he came to learn that the arrangement continued beyond that period and provided Zaitsev and others with financial control over the professional entities.

90. According to Weissman, after Tristate was formed, Zaitsev's accountant Mr. Kaminar took him to a branch of JPMorgan Chase Bank, N.A. in Wayne, New Jersey in order to open an account for Tristate.  Weissman stated that:

> At Mr. Kaminar's direction, I made him an authorized user on the account with signatory authority and gave him my passcode so that he could have computerized access to the account.  Although I received monthly statements from the bank, I never signed a check, initiated a wire transfer, or deposited any monies into the [Tristate] account.

91. As further stated in the Weissman Affirmation, after Riverside was formed, they followed the same procedure:

> Mr. Kaminar and I once again went to Chase Bank in Wayne, New Jersey to meet with the same bank officer in order to open an account for Riverside. Again, at Mr. Kaminar's direction, I made him an authorized user on the account with signatory authority and gave him my passcode so that he could have computerized access to the account. Although I received monthly statements from the bank, [ never signed a check, initiated a wire transfer, or deposited any monies into the Riverside account.

92. According to Weissman, he was directed by Zaitsev's accountant to open a credit card for each of the two PCs as well:

> Mr. Kaminar also had me open a Chase Visa card for both [Tristate] and Riverside.  The credit cards were opened in my name with Mr. Kaminar added as an "account manager" . . . . I did not actively use either card nor did I have responsibility for paying the monthly balances.

93. Weissman also indicated that once Tristate and Riverside were operational, his duties remained essentially the same as they had been at the prior entity they replaced, as did his compensation:

> Although I was listed as the owner of [Tristate] and Riverside, in practice I continued to work for Dr. Zaitsev because he and Mr. Kaminar controlled all of the financial and operational decision-making with respect to [Tristate] and Riverside. For example, I did not hire, fire, or set the salary of any of the professional or non-professional staff at [Tristate] and Riverside, most of whom had been my coworkers at Interstate and Metropolitan. Although I received monthly statements from Chase bank, those statements only reflected money

deposited into the accounts by Financial Vision and the payment of salaries and other operational expenses.

94. Weissman admitted that:

> I had no knowledge as to the actual finances of [Tristate] and Riverside. For example, I was not aware of (i) where the money came from to fund the ongoing operations of the professional entities and if the source of the funds was limited to Financial Vision or involved other sources, (ii) the amount of monthly billings and collections of the professional entities, or (iii) the expenses associated with the ongoing operations of the professional entities.
>
> In addition, I never saw the general ledgers (including account receivable or account payable ledgers) or any of the other books and records for either company and do not believe that I signed any federal or state tax returns for either of the professional entities.  Initially, I also had no knowledge as to the amount of money [Tristate] and Riverside were obligated to pay pursuant to their lease agreements, or whether the amounts were fair market value.  I asked Mr. Kaminar and Dr. Zaitsev repeatedly for the books and records of the two companies but was never given access to them.

95. Weissman illustrated his lack of control and knowledge of Tristate by stating:

> The first time I was even aware of the amount of rent or the lease locations from which Tristate and Riverside were operating was in preparation for an examination under oath of [Tristate].  I was scheduled to testify in that proceeding (represented by Abrams Fensterman) and Mr. Kaminar provided me a "cheat sheet" that listed [Tristate]'s leases in the New York metropolitan area, including the location, amount of rent, and name of landlord.
>
> According to that list, among other rents, [Tristate] paid at least $16,600.00 per month in rent at four addresses to a person named Lyubov Gatilova.  Only recently have I learned that Lyubov Gatilova is Dr. Zaitsev's mother-in-law.

96. According to Weissman, the only difference between the prior entities he had worked for, Interstate and Metropolitan, and Tristate and Riverside "was the use of Financial Vision as a funding company and the removal of Dr. Zaitsev from the paperwork relating to the ownership and operation of the companies."  Weissman elaborated that:

> For all intents and purposes, Dr. Zaitsev controlled all material aspects of [Tristate] and Riverside in the same manner as he had owned and controlled Interstate and Metropolitan.  The way in which the operation of Tristate and

Riverside were structured by Dr. Zaitsev and Mr. Kaminar allowed Dr. Zaitsev to do this because: (i) he controlled all of the billing and receivables, (ii) he controlled the leases and their terms, (iii) he selected all of the professionals relating to the professional entities, and (iv) he controlled how much money was to be placed into the professional entities' bank accounts and the expenses to be paid out of the accounts.

97. Weissman stated that he realized that Zaitsev needed to control Riverside and Tristate in order to illegally provide a stream of referrals to Ridgewood:

The reason for Dr. Zaitsev's need to control the operations of the professional entities became more obvious shortly after we began practicing under the Tristate and Riverside names. Though I had made clear to Dr. Zaitsev my objection to referrals for laboratory services going from [Tristate] and Riverside to Ridgewood and was assured by him that it would not happen, I later realized that the referrals began a month or so after the companies began to operate.

I also learned that, by the time that [Tristate] and Riverside were operating for several months, approximately 85%-90% of [Tristate] and Riverside's lab referrals were being sent to Ridgewood as a result of Dr. Zaitsev's direction to the physician assistants and nurse practitioners at [Tristate] and Riverside.

98. According to Weissman, the referrals being made from Tristate and Riverside to Ridgewood for drug testing were pursuant to a protocol directed by Dr. Zaitsev, unrelated to the medical necessity of the drug testing.  Weissman reviewed a representative sample of tests that were submitted by Ridgewood to GEICO and stated that:

Although my name was identified as the prescribing/referring physician on the claims, I did not sign any of the requests for tests and therefore they were submitted without either my knowledge or consent.  This confirmed my view about the unjustified nature of the referral protocols directed by Dr. Zaitsev.  Any referral that lacks my personal signature is similarly unjustified. When I felt certain tests were appropriate for my patients, I always signed the request for tests to be performed.

Moreover, although Riverside and [Tristate] submitted a referral to Ridgewood for a drug test prior to a procedure performed under anesthesia, my review of the reports indicates that the samples were often not tested and the results were not communicated until several days after the procedures were performed.  For those claims I did not sign, I cannot justify the reason for such testing.

31

99. In a clear case of self-referral, according to Weissman's Affirmation:

> Dr. Zaitsev dictated the ambulatory surgical centers where [Tristate] and Riverside would perform the vast majority of pain management procedures in order to ensure they were done at Accelerated Surgical Center and Barnert Surgical Center, in which he had ownership interests.

100. Weissman also admitted that Tristate and Riverside improperly billed for the services of independent contractors:

> During my time at [Tristate] and Riverside, in addition to consultations and pain management procedures, other services such as electrodiagnostic testing and physical performance tests were billed to insurance companies through the professional entities.  These services, however, were not performed by the employees of [Tristate] and Riverside.  Rather, outside companies were brought in to perform the services and they were paid, I believe, on a per diem basis by Mr. Kaminar.  I had no involvement in setting up any arrangements with the outside companies or in paying those outside companies.

101. Weissman expressed considerable concerns about the improper operation of Tristate and Riverside:

> After several months of [Tristate] and Riverside being operational, I was not comfortable with the way things were progressing. Among other things, I was concerned about: (i) Financial Vision and Abrams Fensterman still collecting all of [Tristate] and Riverside' s receivables when I had been told that would only be the case for a few months; (ii) the unwillingness of Mr. Kaminar or Dr. Zaitsev to give me access to the books and records of the companies; (iii) the volume of referrals flowing from [Tristate] and Riverside to Ridgewood despite the fact that I had been told that those referrals would not be made; and (iv) being required to sign patient charts without seeing the corresponding bills to insurance companies.

102. After seeking to obtain records for Tristate and Riverside in early 2019, Weissman stated that:

> Based on my conversations with my counsel, I told Dr. Zaitsev that I was no longer interested in being listed as the owner of [Tristate] and Riverside and that he needed to find someone else to take over ownership of the professional entities.  Dr. Zaitsev told me that he would look for someone else to take over my role, and about a month thereafter, Mr. Kaminar identified a "purchaser" by the name of Kristappa Sangavaram, M.D., a physician whom I did not know . . . .

32

In connection with the transfer of ownership, there was no due diligence performed and I received no money from anyone.  In fact, shortly after the transfer, Mr. Kaminar stopped making payments on [Tristate] and Riverside's Chase Visa credit cards, despite there being large balances on both cards, and he did not pay me my compensation for the last 3 weeks that I worked.

103.  Weissman indicated that the credit cards also were used improperly:

Because the credit card company demanded payment from me for the balance on the cards, I went back and reviewed the statements.  What 1 found was troubling.  Between November 29, 2018 and June 17, 2019, the [Tristate] Visa card had been charged for fifty $500.00 payments totaling $25,000.00 to the same unidentified Google Pay account.  What is more, over $16,000.00 of those charges were made in the month and a half between when I left the practice and when the account was closed."

104.  Weissman also did not sign or file tax returns for Tristate or Riverside.  He stated that he had "no knowledge as to whether [Tristate] or Riverside has ever filed a state or federal income tax return," and that he "never signed one."

105.  The Defendant Riverside has listed its address with the State of New York as 30 Somerset Place, Syosset, New York 11791, the residential address of the Defendant Alladin (where he is located per licensing records obtained from the New York State Education Department), and of his mother Khullat Alladin, who has been a registered "Partner" in the Defendant ASC Accelerated for most of its existence.

106.  The Defendants Riverside and Tristate were formerly owned by the Defendant Weissman, who is or was an owner of Barnert.  Some of the referrals to the Defendant ASCs by Riverside and Tristate reflect that the treating provider was the Defendant Gorman, who is or was also an owner of Accelerated.

107.  The Defendant Tristate was initially incorporated on April 13, 2018 in the Defendant Weissman's name with the address, 351 Terhune Avenue, Passaic, New Jersey 07055.  Less than a year later, Tristate's corporate registration was revised by Certificate of

Amendment dated April 10, 2019, to reflect Sangavaram's replacement of Weissman as Tristate's sole officer or director. The address was also changed 126 State Street, Hackensack, NJ 07601 ("126 State Street"), which is Ridgewood's address.

108. As detailed herein, Tristate's 2019 Certificate of Amendment was filed with the New Jersey Department of State at the direction of Zaitsev, who is Ridgewood's owner. It was also Zaitsev who directed the incorporation of Tristate as well as Riverside in Weissman's name, as replacements for his former PCs Interstate and MIMS. At all times since their incorporation, Zaitsev has been the secret owner of both Riverside and Tristate.

109. In some cases, Tristate has submitted bills to Allstate for services provided at the same Ridgewood address, 126 State Street in Hackensack, which is listed as Tristate's address on the 2019 Certificate of Amendment. For example, Tristate mailed to Allstate a bill totaling $11,100.00 for EDX nerve testing, including nerve conduction velocity (NCV) testing and electromyography (EMG), provided to patient J.T. identified by claim number 0617501028-02 on August 5, 2011 at 126 State Street, and the bill was mailed on or about its date of August 30, 2021.

110. Tristate has also submitted bills to Allstate using the Ridgewood address at 126 State Street as its billing address. For example, Tristate mailed a bill totaling $3,000.00 to Allstate on or about October 17, 2019, for anesthesia services provided to patient E.M. identified by claim number 0535572044-01 on September 11, 2019, with the bill listing Tristate's billing address as 126 State Street in Hackensack.

111. Notwithstanding Zaitsev's true ownership and control of Riverside and Tristate, all of the bills from both of these Defendant PCs are signed in the name of either Weissman or Sangavaram, corresponding temporally with the change of the PCs' nominal ownership on or

34

about April 10, 2019.  In this way, each and every bill submitted to Allstate by Riverside and Tristate contains the material misrepresentation that the two PCs were owned by Weissman and then Sangavaram, thus concealing Zaitsev's secret ownership of both at all relevant times.  For example:

a.  Tristate mailed to Allstate a bill totaling $200.68 for an initial office examination provided to patient L.A. identified by claim number 0509554498-01 on July 16, 2018, and the bill was mailed on or about its date of August 14, 2018. Weissman's name is typed into the box labeled "Provider's Signature."

b.  Tristate mailed to Allstate a bill totaling $518.82 for anesthesia services provided to patient V.M. identified by claim number 0511898206-01 on September 5, 2018, and the bill was mailed on or about its date of September 5, 2018. Weissman's name is typed into the box labeled "Provider's Signature."

c.  Tristate mailed to Allstate a bill totaling $204.41 for outcome assessment testing (OAT) provided to patient C.C. identified by claim number 0512738790-02 on September 18, 2018, and the bill was mailed on or about its date of October 3, 2018.  Weissman's name is typed into the box labeled "Provider's Signature."

d.  Riverside mailed to Allstate a bill totaling $735.23 for facet injections provided to patient C.J. identified by claim number 0527736052-01 on February 6, 2019, and the bill was mailed on or about its date of February 21, 2019.  Weissman's name is typed into the box labeled "Provider's Signature."

e.  Riverside mailed to Allstate a bill totaling $200.68 for an initial office examination provided to patient A.A. identified by claim number 0529415648-03 on April 9, 2019, and the bill was mailed on or about its date of April 25, 2019. Weissman's name is typed into the box labeled "Provider's Signature."

f.  Riverside mailed to Allstate a bill totaling $1,067.28 for trigger point and epidural steroid injections provided to patient N.S. identified by claim number 0542952940-01 on July 16, 2019, and the bill was mailed on or about its date of July 29, 2019.  Sangavaram's name is typed into the box labeled "Provider's Signature."

g.  Tristate mailed to Allstate a bill totaling $10,000.00 for injections with fluoroscopy provided to patient E.M. identified by claim number 0535572044-01 on September 11, 2019, and the bill was mailed on or about its date of October 17, 2019.  Sangavaram's name is typed into the box labeled "Provider's Signature."

h.  Riverside mailed to Allstate a bill totaling $826.79 for trigger point injections, ESI, and epidurography provided to patient N.V. identified by claim number

0547039651-02 on November 27, 2019, and the bill was mailed on or about its date of December 24, 2019. Sangavaram's name is typed into the box labeled "Provider's Signature."

i. Tristate mailed to Allstate a bill totaling $1,500.00 for injections with fluoroscopy provided to patient P.F. identified by claim number 0552789349-02 on November 27, 2019, and the bill was mailed on or about its date of December 16, 2019. Sangavaram's name is typed into the box labeled "Provider's Signature."

112. Tristate mailed to Allstate a bill totaling $250.00 for a new patient consultation and examination provided to patient M.J. identified by claim number 0614565323-02 on June 8, 2021, and the bill was mailed to Allstate on or about its date of July 2, 2021. Sangavaram's name is typed into the box labeled "Provider's Signature." The Defendants Weissman and Sangavaram knowingly enabled and participated in the fraudulent ownership of the Defendant PCs that they held out to the State as being under their ownership. Their willingness to be fraudulent fronts for the Defendant Zaitsev helped to provide a stream of unnecessary referrals and to conceal illegal referrals.

113. Under New York law, a foreign PC may not conduct business within this State without first applying for and obtaining authority from the New York Department of State. *See* B.C.L. §§ 1528, 1530. Among the other required components of such an application, of particular relevance here, a foreign PC applicant must include a statement that it has not conducted any business in the State of New York since the date of its incorporation (*i.e.*, prior to registration as a foreign PC). *See* B.C.L. § 1530(a)(8).

114. At least three of the Defendant PCs incorporated in New Jersey – Elmwood, Molnar, and Tristate – have violated both of these requirements by operating in New York prior to their authorization as foreign PCs, and for failing to disclose on their applications for such authorization that they had not illegally operated in this manner.

115.  The Defendant Tristate was incorporated in New Jersey on April 13, 2018, but it was not authorized to do business in New York until March 10, 2020.  Nonetheless, during the intervening period, Tristate did in fact bill Allstate for services purportedly provided in New York, to patients who were residents of New York.  In fact, most of Tristate's New York billing – including every single bill for at least 780 of its patients – has arisen from dates of service prior to March 10, 2020.  Elmwood was incorporated in New Jersey on October 1, 2018, and Molnar was incorporated in New Jersey on March 5, 2019.  Both Elmwood and Molnar were then authorized to do business in New York as of March 10, 2020, registering as foreign PCs on precisely the same date as each other, and as Tristate.

116.  In February of last year, GEICO sued the Defendants Sangavaram, Elmwood, and Molnar in a federal RICO and declaratory action, alleging that Sangavaram's paper ownership of Elmwood and Molnar has been a ruse to facilitate improper referrals and billing for unnecessary medical treatment by these PCs and a network of related providers, with individual John Doe defendants controlling and managing Elmwood and Molnar pursuant to pre-determined fraudulent protocols.  *See GEICO v. Elmwood Park Med. Grp.*, No. 21-CV-0617, ECF No. 1 (E.D.N.Y. Feb. 2, 2021).  Among other grounds for recovery, GEICO alleged that both Elmwood and Molnar submitted New York No-Fault claims during time periods when they were not registered as foreign corporations in New York, and in the case of Molnar, before its date of incorporation in New Jersey.  The same is true here, for the subject claims submitted to Allstate by Elmwood and Molnar.

117.  As was the case for claims submitted to GEICO in *Elmwood Park*, every single bill submitted to Allstate by Elmwood and Molnar on New York claims refers to dates of service long before the two PCs' New York registration on March 10, 2020.  Elmwood billed at least

$171,095.03 for medical services purportedly provided to 133 patients between November 2, 2018 and February 18, 2019; while Molnar billed at least $89,506.12 for medical services purportedly provided to 80 patients between February 22, 2018 and November 1, 2019. Moreover, and again like in *Elmwood Park*, a significant portion of the billing from Molnar came before it had even been incorporated in its home state of New Jersey.

118.  For example, Elmwood mailed to Allstate a bill totaling $218.00 for MMT provided to patient M.A. identified by claim number 0523269801 on December 26, 2018, and the bill was mailed on or about its date of February 8, 2019.  The billed-for services were provided in Brooklyn, and patient M.A. is a New York resident.  However, Elmwood was not authorized to do business in New York until March 10, 2020.

119.  Elmwood mailed to Allstate a bill totaling $305.20 for MMT provided to patient G.R. identified by claim number 0515278141-01 on January 4, 2019, and the bill was mailed on or about its date of February 8, 2019.  The billed-for services were provided in the Bronx, and patient G.R. is a New York resident.  However, Elmwood was not authorized to do business in New York until March 10, 2020.

120.  Molnar mailed to Allstate a bill totaling $475.00 for ALM provided to patient J.D. identified by claim number 0525088548-01 on January 7, 2019, and the bill was mailed on or about its date of February 8, 2019.  The billed-for services were provided in Woodhaven, and patient J.D. is a New York resident.  However, Molnar was not authorized to do business in New York until March 10, 2020.

121. Molnar mailed to Allstate a bill totaling $457.10 for ROM testing provided to patient T.L. identified by claim number 0528267271-02 on February 28, 2019, and the bill was mailed on or about its date of April 8, 2019.  The billed-for services were provided in Valley

Stream, and patient T.L. is a New York resident.  However, Molnar was not authorized to do business in New York until March 10, 2020.

122.  In *Elmwood Park*, GEICO further alleged that Sangavaram's nominal ownership of Elmwood and Molnar from their inception has been a sham, designed to facilitate improper referrals and billing for unnecessary medical treatment by these PCs and a network of related providers, and that they submitted unnecessary billing pursuant to pre-determined fraudulent protocols.

123.  Setting forth details that Sangavaram was a completely sham owner, GEICO alleged that Sangavaram in fact had not:  examined, tested, or treated any of Elmwood's and Molnar's patients; provided any of their start-up or other capital; determined their daily schedules; directed which services they would provide; control or maintain their books and records; review or monitor their bank accounts; or been aware of their billing, collections, income, and expenses.  Additionally, GEICO cited Sangavaram's extensive disciplinary history (in connection with which he has since been expelled from the practice of medicine in New Jersey and New York), submitting that his stained professional reputation has rendered him unable to find employment as a legitimate physician, thus supplying him with a motive to participate.

124.  Sangavaram, Elmwood, and Molnar defaulted in the action, leading GEICO to seek judgment on its causes of action for fraud, unjust enrichment, and declaratory judgment.  On February 22, 2022, United States Magistrate Judge Ramon E. Reyes, Jr. issued a Report and Recommendation, by which he recommended that judgment be granted.  *See GEICO v. Elmwood Park Med. Grp., P.C.*, No. 21-CV-617 (FB) (RER), 2022 U.S. Dist. LEXIS 32961, at *37-38

(E.D.N.Y. Feb. 23, 2022) (Reyes, M.J.). The Report & Recommendation sets out in detail Sangavaram's phony ownership and the fraudulent billing submitted by Elmwood and Molnar.

125. In the Report & Recommendation, Judge Reyes noted the extensive details set forth by GEICO, including the following:

> Dr. Sangavaram has a history of uncontested allegations of professional misconduct in New York and New Jersey, including allegations of fraud, which have resulted in periodic suspensions of his license to practice medicine in both states. This checkered history "has made it virtually impossible for Sangavaram to find employment as a legitimate physician, and contributed to his motive to participate in the fraudulent scheme" described below.

> According to GEICO, the scheme began in October 2018, when the John Doe Defendants recruited and paid Dr. Sangavaram to incorporate and act as the sham owner of a New Jersey professional corporation—Elmwood Park—which they could jointly use to defraud insurers like GEICO through New York's No-Fault insurance regime as further outlined below. In order to feign compliance with New Jersey's requirements for establishing a medical practice, Dr. Sangavaram "agreed to falsely represent that he was the true shareholder, director and officer of Elmwood Park and that he truly owned, controlled, and practiced through the professional corporation" in exchange for compensation from Elmwood Park's true owners and operators, the unlicensed John Doe Defendants. Beginning in February 2019, to conceal their ongoing fraud at Elmwood Park and to evade detection by insurers, the defendants began transferring patients to a second entity—Molnar Medical—which followed the same playbook and incorporated using Dr. Sangavaram's credentials in March 2019.

> \*     \*     \*

> Dr. Sangavaram acted "at best, [as] a glorified employee"—he saw no patients, rendered no medical services, took no steps to bring in new patients, exercised no medical judgment, and played no role in overseeing either the practice of medicine or the financial affairs or management of the businesses he purportedly owned.

> After fraudulently incorporating Elmwood Park and Molnar Medical in contravention of New Jersey law, the defendants acted through the two companies to submit "thousands of fraudulent charges relating to . . . bogus range of motion and muscle strength tests."

> \*     \*     \*

> To accomplish their scheme, and despite lacking authorization to operate medical practices in New York State, the defendants purportedly provided

medical services to patients at forty-six "revolving door" clinics located across the New York Metropolitan area.  According to GEICO, the defendants purportedly rendered medical treatment to insured patients at these clinics, and paid the clinics for legitimate overhead expenses such as space or personnel, or to perform legitimate administrative services like marketing and billing; in reality, defendants were engaged in "'pay-to-play' arrangements," making kickback payments to the clinics based on the volume of insured patients referred to Elmwood Park and Molnar Medical to receive medically unnecessary services.  GEICO alleges that the defendants knew these arrangements were illegal, took affirmative steps to conceal their existence, and relied upon them to provide a steady stream of insured patients "to execute the fraudulent treatment and billing protocol."

126. The Report & Recommendation in *GEICO v. Elmwood Park* also noted the illegality of the charges under New Jersey law, stating that:

New Jersey law entirely prohibits medical professionals from billing for "computer supported range of motion tests" like those at issue here because such tests "are not recognized in the scientific community as being capable of yielding data of sufficient clinical value in the development, evaluation, or implementation of a plan of treatment."  N.J. Admin. Code § 13:35-2.6(c)(1)(ix); *see also id.* at § 13.35-2.6(q)(5)(i) ("Bills for diagnostic or screening tests submitted for payment . . . shall reflect . . . no charge for any test: designated pursuant to (c) above to be without apparent clinical value and thus lacking validity.").

127. Judge Reyes then ruled that GEICO had established its common law fraud claims and its right to a declaratory judgment that no payments were owed to either Molnar or Elmwood:

GEICO has described in detail the Defaulting Defendants' participation in a scheme to submit charges for reimbursements which they were not eligible to receive.  Specifically, GEICO alleges that the Defaulting Defendants caused the submission of NF-3 and HCFA-1500 forms, which falsely certified that they were properly authorized to render services in New York and were eligible to bill under New York's No-Fault statute, and misrepresented that the services they charged for were performed by employees, when in fact the services, to the extent performed at all, were performed by independent contractors.  Further, the Complaint alleges that the Defaulting Defendants omitted from these bills related material facts regarding the circumstances that rendered them ineligible to receive no-fault benefits.

128.  In determining that GEICO had satisfied all of the elements of common law fraud, Judge Reyes held, *inter alia*: that the unchallenged allegations of Sangavaram's motives based

41

on his disciplinary history supplied the requisite intent to defraud; that the external individuals controlling Elmwood and Molnar had the motive and opportunity to receive substantial No-Fault payments to which they were not entitled; and that GEICO had demonstrated the submission of claims by Elmwood and Molnar which misrepresented the services they provided (including services actually performed by independent contractors) and/or their eligibility as licensed medical providers.

129. Judge Reyes recommended that "GEICO be awarded damages of $842,422.90 jointly and severally against Dr. Sangavaram and Elmwood Park; and that GEICO be awarded damages of $179,373.37 jointly and severally against Dr. Sangavaram and Molnar Medical," and "that the Court enter a declaratory judgment providing that Plaintiffs are not obligated to pay the outstanding fraudulent claims submitted by [these] Defendants."

130. By Memorandum and Order dated March 14, 2022, Senior United States District Judge Frederic Block adopted the Report & Recommendation of Judge Reyes in its entirety. *See GEICO v. Elmwood Park Med. Grp., P.C.*, No. 21-CV-00617-FB-RER, 2022 U.S. Dist. LEXIS 44716, at *3 (E.D.N.Y. Mar. 14, 2022) (Block, S.D.J.). On April 8, 2022, the Court entered a judgment in GEICO's favor against Sangavaram, Elmwood, and Molnar, granting to GEICO the damages and declaratory relief in accordance with the Report & Recommendation, along with awards of pre-judgment interest. The case was subsequently closed on July 22, 2022, and no appeal or relief from the judgment has been sought by Sangavaram, Elmwood, or Molnar.

131. The Defendant Sangavaram has been disciplined by the New Jersey State Board of Medical Examiners for his professional malfeasance. In connection with a 2007 Consent Order, and following a criminal complaint from the Attorney General, Sangavaram's license was suspended for "charging excessive fees for anesthesia and for wrongful discharge of a pain

management patient." The 2007 Consent Order also recited that Sangavaram had owned and

served as the medical director for an unlicensed ASC named Wyckoff Surgical Center, LLC, and

that he had been the medical director for two more ASCs: Saddle Brook Surgical Center and

Advanced Center for Pain Management. During the period of probation and supervision by the

Board, and as reflected in the 2014 Consent Order finally removing the suspension (though

ordering further supervision), it was determined that Sangavaram had persisted through at least

2011 in committing notable professional violations:

> Deficiencies noted included, but were not limited to, Sangavaram's
> continuing to order an excessive number of office visits and an excessive number
> of procedures; his giving multiple injections on the same office visit; the absence
> of documentation regarding prescription renewal, medication contract, or pain
> scale; and his illegible consent forms.  The Board-appointed physician consultants
> concluded that the patients treated before and after April 19, 2007 were treated in
> the same manner, with the same multiple treatment concerns.

132.  More recently, Sangavaram's medical license has been revoked altogether by the

New Jersey State Board of Examiners, for his failure to abide by the monitoring and supervision

conditions of the 2014 Consent Order. (Aug. 26, 2021 Consent Order).  The Attorney General of

New Jersey had investigated Sangavaram's compliance with the 2014 Consent Order and found

that he had concealed from his Board-appointed "lifetime practice monitor" the fact that he had

been rendering pain intervention services for the Defendant Tristate, notwithstanding that he had

treated "over 330 patients" of Tristate "between June 30, 2020 and March 2, 2021," in New York

as well as New Jersey.  Under the terms of the 2021 Consent Order, the Board ordered, *inter

alia*, that Sangavaram's medical license and registration to prescribe controlled dangerous

substances (CDS) be revoked, and that he may not reapply for licensure in the State of New

Jersey for a period of forty-five (45) months, during which time he must not practice medicine in

any State. *Id*. at pp. 4-5.

133.  Based on the latest disciplinary Consent Order from the New Jersey State Board of Examiners, Sangavaram also surrendered his license to practice medicine in the State of New York as of November 22, 2021.

134.  The Defendant Ridgewood, a New Jersey LLC also owned by Zaitsev, has similarly violated the New York Limited Liability Company Law by conducting business in this State without first registering as a foreign LLC.  *See* N.Y. L.L.C. L. § 802 ("*Before doing business in this state*, a foreign limited liability company shall apply for authority to do business in this state....") (emphasis added).

135.  Ridgewood was formed in New Jersey on July 22, 2014, but it did not apply for and obtain registration as a foreign LLC in New York until December 26, 2019, prior to which date it was not authorized to conduct business within this State.  Nonetheless, during the intervening period of more than five (5) years, Ridgewood did in fact bill Allstate for services purportedly provided to patients who were residents of New York, including drug testing of patient samples collected at locations within New York.

136.  Beginning with dates of service at least as early as March 29, 2016 – and prior to its belated registration as a foreign LLC in New York on December 26, 2019 – Ridgewood routinely billed Allstate for drug testing and other clinical laboratory services purportedly provided to New York patients covered by New York No-Fault policies.  During this period of nearly four (4) years, Ridgewood billed Allstate at least $1,825,067.89 for clinical laboratory services purportedly provided to at least 630 New York patients covered by New York No-Fault policies, despite its lack of legal authorization to conduct business in this State during that time period.

137. During much of the same period, Ridgewood also billed Allstate for services purportedly provided to New York patients, including the testing of patient samples collected in New York, without obtaining the requisite Clinical Laboratory Permit from the NYDOH.  *See* N.Y. P.H.L. § 574 ("No person shall own or operate a clinical laboratory located in or accepting specimens from New York state or own or operate a blood bank which collects, processes, stores and/or distributes, human blood, blood derivatives or blood components, in New York state unless a valid permit has been issued."); *see also* P.H.L. § 574 (authorizing NYDOH enforcement actions for violations); P.H.L. § 578 ("A person who owns or operates a clinical laboratory . . . , and who does not hold a valid permit issued pursuant to the provisions of this title . . . is guilty of a misdemeanor.").  Ridgewood, whose Managing Member is Zaitsev, billed Allstate at least $239,628.94 on such claims during the more than two-and-a-half year period prior to October 11, 2018, when Ridgewood finally obtained its clinical laboratory license.

138. The Defendants Alladin and Rahat have also held Rahat out to the public as a "Director" of the Defendant Alladin PC.  Rahat is not a medical doctor and cannot own, control, or be a director of the Defendant Alladin PC.

B.     Licensing Violations by the Defendant ASCs

139.  The Defendant ASCs Accelerated and Barnert have submitted bills to Allstate for facility fees despite their ineligibility to operate as ASCs under the laws and regulations of the State of New Jersey, including for their malfeasance and/or nonfeasance in complying with applicable ASC reporting and disclosure requirements.

140. Completeness and candor in the disclosures made by ASCs to the competent regulators at the NJDOH is a prerequisite for obtaining and maintaining a valid license to operate

an ASC in New Jersey.  *See, e.g.,* N.J.S.A. § 26:2H-12; N.J.A.C. § 8:43A-3.3; N.J.A.C. § 8:43E-3.1.  In order to keep their licenses, Accelerated and Barnert have falsified or concealed from the NJDOH material facts regarding their operations, ownership, and potential conflicts of interest.

141.  Accelerated and Barnert have also falsely represented to the NJDOH, insurers, and the public that they are distinct ASCs under New Jersey law, when in fact they are but two faces of the same business.  Likewise, both of the Defendant ASCs have billed for facility fees attributable to services purportedly rendered by providers beyond the scope of their professional licenses, especially manipulation under anesthesia (MUA) rendered by chiropractors for certain pelvic ring injuries.

1.      *The Defendant ASCs' Misrepresentations and Omissions to Regulators*

142.  ASCs are an exception to the general rule that health provider entities must be owned by licensed professionals.  The State of New Jersey permits ASCs in order to assist the people of New Jersey in accessing services that might not otherwise be available, similar to the rules applicable to hospitals.

143.  The Defendants Accelerated and Barnert have obtained and maintained their ASC licenses with the State of New Jersey without disclosing to the appropriate regulators at the NJDOH that their business plan consists of importing patients *en masse* from New York to New Jersey for procedures, usually if not always accompanied by the potentially life-threatening dangers of anesthesia, and in violation of the applicable New Jersey ASC fee schedule.

144.  By design, a huge number of the Defendant ASCs' patients are brought in from New York, with transportation paid for by Accelerated or Barnert itself, in numerous cases upon referrals from financially related surgeons or other providers.  Had Accelerated and Barnert

disclosed this scheme to the NJDOH, or its frequent billing to New York insurers in violation of the New Jersey ASC fee schedule, the chance that the State of New Jersey would have granted such an application would have been reduced.

145.  The Defendant ASCs have similarly failed to make accurate representations to New Jersey regulators regarding their ownership, which is another prerequisite for obtaining and maintaining a valid license to operate an ASC in New Jersey.  A New Jersey ASC is licensed and monitored by the State of New Jersey and must disclose its ownership to that State.

146.  The Defendant ASCs Accelerated and Barnert are sham entities, which are not truly owned by all of their paper "owners" of record.  For much of the relevant time period, the record owners of Accelerated and Barnert have included sham owners, especially the surgeons and other providers bringing patients to the Defendant ASCs, who have paid and/or received nothing for their ownership interests as such.

147.  Accelerated and Barnert obtain patients from New York through a referral network that assigns sham ownership to referring health care providers who have performed surgical services at Accelerated and Barnert.  These ownership shares are supposedly issued in exchange for an "investment" by the referring providers, but those providers do not actually contribute any capital to the Defendant ASCs.

148. Instead, Accelerated and Barnert grant phony ownership interests to referring providers as a means to provide cover for payments which are, in actuality, kickbacks and other illegal payments for referrals of patients.  The only real "investment" these sham owners have made in the Defendant ASCs has been to supply them with a steady stream of undisclosed or otherwise illegal patient referrals from their own financially related provider entities.

149.  The Defendants Accelerated and Barnert had no need for these "investments". These "investments" are not needed as capital by Accelerated and Barnert.  There is no risk for the "investors". The ownership and investment generally last while the "investors" makes referrals to Accelerated and Barnert for procedures that do not need to be performed at an ASC in New Jersey. Pure and simple this is the payment of money by Accelerated and Barnert to the referring providers who bring their patients to Accelerated and Barnert so that Accelerated and Barnert can then bill facility fees. No such investment opportunities are offered to health care providers who do not bring their patients to Accelerated and Barnert or to members of the public. The claim that the referring provider owners are the actual owners of Accelerated and Barnert is a misrepresentation, and each entity of Accelerated and Barnert is a sham entity which is not entitled to New York No-Fault benefits.

150.  The Defendant Rahat testified that when an "owner" leaves and stops providing services at Accelerated and Barnert they give up their shares.  There is no reason for any "owner" or "investor" to give up their shares and the potential distributions.  The fact that they do so documents that their ownership is a complete sham designed to mask that they are being paid to make referrals for unnecessary services.

151.  In keeping with their appointment of sham owners, the Defendant ASCs have also been far from diligent in keeping their record ownership updated within the NJDOH registry, in several cases neglecting to notify NJDOH of changes in ownership for months or even years after the relevant share transaction purportedly occurred.

152.  On or about December 20, 2017, the Defendant ASC Barnert submitted materials to the NJDOH to add eight (8) owners of record, including the Defendants Zaitsev and Weissman. However, by letter dated February 6, 2018, the NJDOH responded that according to the materials

submitted by Barnert, all eight (8) of those owners had already long since purportedly acquired their ownership interests, noting that "[s]ince December 1, 2012, there have been numerous changes in ownership for Barnert Surgical Center, LLC, **without Department notification**" (emphasis in original).

153.  The NJDOH pointed out in its February 6, 2018 letter that, *inter alia*, Zaitsev had purportedly acquired a 9.99% ownership share in Barnert <u>more than five (5) years prior</u>, on December 1, 2012, without registering that interest with the State of New Jersey.  Significantly, Barnert was able to avoid the requirement of a new ASC license because neither Zaitsev nor any other new owners held an ownership share of 10.0% of more.

154.  Likewise, the NJDOH noted that Barnert's materials showed that Weissman had acquired a 2.0% ownership <u>nearly four years earlier</u>, on April 1, 2014, also without registering that interest with the State of New Jersey.  Curiously, the same letter also recites Barnert's representation that Weissman acquired another undisclosed 1.0% ownership share one year later, on April 1, 2015, yet that additional interest is omitted from Barnert's subsequent licenses and certificates, which continued to reflect that Weissman held only 2.0%, until that interest was divested.

155.  The Defendant Rahat has purportedly served as the chief executive officer of no fewer than five (5) New Jersey ASCs during the relevant time period.  In addition to the Defendant ASCs Accelerated and Barnert, Rahat has also been the CEO of non-party ASCs Ambulatory Surgical Pavilion of New Jersey LLC ("Pavilion"), Princeton Surgiplex, LLC ("Princeton"), and Ambulatory Surgery Center of Pompton Lakes, LLC ("Pompton").  At the EUO of the Defendant Bailey taken on April 29, 2022, Alladin testified that he is the Medical

Director for those same three New Jersey ASCs – Pavilion, Princeton, and Pompton – in addition to Accelerated and Barnert.

156.   Under New Jersey law, ASC operators are required to disclose to the NJDOH, in connection with license applications and renewals, any ownership, management, or operational interests held by any of their principals which could give rise to self-referral issues or other conflicts of interest.   However, the Defendant ASC Barnert has consistently failed to disclose the interests of Rahat and Alladin in the Princeton ASC in its License Renewal Questionnaires, notwithstanding that Rahat is Barnert's CEO, and they are both owners of Barnert.   The omission is made all the more egregious by the fact that it is Rahat himself who has signed each and every License Renewal Questionnaire on behalf of Barnert, in each case executing a Certification of the truth of such disclosure under pain of civil penalties.

157.   Accordingly, in addition to the Defendant ASCs' rotating cast of illegal sham owners, several of Barnert's New Jersey ASC license renewals were illegally obtained, based on this material omission of disclosure in one or more of its License Renewal Questionnaires.

158.   Insofar as the Defendant ASCs have used phony record owners in furtherance of the Defendants' illegal referral scheme, as well as making other material misrepresentations and/or failing to disclose their true ownership to the NJDOH, the Defendant ASCs are ineligible for No-Fault reimbursement under applicable law and regulation.

*Accelerated and Barnert Are Not Validly Licensed as Distinct New Jersey ASCs*

159.   Additionally, Accelerated and Barnert have falsely represented to New Jersey regulators, as well as to insurers and the public, that they are two distinct ASCs, despite their thorough commonalities in terms of ownership, management, location, services, referring

surgeons or other providers, personnel, and patients.  In reality, these operationally identical Defendant ASCs are interchangeable, and they are not properly licensed as two distinct ASCs under New Jersey law.

160.  As with several of the Defendant PCs, the two Defendant ASCs Accelerated and Barnert have been used interchangeably.  The Defendant ASCs share far more in common than just their address at 680 Broadway in Paterson, New Jersey, where Accelerated occupies "Suite 203" and Barnert occupies "Suite 202."

161.  At various times of relevance to this Complaint, the Defendants Alladin, Rahat, and Zaitsev have been part owners of both of the Defendant ASCs, while the Defendant Gorman has been a part owner of Accelerated, and the Defendant Weissman has been a part owner of Barnert.

162.  Accelerated and Barnert have always been under the same ownership and control, even before they were owned by any of the Defendants in this action.  Alladin and Rahat acquired the ASCs now known as Accelerated and Barnert from the same development consortium, Community Healthcare Associates, LLC ("CHA"), at that time owned equally by the same five partners: Jeffrey Moll, E. Stephen Kirby, William Colgan, Michael Nudo, and Ariel Morales.

163.  Indeed, Accelerated and Barnert have been interchangeable from their outset.  CHA originally applied to the NJDOH for the two licenses on the very same date, July 31, 2008. During the tenure of CHA's licenses, the facilities now occupied by Accelerated and Barnert were operated by the CHA-owned entities "Barnert ASC Surgical II, LLC" and "Barnert ASC Surgical III, LLC," respectively.

164.  On or about July 9, 2010, CHA sold the license to operate the Accelerated ASC to a new slate of owners including Alladin and Rahat.  However, the single largest owner as of this date was Alladin's mother, Khullat Alladin (50%); Alladin and Rahat owned 45% and 5%, respectively.  The record ownership of Accelerated then did not change for nearly five (5) years.

165.  On or about December 27, 2011, CHA sold the license to operate the Barnert ASC to Alladin and Rahat.  Unlike Accelerated, Alladin's mother has never appeared as a record owner of Barnert.  Instead, Alladin and Rahat owned 95% and 5%, respectively.  The record ownership of Barnert then did not change for nearly six (6) years.

166.  From about February 13, 2015 until February 18, 2021, and for most of the time period relevant to this Complaint, Accelerated had 12 owners according to NJDOH records.  The record owners of Accelerated were then Alladin (47.04%), Zaitsev (9.99%), Rahat (5.00%), Rahat's management company ASC MedSolutions (4.99%), Gorman (2%), Marcello Sammarone, MD (5%), Didier Demesmin, MD (9.99%), Amit Goswami, MD (9.99%), Glenn Rosenberg, DC (2%), Clifton Burt, MD (2%), Charles Nicola, DC (2%), and Khait (1%).

167.  The shares held by Accelerated's ten new owners as of February 13, 2015, as well as Alladin's increase in ownership, came out of the 50% share formerly held by his mother, Khullat Alladin.  Nonetheless, Khullat Alladin continued to be registered as a non-owner (0.0%) "Partner" of record for Accelerated for several years thereafter, maintaining her title as an officer until at least July 31, 2019.

168.  From about November 30, 2017 until February 18, 2021, and for most of the time period relevant to this Complaint, Barnert had nine (9) owners according to NJDOH records.  The record owners of Barnert had been Alladin (69.02%), Zaitsev (9.99%), Rahat (5.00%), Weissman (2%), Amit Goswami, MD (9.99%), Alex Khait, DC (1%), Terrance Winn (1%),

Jignyasa Desai, DO (1%), and Seung Lee, MD (1%).  The shares held by Accelerated's five new owners came out of the 95% previously held by Alladin.

169.  During that time, most of Barnert's owners were also owners of Accelerated: namely Alladin, Rahat, Zaitsev, Goswami, and Khait.  Also during that time, the combined ownership of the Defendants Alladin, Rahat, Zaitsev, Gorman, and Weissman amounted to the large majority of ownership in Accelerated (69.02%) and Barnert (86.01%).  Alladin's very specific ownership percentage in Barnert (69.02%) was identical to the combined interests of Alladin, Rahat, Zaitsev, and Gorman in Accelerated.

170.  As of February 18, 2021, most of the owners of the Defendant ASCs have been divested of their shares, with Alladin acquiring virtually all of their ownership interests. Eight (8) of Accelerated's 12 owners were removed from NJDOH records, including Zaitsev and Gorman, and Alladin's ownership in Accelerated grew from 47.04% to 80.02%.  Five (5) of Barnert's nine owners were removed from NJDOH records, including Zaitsev and Weissman, and Alladin's ownership in Barnert grew from 69.02% to 91.00%.

171.  The current record owners of Accelerated are Alladin (82.02%), Rahat (5%), Rahat's management company ASC MedSolutions (4.99%), and Demesmin (9.99%).

172.  The current record owners of Barnert are Alladin (91.00%), Rahat (5.00%), Jignyasa Desai, DO (2.00%), and Terrance Winn, MD (2.00%).

173.  Alladin is also employed as the Medical Director for both Accelerated and Barnert. The Defendants Alladin PC and Bailey, both of which are also owned by Alladin, have billed Allstate for services rendered at the Defendant ASCs, including surgical procedures performed by Alladin personally.

174. Rahat is the CEO and/or Managing Director of both Accelerated and Barnert. Additionally, Rahat has served as the Administrator of both of the Defendant ASCs, testifying on their behalf for examinations under oath (EUOs) conducted by Allstate on November 16, 2018.

175. Many of the forms and templates used by the two Defendant ASCs are identical, with some containing checkboxes by which a provider may specify whether the services were provided at Accelerated or Barnert, which are located in Suites 203 and 202, respectively, at 680 Broadway in Paterson, New Jersey. A third ASC occupying a suite at 680 Broadway in Paterson, non-party New Horizon Surgical Center, LLC ("New Horizon"), is not included on this form, despite having been located at all relevant times in Suite 201 at the same Paterson address.

176. For example, Accelerated mailed to Allstate a bill totaling $5,000.00 for facility fees associated with MUA provided to patient R.B. identified by claim number 0402937361-01, as performed at Accelerated on April 25, 2016 by Khait, and the bill was mailed on or about its date of May 16, 2016. Non-party MEDICSURG also mailed to Allstate a bill for related anesthesia, as provided by Mankikar, and the bill was mailed on or about its date of May 21, 2016. The relevant Anesthesia Record for the April 25, 2016 procedure is handwritten on a template which contains at the top of the page two checkboxes: one labeled "Barnert Surgical Center, LLC," and another labeled "Accelerated Surgical Center," with an "X" handwritten in the latter checkbox.

177. In another example, the Barnert mailed to Allstate a bill totaling $161.46 for facility fees based on injections provided to patient N.S. identified by claim number 0542952940-01 at Barnert by the Defendant Gorman on October 23, 2019, and the bill was mailed on or about its date of November 3, 2019. However, the Defendant Riverside mailed two bills totaling $119.10 and $162.06 for injections and anesthesia, respectively, in each case listing the place of service

54

as the Defendant ASC Accelerated's address at Suite 203, rather than Barnert's Suite 202, and the bills were mailed on or about their dates of November 14, 2019 and November 15, respectively.

178.  By way of further example, the Defendant ASC Accelerated mailed to Allstate a bill totaling $5,409.56 for facility fees associated with injections provided to patient J.R. identified by claim number 0565593647-02 at Accelerated on January 27, 2020 by the Defendant Alladin, as owner of the Defendant Bailey, and the bill was mailed on or about its date of February 3, 2020.  Among the documents submitted by Accelerated in support of this bill was a Pre-Procedure Nursing Assessment dated January 27, 2020, whose letterhead reads "Barnert Surgical Center," even though Accelerated also provided an Operative Report of the same date on its own letterhead, which was purportedly signed by Alladin.

179.  Other providers which have billed for services provided to patients at the Defendant ASCs, including several of the Defendant PCs and their personnel, have also viewed Accelerated and Barnert as interchangeable entities.  For example, the Defendant Tristate mailed to Allstate a bill totaling $1,500.00 for injections with fluoroscopy provided to patient P.F. identified by claim number 0552789349-02 on November 27, 2019 at the Accelerated ASC, and the bill was mailed on or about its date of December 16, 2019.  Tristate also mailed to Allstate a bill totaling $3,000 for related anesthesia services, also as provided at the Accelerated ASC, and the bill was mailed on or about its date of December 16, 2019.  However, the relevant bill for ASC services came not from Accelerated but rather from Barnert, which mailed to Allstate a bill totaling $3,072.16 for facility fees relating to the November 27, 2019 procedure, and the bill was mailed on or about its date of December 7, 2019.  The relevant Procedure Report also uses the letterhead and

address of Barnert, not Accelerated, and it is purportedly signed by Sangavaram, who purportedly performed the surgery for Tristate.

180.  Alladin's and Rahat's relationships with Accelerated and Barnert are only a part of the sprawling network of ASCs in New Jersey in which they hold ownership and/or wield executive control.  In addition to their ownership and purported duties at Accelerated and Barnert, Alladin and Rahat are further connected as owners of the related non-party ASCs Ambulatory Surgical Center of Pompton Lakes, LLC ("Pompton"), Ambulatory Surgical Pavilion of New Jersey, LLC ("Pavilion"), and Princeton Surgiplex, LLC ("Princeton"), all of which are located in New Jersey.

181.  Rahat is also the CEO, Administrator, and/or Managing Director of these ASC operators.  Underscoring the interchangeability of the ASCs in the view of their owners and officers, and in how they are held out to the public, the websites of Pavilion, Princeton, and Pompton all have a "Message from the CEO" with the same photo of Rahat, and the same paragraph of text, copied verbatim.

182.  When asked under oath, the Defendant Weissman could not even accurately state which of the two Defendant ASCs he supposedly owned.  At his September 14, 2017 deposition, taken by counsel for plaintiff No-Fault insurers, Weissman testified that he was at that time a part owner of Accelerated.  *See generally Travelers Indem. Co., et al. v. Highland Med. Grp., P.C., et al.*, No. MRS-L-002987-2015 (N.J. Super. Ct. Morris).  However, official records obtained from the NJDOH indicate otherwise: in fact, Weissman has only ever been registered as a part owner of Barnert, and he has never been among the registered owners of Accelerated.

183.  The Defendant ASCs' lax adherence to New Jersey rules has extended beyond just falsifying their required regulatory disclosures.  On December 19, 2013, the NJDOH determined

by a 35-page Statement of Deficiencies that Accelerated had committed a number of violations of New Jersey law and regulation governing licensed ASCs. These violations ranged from failures of facility emergency and other safety protocols, to inadequate personnel sanitation and inoculation practices.  It was documented that Accelerated had consistently mishandled Fentanyl, Ketamine, and other controlled dangerous substances, and that it had failed to adhere to policies for the proper sterilization of surgical instruments and medical equipment.

184.  Underscoring the close and improper relationship between Accelerated and Barnert, the NJDOH found that at least one patient of the later-formed Accelerated had been transferred to an otherwise unknown provider called "Barnert Rehab" without proper documentation.  The 2013 Statement of Deficiencies also noted that the ASC operated by Accelerated was initially referred to as the "Barnert II ASC" in licensing documents.

185.  Numerous patients were subjected to the same or similar procedures as performed by one or more of the Defendant PCs and their personnel at both of the Defendant ASCs, alternating between Accelerated and Barnert interchangeably.  For example, Accelerated and Barnert have billed Allstate for ASC facility fees relating to pain management injection procedures as purportedly provided to patient N.A. identified by claim number 0551163678-02 on numerous dates, including the following:

a) Accelerated billed for facility fees for a lumbar-sacral spinal epidural steroid injection (ESI) and trigger point injection (TPI) procedure, as performed by the Defendant Sangavaram on October 9, 2019, and the bill was mailed on or about its date of October 14, 2019.  The Defendant Riverside billed for the procedure as performed by Sangavaram, as well as for the related anesthesia services, and both bills were mailed on or about their date of October 22, 2019.

b) Barnert billed for facility fees for a lumbar-sacral spinal ESI and TPI procedure, as performed by Gorman on October 23, 2019, and the bill was mailed on or about its date of October 29, 2019.  Riverside billed for the procedure as performed by Gorman, as well as for the related anesthesia services, and both bills were mailed on or about their date of November 14, 2019.

c) Accelerated billed for facility fees for a lumbar-sacral spinal ESI and TPI procedure, as performed by the Defendant Sangavaram on November 6, 2019, and the bill was mailed on or about its date of November 13, 2019.  Riverside billed for the procedure as performed by Sangavaram, as well as for the related anesthesia services, and both bills were mailed on or about their date of December 4, 2019.

186. Similarly, Accelerated and Barnert have billed Allstate for ASC facility fees on pain management injection procedures as purportedly provided to patient B.E. identified by claim number 0561361940-02 on numerous dates, including the following:

a) Barnert billed for facility fees for a lumbar spinal epidural steroid injection (ESI) and trigger point injection (TPI) procedure, as performed by the Defendant Gorman on November 27, 2019, and the bill was mailed on or about its date of December 7, 2019.  The Defendant Tremont billed for the procedure as performed by Gorman, as well as for the related anesthesia services, and both bills were mailed on or about their date of December 24, 2019.

b) Accelerated billed for facility fees for a thoracic ESI and TPI procedure, as performed by Gorman on December 11, 2019, and the bill was mailed on or about its date of December 18, 2019.  Tremont billed for the procedure as performed by Gorman, as well as for the related anesthesia services, and both bills were mailed on or about their date of December 24, 2019.

c) Barnert billed for facility fees for a lumbar spinal ESI and TPI procedure, as performed by Gorman on December 23, 2019, and the bill was mailed on or about its date of December 31, 2019.  Tremont billed for the procedure as performed by Gorman, as well as for the related anesthesia services, and both bills were mailed on or about their date of January 9, 2020.

*The Defendant ASCs' Billing for Facility Fees on Unauthorized Procedures*

187. An ASC is licensed to provide ambulatory surgery services after engaging in a rigorous screening process.  It seeks to provide services that do not need to be provided in a hospital and should not be provided in an OBSP.

188. The Defendant ASCs Accelerated and Barnert have billed Allstate for facility fees under CPT 27194 – the fee schedule code for closed treatment of a pelvic ring fracture, dislocation, diastasis, or subluxation – in connection with MUA performed by chiropractors at

their facilities.  As noted elsewhere herein, few if any of those patients actually appeared to have any such pelvic ring injury, and on that basis alone, the billing is fictitious.

189.  However, even if any of those patients did actually have such pelvic ring injuries, the billed-for treatment was outside the scope of the license of the referring chiropractors. Treatment of such an injury in this setting would not be properly performed by a chiropractor, and it is absurd for chiropractors to seek to manipulate such fractures under anesthesia where the patient could give no feedback of further injury.

190.  The DFS Regulations provide that to be compensated under No-Fault, professional health services must be provided by a licensed provider within the scope of his or her license. See 11 N.Y.C.R.R. §§65-3.16(a)(6) & (12).  To the extent the Defendant ASCs have billed Allstate for facility fees based on surgical procedures performed by referring providers in excess of the practice limits placed on their professional licenses by state law, Accelerated and Barnert are in violation of this provision and are not entitled to No-Fault benefits.

191.  The chiropractors were not legally authorized to perform these procedures, and the Defendant ASCs were not legally authorized to bill for facility fees based on such services. Nonetheless, Accelerated and Barnert not only admitted these patients but also paid to transport them from New York to New Jersey.  In this way, the non-chiropractor owners of Accelerated and Barnert, especially the Defendants Alladin, Rahat, and Zaitsev, have profited from surgical procedures at the Defendant ASCs which the referring chiropractors were not authorized to perform, and to treat injuries which generally did not exist.

192.  Furthermore, the anesthesia services relating to such procedures have been ordered by chiropractors, again exceeding the scope of their licenses.  For example, Accelerated mailed to Allstate a bill totaling $5,000.00 for facility fees relating to MUA of the pelvis, including

closed treatment of pelvic ring, provided to patient R.B. identified by claim number 0402937361-01 by non-party Alex Khait, DC ("Khait") on April 25, 2016, and the bill was mailed on or about its date of May 16, 2016.  Non-party MEDICSURG mailed to Allstate a bill totaling $1,875.00 for related anesthesia services provided by non-party Durgesh Mankikar, MD ("Mankikar"), and that bill was mailed on or about its date of May 21, 2016.   On the corresponding Anesthesia Record completed by Mankikar on Accelerated letterhead, a stamp lists the surgeons for this procedure as two chiropractors: Khait and non-party Avi Weinberger, D.C. ("Weinberger").   The corresponding Operative Report of Accelerated lists Khait as the "Surgeon" and Weinberger as the "Co-Surgeon."

193.  Barnert mailed to Allstate a bill totaling $6,500.00 for facility fees relating to MUA of the pelvis, including closed treatment of pelvic ring, provided to patient I.M. identified by claim number 0429789927-01 by chiropractor Khait on February 10, 2017, and the bill was mailed on or about its date of February 13, 2017.  Non-party MEDICSURG mailed to Allstate a bill totaling $1,500.00 for related anesthesia services provided by non-party Afzal Sheikh, MD ("Sheikh") and that bill was mailed on or about its date of March 11, 2017.   On the corresponding Anesthesia Record completed by Sheikh on Barnert letterhead, a stamp lists the surgeons for this procedure as two chiropractors: Khait and Weinberger.  The corresponding Operative Report of Barnert (inexplicably printed on Accelerated letterhead) lists Khait as the "Surgeon" and Weinberger as the "Co-Surgeon."

C.   Several of the Defendant PCs Are Interchangeable, Sham Provider Entities

194.  As with Accelerated and Barnert, several of the Defendant PCs in this action are not distinct entities, but instead are used interchangeably by the Defendants to facilitate their

fraudulent schemes to generate No-Fault billing. These Defendant PCs and their owners have concealed the nature and magnitude of their fraud through the use of two or more differently-named provider entities which, despite being operationally identical, use distinct names and taxpayer identification numbers (TINs/FEINs).

195. Through the use of interchangeable provider entities, the Defendants have spread No-Fault billing for the same kinds of services across multiple Defendant PCs, thereby reducing the billing of each provider. In this way, the Defendants have managed the amount of liability exposure for any one of these redundant Defendant PCs, as well as reducing the risk that their fraudulent schemes will be detected by insurers, regulators, or the public.

196. The Defendants Alladin PC and Bailey, both owned by the Defendant Alladin, have been used interchangeably in this way. For example, the Defendant Alladin PC mailed to Allstate a bill totaling $150.00 for a patient consultation provided to patient A.S. identified by claim number 0302868401-01 by owner Alladin on September 8, 2014, and the bill was mailed on or about its date of January 27, 2015. However, the September 8, 2014 Office Visit report submitted to Allstate by Alladin in support of this bill contains the fax header of "Bailey Ave Medical" on the top of each of its four pages.

197. At the examination under oath (EUO) of Bailey taken by Allstate on April 29, 2022, Alladin testified that the later-formed Bailey has taken over all of his New York No-Fault patients, notwithstanding the fact that Alladin PC previously billed Allstate under No-Fault and remains open and is seeing other (non-No-Fault) patients. Alladin freely admits that Bailey has billed Allstate for providing the same services to the same patients previously treated by Alladin PC, with the same patterns of treatment and referrals involving the same related

providers.  There was no medical or legitimate business reason for this move; Alladin simply wanted to divide his patients among two otherwise identical providers.

198.  The Defendant PCs owned by the Defendant Sangavaram, each of which is secretly owned by the Defendant Zaitsev, have also been used interchangeably in this way.  For example, the Defendant Bedford faxed its report on a June 16, 2021 Initial Examination of patient C.M. identified by claim number 0629596493-01 to a fax number (201-343-1331) associated with the non-party PC Highland, which is also wholly owned by Zaitsev.  The fax header includes the phrase "TRISTATE MULTI SPECIALTY."

199.  Several of these Zaitsev PCs – namely Bedford, Riverside, Tremont, and Tristate – have billed Allstate for services purportedly rendered at the same clinical location: 108 Kenilworth Place, Brooklyn, NY 11210 (the "Kenilworth Clinic").  Bedford, Riverside, Tremont, and Tristate are largely indistinguishable from one another, apart from their names and TINs.  They have provided the same types of services at the same location; made the same types of referrals to the same related providers; and been nominally owned by the same phony owner: Sangavaram.  Bedford, Riverside, Tremont, and Tristate have also used common or overlapping personnel and paperwork, such that third parties often conflate or confuse with which of these Defendants they are interacting.

200.  For example, Bedford mailed to Allstate a bill totaling $200.68 for an initial visit provided to patient A.P. identified by claim number 0600739023-02 on September 17, 2020 at the Kenilworth Clinic by Su Jung Lee, NP ("Lee"), and the bill was mailed on or about its date of October 28, 2020.  Ridgewood mailed to Allstate two bills totaling $5,016.06 provided to patient A.P. on September 30, 2020, and the bills were mailed on or about their shared date of October 20, 2020.  The corresponding drug testing report of Ridgewood indicates that the

patient's sample was collected by "Su Jung Lee" at "Tristate Medical – Brooklyn," despite the lack of any relevant billing by Tristate or any indication that Tristate treated the patient.

201. Similarly, Riverside mailed to Allstate a bill totaling $200.68 for an initial evaluation provided to patient J.M. identified by claim number 0557318029-02 on August 21, 2019 at the Kenilworth Clinic by Heoeeun Kwon, FNP ("Kwon"), and the bill was mailed on or about its date of September 6, 2019. Ridgewood mailed to Allstate a bill totaling $4,167.98 for drug testing provided to patient J.M. on the same date, August 21, 2019, and the bill was mailed on or about its date of September 5, 2019. Ridgewood's resulting drug testing report dated August 27, 2019 indicates that the patient's sample was collected on August 21, 2019, and that the referring provider was Kwon at "Kenilworth Tristate," despite the lack of any relevant billing by Tristate or any indication that Tristate treated the patient.

202. The Defendant PCs Elmwood and Molnar, both owned at least nominally by Sangavaram, have also been used interchangeably. Elmwood and Molnar were both formed in New Jersey in 2018, but they were not registered as foreign corporations in New York until the same date, March 10, 2020 (on which date Tristate was also registered in New York).

203. Elmwood and Molnar are indistinguishable apart from their names and TINs. Both PCs have billed Allstate under No-Fault for the same three types of services, which comprise substantially all of their billing: range of motion (ROM) testing, manual muscle testing (MMT), and activity limitation measurement (ALM). The twin PCs use the same clinics in the New York area, each shared with other health care providers seeing the same patients.

204. According to their bills, all or virtually all of Elmwood's and Molnar's services are rendered by Sangavaram personally. However, as noted above, a federal judgment was entered against Sangavaram and these twin PCs in *GEICO v. Elmwood Park* on the basis that, *inter alia*,

the ROM testing, MMT, and ALM purportedly provided by Elmwood and Molnar were actually rendered by independent contractors, and not by Sangavaram or any employee.

205.  Most patients of Elmwood are also treated by Molnar, and vice versa.  Patients are usually handed off from one PC to the other during the course of their treatment, despite purportedly continuing to receive the same treatments (billed in identical amounts), at the same clinical location, and purportedly from the same doctor (Sangavaram).  In this way, not only have the Defendants used Elmwood and Molnar interchangeably to reduce the total No-Fault billing attributable to either provider, but also to reduce the amount of billing by each provider for any one patient.

206.  This pattern manifests in most or all cases with the patient seeing Elmwood first, and then Molnar second.  For example, patient A.K. identified by claim number 0526602610-02 was purportedly provided with ROM testing and MMT first by Elmwood, and then by Molnar:

a)  Elmwood mailed to Allstate a bill totaling $475.00 for ALM provided to patient A.K. on January 3, 2019 at 204-12 Hillside Avenue, Hollis, NY 11423, and the bill was mailed on or about its date of February 3, 2019.

b)  Elmwood then mailed to Allstate a bill totaling $502.81 for ROM testing and a bill totaling $479.60 for MMT, each as provided to patient A.K. on January 11, 2019 at the same Hollis address, and the bills were mailed on or about their date of February 12, 2019.

c)  Elmwood then mailed to Allstate a bill totaling $475.00 for ALM provided to patient A.K. on February 1, 2019 at the same Hollis address, and the bill was mailed on or about its date of March 1, 2019.

d)  However, it was then Molnar that mailed to Allstate a bill totaling $502.81 for ROM testing and a bill totaling $479.60 for MMT, each as provided to patient A.K. on February 22, 2019 at the same Hollis address, and the bills were mailed on or about their date of April 3, 2019.

207.  In another example, patient A.R. identified by claim number 0532669249-04 was purportedly provided with all three types of services (ROM testing, MMT, and ALM) first by Elmwood, and then by Molnar:

a) Elmwood mailed to Allstate a bill totaling $274.26 for ROM testing and a bill totaling $130.80 for MMT, each as provided to patient A.R. on February 1, 2019 at 1120 Morris Park Avenue, Suite 1B, Bronx, NY 10461, and the bills were mailed on or about their date of March 2, 2019.

b) Elmwood then mailed to Allstate a bill totaling $475.00 for ALM provided to patient A.R. on February 8, 2019 at the same Morris Park address, and the bill was mailed on or about its date of March 19, 2019.

c) However, it was then Molnar that mailed to Allstate a bill totaling $274.26 for ROM testing and a bill totaling $130.80 for MMT, each as provided to patient A.K. on February 26, 2019 at the same Morris Park address, and the bills were mailed on or about their date of April 7, 2019.

d) Molnar then mailed to Allstate a bill totaling $475.00 for ALM provided to patient A.R. on March 1, 2019 at the same Morris Park address, and the bill was mailed on or about its date of April 10, 2019.

e) Molnar then mailed to Allstate another bill totaling $274.26 for ROM testing and another bill totaling $130.80 for MMT, each as provided to patient A.K. on March 22, 2019 at the same Morris Park address, and the bills were mailed on or about their date of April 23, 2019.

f) Finally, Molnar mailed to Allstate yet another bill totaling $475.00 for ALM provided to patient A.R. on March 26, 2019 at the same Morris Park address, and the bill was mailed on or about its date of May 3, 2019.

208. Patient D.W. identified by claim number 0528111412-02 started out with billing for several visits by Elmwood before being switched over to Molnar:

a) Elmwood mailed to Allstate a bill totaling $502.81 for ROM testing and a bill totaling $392.40 for MMT, each as provided to patient D.W. on January 4, 2019 at 4014A Boston Road, Bronx, NY 10475, and the bills were mailed on or about their date of February 8, 2019.

b) Elmwood then mailed to Allstate another bill totaling $502.81 for ROM testing and a bill totaling $479.60 for MMT, each as provided to patient D.W. on January 10, 2019, and the bills were mailed on or about their date of February 15, 2019.

Unlike all other billing received from Elmwood and Molnar for this patient D.W., and underscoring the routinized nature of their billing, Elmwood's bills for ROM testing and MMT on January 10, 2019 indicate that they were performed not at the Boston Road address, but instead at another Elmwood location: 788 Southern Boulevard, Bronx, NY 10455. There is otherwise no evidence that patient D.W. ever went to the Southern Boulevard location, and

in fact, Allstate received billing from physical therapy and other providers at the Boston Road location for the same date of service.

c) Elmwood then mailed to Allstate a bill totaling $475.00 for ALM provided to patient D.W. on January 16, 2019 at the Boston Road address, and the bill was mailed on or about its date of February 19, 2019.

d) Elmwood then mailed to Allstate another bill totaling $502.81 for ROM testing and another bill totaling $392.40 for MMT, each as provided to patient D.W. on February 4, 2019 at the Boston Road address, and the bills were mailed on or about their date of March 11, 2019.

e) However, it was then Molnar that mailed to Allstate a bill totaling $475.00 for ALM provided to patient D.W. on February 20, 2019 at the same Boston Road address, and the bill was mailed on or about its date of March 31, 2019.

f) Molnar then mailed to Allstate a bill totaling $502.81 for ROM testing and a bill totaling $392.40 for MMT, each as provided to patient D.W. on March 11, 2019 at the Boston Road address, and the bills were mailed on or about their date of April 13, 2019.

g) However, it was then Molnar that mailed to Allstate a bill totaling $274.26 for ROM testing and a bill totaling $130.80 for MMT, each as provided to patient A.K. on February 26, 2019 at the same Morris Park address, and the bills were mailed on or about their date of April 7, 2019.

h) Molnar then mailed to Allstate a bill totaling $475.00 for ALM provided to patient A.R. on March 1, 2019 at the same Morris Park address, and the bill was mailed on or about its date of April 10, 2019.

i) Molnar then mailed to Allstate another bill totaling $274.26 for ROM testing and another bill totaling $130.80 for MMT, each as provided to patient A.K. on March 22, 2019 at the same Morris Park address, and the bills were mailed on or about their date of April 23, 2019.

j) Finally, Molnar mailed to Allstate yet another bill totaling $475.00 for ALM provided to patient A.R. on March 26, 2019 at the same Morris Park address, and the bill was mailed on or about its date of May 3, 2019.

II.     **The Defendants' Awareness of the Illegality of their Conduct Based on Extensive History of Fraud Actions**

209. Most of the Defendants named herein, as well as many of their purported employees, related providers, and other non-parties, have been sued in similar actions by insurers

in New York and/or New Jersey for the fraudulent submission of invalid No-Fault claims for medical services.  These actions have placed the Defendants on notice of the illegality of their fraudulent conduct, and the Defendants' continuation of the same or similar conduct – even after being placed on such notice –shows that it is a knowing and intentional course of conduct.

210.  It cannot be doubted that these Defendants have at all relevant times been well-aware of the import and potential consequences of their treatment and billing practices.  Indeed, each of these prior civil actions has been based on one or more patterns of fraudulent or otherwise illegal conduct which are similar if not identical to those alleged herein.  The relevant Defendants have settled in all of the cases which have concluded, and none of the complaints has been successfully challenged on a motion to dismiss.

211.  Nonetheless, far from being discouraged by this history, these Defendants and their confederates have persisted in perpetrating the same No-Fault schemes which led to several suits against them in the past.  Rather than reforming their medical and billing practices so as to avoid impropriety and to comply with the law, they have devised and taken measures to conceal or delay detection of their scheme, such as by rolling over their existing operations into new entities, and by falsely manipulating their ownership and structure.  Apart from those measures, the Defendants have largely maintained "business as usual," and that business is fraud.

A.    _State Farm v. Fayda_ (2014) and _GEICO v. Accelerated Rehab_ (2020)

212. On December 11, 2014, State Farm commenced an action in the United States District Court for the Southern District of New York against, _inter alia_, the Defendant ASC Accelerated; the Defendant Alladin and his non-party New Jersey provider entity Accelerated Rehab & Pain Management, P.A. ("Accelerated Rehab"); and the Defendant Rahat and his non-

party company ASC MedSolutions, L.L.C. ("MedSolutions"). *See State Farm Mut. Auto. Ins. Co. v. Fayda, et al.*, No. 14-CV-9792, ECF No. 1 (S.D.N.Y. Dec. 11, 2014) ("*Fayda*").

213. As alleged in *Fayda*, the defendants had engaged in a fraudulent scheme to provide examinations, testing, and treatments, including pain management injections at Accelerated, pursuant to a pre-determined treatment protocol that was designed for maximizing the defendants' income, and not for the patients' actual medical needs. According to the complaint, Alladin and Accelerated Rehab performed examinations at a clinic in New York whose purpose was to diagnose a need for pain management injections, and then they performed those injections at Accelerated, where Alladin was (and remains) an owner. The *Fayda* defendants allegedly obtained patients through illegal self-referrals between the providers with common ownership, and/or pursuant to a scheme to exchange referrals for kickbacks and other illegal compensation.

214. At the time of the *Fayda* complaint, the Defendant Alladin owned 45% of Accelerated and served as its appointed Medical Director, while the Defendant Rahat owned 5% of Accelerated and served as its Executive Director and Managing Partner. Rahat also served as the administrator or manager of Alladin's provider entity Accelerated Rehab. The remaining 50% share of ownership in Accelerated was then held by Khullat Alladin, the mother of Alladin. Ms. Alladin was (and still is) listed as a "Partner" on licensing records obtained from the NJDOH.

215. After a motion to dismiss by certain other *Fayda* defendants was denied, Accelerated, Alladin, and Rahat settled the claims against them. However, while *Fayda* was pending, and less than three months after the complaint was filed, Accelerated applied to the NJDOH for approval of a change in ownership, whereby the 50% share held by Alladin's mother was largely distributed to several new owner-providers, including the Defendants Gorman and

Zaitsev.  The divestiture of Ms. Alladin also allowed for an increase in Alladin's ownership to its current level of 47.04%, and Rahat kept his same individually-held 5% share, though he also acquired another 4.99% ownership in Accelerated through his MedSolutions entity. Nonetheless, Ms. Alladin has continued to appear as a "Partner" on licensing records, despite her ownership share having been reduced to 0.0%.

216.  Although the *Fayda* action provided ample notice to the Defendants of the illegality of the fraudulent scheme, they have engaged in essentially the same scheme of referrals from financially related providers who then bring New York residents to another State where billing is then submitted for completely unnecessary facility fees.

217.  The Defendants Alladin, Rahat, Alladin PC, Accelerated, and Barnert were subsequently sued (along with numerous related non-parties here) by GEICO in the United States District Court of New Jersey, seeking RICO damages and declaratory judgment based on similar conduct, and that action remains pending.  *See GEICO, et al. v. Accelerated Rehab & Pain Mgmt, P.A. et al.*, No. 20-CV-16361, ECF No. 1 (Nov. 17, 2020).

218.  According to the operative (amended) complaint in *Accelerated Rehab*, the relevant No-Fault claims were, like the claims at issue in *Fayda*, based on services that were provided (if at all) pursuant to pre-determined fraudulent treatment protocols, designed solely to financially enrich the defendants, and not based on the needs or well-being of their patients.  Also as State Farm alleged in *Fayda*, GEICO's complaint in *Accelerated Rehab* charged that Alladin had fraudulently billed through his PCs (this time including Alladin PC as well as Accelerated Rehab) for medically unnecessary, illusory, or otherwise non-reimbursable examinations, testing, and pain management injections and other procedures.  The similarities to *Fayda* continue with GEICO's allegations in *Accelerated Rehab* that Alladin and his PCs

referred and steered patients toward various New Jersey ASCs, including Accelerated and Barnert, where he has at all relevant times held the single largest ownership share, as well as allegations of the defendants' network of self-referrals and kickbacks or other illegal compensation in exchange for referrals.

219. Among the other defendants in *Accelerated Rehab* are the anesthesia providers MEDICSURG, its successor entity University Anesthesia, and several of their member-anesthesiologists, including without limitation Donghui a/k/a Dongui Chen, MD ("Chen"), Marcia Copeland MD ("Copeland"), and Sheikh, each of whom has also provided anesthesia for surgical procedures performed by, and/or has performed services billed by, one or more of the Defendants in this action. These anesthesiology defendants allegedly generated revenue for the scheme by billing for anesthesia services on surgeries unnecessarily performed at Accelerated, Barnert, and other New Jersey ASCs,

220. According to the Complaint, Alladin and Rahat (who together own the majority of both Accelerated and Barnert) directed the incorporation of MEDICSURG and University Anesthesia, and Alladin has at all times purported to be the sole owner of both. However, GEICO alleged that Rahat has also been a secret owner of MEDICSURG and University Anesthesia, as well as a secret owner of Alladin's entities Accelerated Rehab and Alladin PC. Moreover, Rahat, a layperson, was allegedly held out to potential employees of these four providers as the person who owns or controls them; he made all of their recruiting and hiring decisions, and he was a signatory on their bank accounts.

221. Additionally, GEICO alleged that Alladin and Rahat devised a scheme whereby Accelerated Rehab and Alladin PC fabricated or manipulated reports on their examinations of patients, so as to justify their own billing for medically unnecessary electrodiagnostic (EDX)

testing, including nerve conduction velocity (NCV) tests and electromyography (EMG).   In many cases, according to GEICO, a patient's prior examination report was recycled to serve as the pre-EDX evaluation report, purportedly prepared on the same date.  On this fraudulent basis for nerve testing, the same or a similar battery of excessive EDX tests was allegedly billed by Accelerated Rehab and Alladin PC for patient after patient, a practice which they sometimes obscured by splitting the NCV and EMG tests onto two separate bills.  GEICO further alleged that the purported results of the EDX testing by Accelerated Rehab and Alladin PC were, in turn, used to support false diagnoses of radiculopathies in most of their patients, with the express purpose of enabling further billing for ASC injections and other unnecessary services.

222.  On August 9, 2017, GEICO filed a federal civil complaint in the District of New Jersey, alleging that the Defendants Zaitsev, Gorman, and Weissman, among others, submitted No-Fault claims which were allegedly fraudulent for similar reasons to the claims at issue herein. *See GEICO v. Interstate Multi-Specialty Med. Grp., P.C., et al*., No. 17-CV-5725 (D.N.J. Aug. 9, 2017) ("*GEICO I*").  GEICO sought a declaration that it was not obligated to pay any of the defendants' pending claims, as well as a money judgment for damages in excess of $3 million based on claims already paid.

223.  Specifically, the *GEICO I* complaint alleged that Zaitsev was the owner of two professional corporations (non-parties here), the lead defendant Interstate and Highland Medical Group, P.C. ("Highland"), and that they had paid kickbacks to other medical providers for referrals of No-Fault patients.   According to GEICO, virtually every insured purportedly received an initial examination from Zaitsev, Weissman, Gorman, and their associates at Interstate and Highland, and they supplied phony diagnoses in order to justify a pre-determined and excessive array of services, including electrodiagnostic (EDX) nerve testing, pain

management injections, and anesthesia.  GEICO alleged further that these examinations, as well as follow-up examinations, were fraudulently provided and/or billed: exaggerating the severity of patient's injuries; overstating the amount of time actually spent examining patients; and misrepresenting the scope and complexity of those examinations.

224.  Of particular relevance here, GEICO alleged that Zaitsev, Weissman, Gorman, Interstate, and Highland subjected many patients to pre-determined and medically unnecessary pain management injections, along with the risks of anesthesia which may include death.  Like much of the billing at issue in this Complaint, Interstate and Highland allegedly billed under CPT codes 62310, 62311, 64483, 64484, 64490, 64491, 64493, 64494, 64495, 72275, and/or 77003 for pain management injections, including without limitation epidurals and facet blocks, frequently with fluoroscopic guidance and epidurography.  Most of these injections were allegedly performed by Zaitsev, Weissman, or Gorman, and most of them were performed not at the clinical offices of Interstate or Highland, but rather at the Accelerated ASC, and often the relevant ASC referral came from a provider other than the billing surgeon.  As such, GEICO pointed out that billing for such services was not eligible for the so-called "ASC Exception" to New Jersey's anti-referral statute, known as the Codey Law.  *See* N.J.S.A. § 45:9-22.5.

225.  GEICO further alleged that Zaitsev, Weissman, Gorman, Highland, and Interstate, among others, had subjected patients to and/or billed for medically unnecessary EDX nerve testing, specifically including nerve conduction velocity (NCV) testing and electromyography (EMG), for which they charged GEICO at least $4,000.00 per patient.  The results of such EDX testing, if it was performed at all, were allegedly fabricated to support the aforementioned pain management surgical procedures, with boilerplate and false findings and diagnoses.  According

to GEICO, moreover, many of the referrals for EDX testing made by Zaitsev and Weissman were also self-referral violations under the Codey Law.

226. Annexed to the complaint in *GEICO I* is the plea allocution transcript of one Alexander DiMeo a/ka Di Meo, D.C. ("DiMeo"), a chiropractor who had previously pleaded guilty to New Jersey criminal bribery, mnoney laundering, and conspiracy charges in the Superior Court of New Jersey, based on his participation in a web of patient referral and kickback schemes. *See New Jersey v. DiMeo*, Nos. 16-05-000251, 16-05-000252 (N.J. Super. Middlesex May 20, 2016). According to the transcript, DiMeo was approached by an individual named Samuel Davit a/k/a Merabi Davitiashvili ("Davit") on Zaitsev's behalf in 2012, with an offer to pay DiMeo an agreed sum for each referral of his patients to Zaitsev's provider Highland Medical Group, P.C. for neurological services, especially electrodiagnostic testing (EDX). DiMeo testified further that he was paid monthly by Davit on Zaitsev's behalf from 2012 through late 2015, and that Zaitsev had paid him a total of approximately $37,975.00 for patient referrals during that period.

227. Less than three months after *Interstate's* commencement, on November 6, 2017, the parties settled, and the case was terminated, with a full dismissal of the action subsequently ordered on December 11, 2017.


B. *GEICO v. Zaitsev, GEICO v. Elmwood Park,* and *Zaitsev v. Weissman* (2021)

228. After encountering litigation and other obstacles for his MIMS provider in New York and his Interstate provider in New Jersey, Zaitsev set up the Defendants Riverside and Tristate, respectively, to replace them. Tristate was incorporated in New Jersey on April 13, 2018, and Riverside was incorporated in New York on August 9, 2018. Unlike their respective

predecessors MIMS and Interstate, however, Riverside and Tristate were formed by the Defendant Weissman, who was also their initial owner of record.

229. The reason Weissman was substituted for Zaitsev as the owner of the latter's new Riverside and Tristate providers has become a central issue in subsequent litigation, both in New York and New Jersey. In the pending action *GEICO v. Zaitsev*, No. 20-CV-3459, ECF No. 90-3 (E.D.N.Y. Feb. 10, 2021), the complaint (as amended) alleges that Zaitsev previously, between at least 2012 and 2015, submitted fraudulent No-Fault claims for examinations, testing, and treatments, including pain management injections and anesthesia, through his Interstate and Highland entities, and that the scheme was fueled by kickbacks and illegal referrals. According to GEICO, around the time of the DiMeo criminal case, Zaitsev became worried that his scheme would be detected, and he sought to limit exposure for his known entities by transitioning their billing to Riverside and Tristate, as well as to related non-party Crosstown.

230. According to the December 9, 2020 Weissman Affirmation filed in *GEICO v. Zaitsev*, Weissman incorporated Tristate in New Jersey and Riverside in New York at the direction of Zaitsev through his accountant, Mark Kaminar. Tristate and Riverside were intended to inherit the operations of Zaitsev's providers Interstate and MIMS, respectively. Zaitsev had explained to him that negative attention from *GEICO I* made it less desirable to own these providers in his own name, and that Zaitsev wanted to focus on Ridgewood, which he viewed as a more lucrative venture. Despite Zaitsev's reassurances, Weissman eventually came to realize that it was Zaitsev's plan to use the new entities to facilitate referrals to Ridgewood. Through various means, including wielding control over the PCs' finances through accountant Kaminar, Zaitsev was able to remain effectively in control of Riverside and Tristate, notwithstanding the charade of Weissman's nominal ownership, and that control enabled Zaitsev

to direct referrals of their patients for pre-determined and unnecessary drug testing by Ridgewood, as well as for surgical procedures needlessly performed at the Defendant ASCs Accelerated and Barnert in New Jersey.

231.  As previously discussed, judgment has been entered in *GEICO v. Elmwood Park* against the Defendants Sangavaram, Elmwood, and Molnar, based on uncontested allegations that, *inter alia*, Sangavaram's paper ownership of Elmwood and Molnar has been a ruse to facilitate improper referrals and billing for unnecessary medical treatment by these PCs and a network of related providers, with one or more other individuals controlling and managing Elmwood and Molnar pursuant to pre-determined fraudulent protocols.  Among other reasons for suspecting such a scheme, GEICO alleged that Sangavaram in fact had not: examined, tested, or treated any of Elmwood's and Molnar's patients; provided any of their start-up or other capital; determined their daily schedules; directed which services they would provide; controlled or maintained their books and records; reviewed or monitored their bank accounts; or been aware of their billing, collections, income, and expenses.  GEICO also cited Sangavaram's tarnished professional reputation, based on his history of disciplinary sanctions in New York and New Jersey for serious and repeated misconduct, as a factor leading to his recruitment as the phony owner of Elmwood and Molnar – a role he has also played for Riverside and Tristate here.

232.  In determining that GEICO had satisfied all of the elements of common law fraud, the District Court in *Elmwood Park* held, *inter alia*, that: the unchallenged allegations of Sangavaram's motives based on his disciplinary history supplied the requisite intent to defraud; the external individuals controlling Elmwood and Molnar had the motive and opportunity to receive substantial No-Fault payments to which they were not entitled; and GEICO had demonstrated the submission of claims by Elmwood and Molnar which misrepresented the

services they provided (including services actually performed by independent contractors) and/or their eligibility as licensed medical providers.

233.   Recently, the Defendants' scheme has even produced litigation within their own ranks.  Presumably in response to Weissman's Affirmation in *GEICO II*, Zaitsev and Ridgewood filed suit against Weissman in the New Jersey Superior Court, raising state law causes of action for libel and/or slander, tortious interference with business, and false light.  *See Zaitsev, et al. v. Weissman*, No. PAS-L-003647-21 (N.J. Super. Nov. 19, 2021).   While it is silent as to any specific falsehood or interference, Zaitsev's complaint alleges that he and Weissman had entered into an agreement to sell Zaitsev's "medical practice" to Weissman "following his employment relationship," and that the relevant tortious conduct consisted of "fabricating allegations of [Zaitsev's] inappropriate conduct and misrepresentation," with Weissman thereby intentionally defaming Zaitsev's "professional judgment, credentials and his business in written form and by way of inappropriate statements made to others including third party payors."

234.   On February 21, 2022, Weissman moved the Superior Court to dismiss Zaitsev's and Ridgewood's case against him, arguing essentially that the complaint had failed to plead adequate specifics supporting the stated causes of action, insofar as it did not specify any false statement Weissman allegedly made, or when; nor did it identify any third person to whom any such statement was directed.  According to Weissman's brief, any statement he made in the pending *GEICO II* litigation would be protected by New Jersey's litigation privilege, and in any event, Weissman stood by the "absolute truth of all statements made."

235.   On March 11, 2022, Zaitsev responded to Weissman's motion with a cross-motion to amend the complaint.  However, even in his proposed amended complaint, Zaitsev once again

declined to publicly disclose whatever specific "falsehood" Weissman had allegedly been spreading about him, and to whom.

236. The Court ultimately agreed with Weissman, issuing orders dated April 14, 2022 granting his motion to dismiss the complaint, and denying Zaitsev's cross-motion to amend the same. Insofar as the dismissal order was made without prejudice, Zaitsev has yet to file another amended complaint in that action as of the date hereof.

237. In support of the successful motion to dismiss, and in response to the complaint's allegation that there was a contract for sale of Zaitsev's medical practice, Weissman annexed what purports to be an Indemnification, Hold Harmless Agreement and General Release dated on or about April 3, 2019, which appears to describe the transactions by which Weissman resigned as the nominal owner of Riverside and Tristate and was replaced in that role at Zaitsev's direction. This walk-away agreement for Weissman was executed about one week before the April 10, 2019 Certificate Amendment by which Sangavaram replaced Weissman as the owner of record with the NYDOS.

238. Weissman, at that time the nominal owner of Tristate and Riverside, signed the walk-away agreement on behalf of those two PCs; in his individual capacity; and on behalf of related non-party Riverside Management Group, Inc. ("Riverside Management"). Zaitsev signed the agreement in two capacities: first as an individual and as a "principal or manager of any entity which entered into an agreement or transacted business with" the Defendants Tristate and Riverside and related non-party Riverside Management. Zaitsev then also signed the agreement on behalf of his predecessor provider entities Interstate and MIMS, as well as related non-party Financial Vision Group, LLC ("Financial Vision").

239.  As recited in the agreement, Zaitsev's Financial Vision entity had entered into a secured, revolving loan with Tristate, which comports with Weissman's statement in *GEICO II* that Zaitsev's accountant had instructed him that the start-up funding for Tristate as well as Riverside would be provided by that entity.  The agreement indicates that Weissman had been interested in acquiring Interstate and/or MIMS through the newly-created entities in his name, *i.e.* Riverside, Tristate, and Riverside Management, but that he had since decided not to pursue such a purchase.  While the agreement itself is silent as to Weissman's reasons for that decision, it does refer to Zaitsev's recruitment of another physician – now known to be the Defendant Sangavaram – to take Weissman's place in the transaction, reciting that "Zaitsev identified a purchaser to assume ownership of Tristate, Riverside and [Riverside Management] by and through an Assignment and Assumption Agreement."

C.    *Related Proceedings and Investigations into Non-Party Focazio*

240.  Non-party Focazio, the nominal owner of related non-party Crosstown (another Zaitsev PC), has also been the subject of extensive litigation for healthcare billing fraud.  Much of that history has come out in the context of Focazio's petitions for relief under Chapter 11 of the Bankruptcy Code: first jointly with his wholly-owned ASC, Endo Surgical Center of North Jersey, P.C. ("Endo"), *see In re Focazio*, No. 18-10752-VFP (Bankr. N.J. Jan. 13, 2018); and second without Endo, *see In re Focazio*, No. 19-10880-VFP (Bankr. N.J. Jan. 15, 2019).

241.  In relation to the latter case, certain of Allstate's affiliates ("Allstate NJ") filed an adversary complaint against Focazio as debtor, objecting to any bankruptcy discharge of Focazio's obligations under a settlement agreement he had allegedly breached.  *See Allstate N.J. Ins. Co. v. Focazio (In re Focazio)*, Adv. No. 20-01004-VFP (Bankr. N.J. Jan 3, 2020).

According to the operative (amended) adversary complaint, Allstate NJ had investigated Focazio and Endo for their operation of an illicit fee-splitting and kickback scheme beginning as early as September of 2006.   Another provider also owned in the name of Focazio, Metropolitan Anesthesia, LLC ("Metro LLC") also became involved in the scheme as well as Allstate's investigation, following its formation on April 24, 2008.

242.  On many of the same claims for which the Defendants have billed, Allstate has also received billing from Crosstown, which is located at 625 East Fordham Road, Bronx, NY 10458, for muscle testing and other services performed at its office.   Its true owner is the Defendant Zaitsev, who transferred start-up capital or other funds to Crosstown shortly after it was formed.  Crosstown's address at 625 East Fordham is also used by other providers owned in whole or part by Focazio (at least on paper), including the ASC operated by Avicenna ASC, Inc. ("Avicenna"), and the accredited OBSP operated by Medalliance Medical Health Services, Inc. ("MedAlliance").

243. The Defendant Tristate has billed for surgical services provided at the Avicenna ASC.  For example, Allstate received a bill from Tristate for patient A.A., identified by claim number 0507396223-01, for charges totaling $1,427.76 based on injections performed at the Avicenna ASC, located at 2522 Hughes Avenue, Bronx, NY 10458 by the Defendant Gorman, as surgeon, on August 21, 2018, and the bill was mailed on or about its date of September 11, 2018. Allstate also received a bill from Avicenna for facility fees associated with the August 21, 2018 injections totaling $1,956.56, with Gorman named as the attending physician, and the bill was mailed on or about its date of October 8, 2018.

244.  Allstate then also received a bill for patient A.A. from Tristate for drug screening totaling $385.00, as performed on September 4, 2018 by the Defendant Weissman, specifying

the place of service as Avicenna but at the address of the MedAlliance OBSP (625 East Fordham), and the bill was mailed on or about its date of September 12, 2018.  Inexplicably, Tristate also billed for injections totaling $1,298.07, as performed by Weissman on the same date, September 4, 2018, at an ASC in New Jersey, specifically HealthPlus Surgery Center, LLC n/k/a Integrated Specialty ASC, LLC ("Integrated"), and that bill was mailed on or about its date of September 24, 2018.  The latter bill indicated that Weissman was the owner of Tristate.

245.  Allstate has received billing from related non-party County Medical Services, P.C. ("County Medical"), which is owned by Focazio, for patient assessments and physical therapy performed at 282 and/or 284 Avenue X, Brooklyn, NY 11223.  The Defendant Riverside has submitted bills to Allstate using the same service address, specifically 282 Avenue X, for surgical consultations.  For example, Riverside mailed a bill for $200.68 to Allstate for an initial pain evaluation provided to patient N.A. identified by claim number 0551163678-02 at 282 Avenue X on July 23, 2019, and the bill was mailed on or about its date of July 31, 2019. The Defendant Sangavaram's name was typed into the "Provider's Signature" box on the bill, and he purportedly signed the related report on the evaluation, as did Riverside's purported employee Kwon.

246. The Defendant Alladin PC, which is owned by the Defendant Alladin, has also billed Allstate for services provided at the same Avenue X location as Riverside and County Medical.  For example, Alladin PC mailed to Allstate a bill totaling $300.00 for an established patient evaluation provided to patient M.V. identified by claim number 0476536008-02 on June 11, 2018 at the Avenue X office by Qureshi, and the bill was mailed on or about its date of June 25, 2018.

247. Alladin's other New York provider, the Defendant Bailey, has also billed Allstate for services provided at the same Avenue X location. For example, referring to patient K.M. identified by claim number 0565894292-01, Bailey mailed to Allstate a bill totaling $200.68 for a new patient consultation and examination provided to patient K.M. identified by claim number 0565894292-01 at the Avenue X office on December 23, 2019 by Qureshi, and the bill was mailed on or about its date of January 20, 2020.

248. Besides Crosstown and County, Focazio owns several other PCs which have submitted No-Fault billing to insurers. In fact, several of these PCs were only created in New York while Focazio had pending petitions for relief under Chapter 11 of the Bankruptcy Code, and after Allstate NJ had already settled claims with Focazio and two of his companies based on their referral and kickback scheme with Angelo and Pacific. *See In re Focazio*, No. 18-10752-VFP (Bankr. N.J. Jan. 13, 2018); *In re Focazio*, No. 19-10880-VFP (Bankr. N.J. Jan. 15, 2019); *Allstate N.J. Ins. Co. v. Focazio (In re Focazio)*, Adv. No. 20-01004-VFP (Bankr. N.J. Jan 3, 2020). According to the operative (amended) adversary complaint, Allstate NJ had investigated Focazio, Endo, and Metropolitan Anesthesia, LLC ("Metro LLC") (a New Jersey provider also owned by Focazio) for their operation of an illicit fee-splitting and kickback scheme beginning as early as September of 2006 (and in the case of Metro LLC, upon or shortly after its formation in 2008).

249. That anti-fraud investigation was itself an offshoot of an earlier investigation by Allstate NJ into No-Fault billing for MUA, injections, and other surgical pain management procedures as performed at the Endo ASC by non-party chiropractors Christopher Montana, D.C. and Fernando Barrese, D.C. Specifically, Allstate NJ suspected that Montana and Barrese had, with the assistance of personal injury attorneys, paid "runners" to bring car accident patients to

their clinics.   Moreover, there was reason to believe Montana and Barrese also received kickbacks from specialty providers and ancillary healthcare facilities, such as Endo and Metro LLC, in exchange for providing referrals of their patients for surgical services.   While Allstate NJ's investigation was ongoing, the FBI and the New Jersey Office of the Insurance Fraud Prosecutor conducted their own criminal investigation of Montana and Barrese, leading to their conviction on or about November 28, 2012 in the New Jersey Superior Court of multiple felony counts for their use of runners, and for filing false and fraudulent tax returns.

250. Allstate NJ's investigation into Focazio, Endo, and Metro LLC revealed that in April of 2007, they had entered into an "Exclusive Marketing Agreement" with Pacific Marketing, Inc. ("Pacific") and its owner Michael Angelo ("Angelo"), a person already known to Allstate NJ as a "patient broker" who facilitated unscrupulous referrals in exchange for illegal kickbacks.   This agreement was a thinly-veiled agreement to conduct an illegal referral, fee-splitting, and kickback scheme.   Under the agreement, Focazio and his companies contracted to pay Angelo and Pacific 50% of all net profits earned by Endo for surgical procedures at the Endo ASC that were the result of "marketing" efforts by Angelo and Pacific.   In two separate New Jersey civil actions, this characterization of the arrangement was not disputed by Focazio, who admittedly paid more than $11 million to Angelo and Pacific during a five-year period.   *See Angelo v. Focazio*, No. L-008733-2011 (N.J. Super. Bergen Oct. 20, 2011); *Focazio v. Angelo* (N.J. Super. Passaic Nov. 30, 2012).

251. Based on that agreement and other evidence uncovered in the investigation, including an analysis of patients who underwent procedures at the Endo ASC during that time period, Angelo's longtime relationship with Montana and Barrese, and his use of toll-free telephone numbers and web domains to recruit patients on behalf of personal injury attorneys,

82

Allstate NJ concluded that Focazio, Endo, and Metro LLC had helped to fund an unlawful referral network scheme.  In accordance with that determination, Allstate NJ ceased making voluntary payments to Endo and Metro LLC as of March 1, 2012 and prepared to file suit.

252. Before any litigation was commenced, Allstate NJ and Focazio, Endo, and Metro LLC negotiated and entered into a Settlement Agreement on October 31, 2013.  However, Focazio and his companies defaulted on their obligations under the agreement in several material respects, including their failure to provide a recordable security interest in any assets, and payments that were late, rejected for insufficient funds, or not made at all.  As a result of accrued default interest, according to the adversary complaint, Focazio and his companies then owed Allstate NJ a total obligation of $3,208,064.26 under the settlement agreement.

## III.    The Defendants' Fraudulent Scheme to Bill for Unnecessary ASC Facility Fees

253. The vast majority of the facility service fees that the Defendant ASCs billed to Allstate were for services that should not be provided in an ASC. Instead, these services should have been provided at an office-based surgery practice ("OBSP") in New York.  However, the Defendant ASCs brought patients to New Jersey so that the Defendant ASCs could bill for a facility fee in addition to the charges billed for by the referring providers and surgeons.  The Defendant ASCs and the referring providers and surgeons falsely represented the need for these services to be performed in an ASC and falsely represented the need for the facility fee charges.

254. The Defendant ASCs Accelerated and Barnert have an extensive network within New York to provide them with huge numbers of patients from New York who have no connection with New Jersey, and no reason to have their treatment in New Jersey, yet who are brought to New Jersey in order to bill excessively.  The billing in many cases is so excessive that

it could deplete all of the remaining mandatory New York No-Fault insurance coverage for the injured parties.

255. This is a serious abuse that has threatened the cost of the New York No-Fault premium. The situation has become so grave that in a pronouncement that applies fully to the Defendants, the Department of Financial Services stated on October 10, 2017 that "certain providers have assumed a practice of charging the prevailing fee, or more, in their geographical location outside of New York, which exceeds New York limits and is believed to lead to inflated claims, depleted coverage, increased litigation and higher premiums." The Department of Financial Services further expressed its concern that "New York residents eligible for no-fault benefits for their physical injuries often are influenced to seek healthcare services from non-New York providers that engage in such practice." The Defendants in this case have repeatedly "influenced" New York residents to have health care services in New Jersey. Again and again, New York residents have been brought to New Jersey not knowing why they were sent there and having never been told the actual reason is for the Defendants to submit excessive billing that will deplete their No-Fault benefits faster. The Defendants never appear to have disclosed to New York residents how much more of their benefits will be depleted by having the services performed in another State.

256. In general, the referrals were not made based upon need, nor were they in the best interests of the patients. The patients were shared among financially-related entities as pawns, and payment or other financial consideration has been made to referring providers by Accelerated and Barnert in order to motivate them to refer the patients. As a consequence, the patients were subjected to unnecessary procedures, some of which included the risk of death. They were brought to another State, far from their homes in New York.

257.  The Defendant ASCs Accelerated and Barnert regularly billed facility fees for services that did not require anesthesia and should not have been billed by an ASC.

258.  Accelerated and Barnert and many of the Defendants regularly performed surgical services in an ASC that should have been performed in an office setting. They did so in order to improperly bill for a facility fee.  This is what Accelerated and Barnert have received in exchange for paying off their referring providers, including by making them sham owners.  If and when those providers fail to provide the expected referrals for unnecessary facility fees, their shares are taken away from them.

259.  The Defendant Alladin regularly performed injection procedures in an office setting in New York, billing through his provider entities Alladin PC and Bailey.  Yet he engaged in the scheme with Accelerated and Barnert to bill facility fees for the same services claiming they needed to be performed at the Defendant ASCs Accelerated and Barnert in New Jersey.  Alladin, Accelerated and Barnert proceeded to bill for procedures that could have been done in New York holding the facility fees out as necessary, when in fact Alladin's own prior billing showed they were unnecessary, and that the billing by Accelerated and Barnert for ASC facility fees was improper.

260.  Alladin has advertised on his website for New York patients that his offices in New York provide injections.  There is no mention that any patients will be transported to New Jersey in order to generate unnecessary facility fees.

261.  None of these services for New York residents need to be provided in New Jersey, and the vast majority of those services do not need to be provided in an ASC, if at all. There is no basis for the billing by Accelerated and Barnert for facility fees.  These are sham and

unnecessary charges enabled by the payments made by Accelerated and Barnert to its referring provider-owners, including the Defendants Alladin, Weissman, and Gorman.

262.  Accelerated and Barnert paid for the transportation of patients from New York to New Jersey, and it was provided without charge to the patients.  This free transportation was an illegal gratuity designed to influence the patients to agree to travel to New Jersey where the Defendant ASCs billed excessively and, in many cases, billed for services that were unnecessary and/or for injuries that did not exist.  The illegal gratuities to the patients were a part of the scheme designed to lure the patients to the Defendant ASCs' New Jersey locations, and to enable unnecessary billing for facility fees and/or anesthesia.  The patients were not told that by agreeing to do so, they risked having all their mandatory insurance coverage exhausted.

263.  Testifying on behalf of the Defendant ASCs Accelerated and Barnert as their Administrator at their examination under oath (EUO) on November 16, 2018, the Defendant Rahat stated that Accelerated and Barnert provide transportation to patients free of charge, and that about 15-20% of the patients of both New Jersey facilities are brought from New York.

264.  In numerous cases, the patients have had injuries that could be treated in a medical office in New York as office-based surgery.  There was no basis for the patients to receive this treatment at an ASC, let alone to be transported to an ASC in another State.  In submitting such claims, the Defendants have made the serious misrepresentation that treatment at an ASC in New Jersey and the charges for facility fees were necessary.  Millions of dollars in No-Fault claims have been submitted based upon this misrepresentation.

265.  Surgeries that can be performed in an OBSP are of the lowest complexity and are referred to as "outpatient procedures."  Some of the characteristics of outpatient procedures are that the procedure or surgery is not likely to be time consuming or followed by complications.  In

86

New York, an ASC is for higher-level surgery that requires a stay of "less than 24 hours' duration."  10 NYCRR § 755.1.  These procedures do not include those outpatient surgical procedures that can be performed safely in a physician's office or outpatient treatment room.

266. The New York State Department of Health advisors "recommend that OBS procedures be limited to those with an expected operative/procedural time of less than six hours."  https://www.health.ny.gov/professionals/office-based_surgery/obs_faq.htm.  This description demonstrates the difference in complexities between the outpatient procedures that should be performed in an OBS and an ASC.

267. The Defendants and associated non-parties directly contravened the intent of the above-cited rules and regulations and recommendation of the New York State Department of Health. Upon information and belief, instead of performing procedures at New York OBSPs, and instead of being subject to New York rules and regulations on OBSP reimbursement, these Defendants and non-parties, as part of their conspiracy, purposefully transported patients out of the State to obtain billing for unnecessary facility fees.  The New York Court of Appeals ruled definitely that an OBS practice could not collect a facility fee in New York in *GEICO v. Avanguard*, 27 N.Y.3d 22 (2016).  The billing for facility fees since that time is especially egregious and an attempt to circumvent the laws of New York by falsely representing that the services needed to be provided at ASCs.

268. The MUAs did not need to be performed at an ASC. The Defendant ASCs billed for MUAs that did not need to be performed at all.  Had these procedures actually been necessary, they could have been performed at OBSPs in New York.  These procedures usually consisted at most of ten minutes of chiropractic manipulation provided while the patients were under anesthesia.

269.  Bringing the patients to New Jersey to receive unnecessary anesthesia often billed by the Defendant ASCs, as part of their conspiracy to inflate billing, is unconscionable.

270.  The Defendant ASCs repeatedly increased their billing and billed for services not provided to make it appear that surgeries of greater complexity had been provided. For instance, as discussed herein, the Defendant ASCs billed for treatment of a pelvic ring fracture even though there were no such injuries and no such procedures were provided.

271.  Injections, arthroscopic surgeries, and MUAs were performed in office settings prior to the Court of Appeals' definitive ruling that an OBS practice was not entitled to collect a facility fee in New York.  The ruling in *GEICO v. Avanguard* did not change the complexity of the medical procedures, nor did it confer any need for use of an ASC facility over an office setting.  The patient's needs are not, and should not be, determined by the size of the reimbursement to the doctor or provider.  Nevertheless, the Defendants used patients for their own benefit.  Patients were brought to the Defendant ASC in another State, where inflated billing was submitted which depleted their insurance coverage.  Unnecessary charges for facility fees were submitted by the Defendant ASCs, further depleting the patients' insurance coverage.

272.  It is readily apparent that the Defendants did not entice patients to travel to New Jersey to have their procedures performed at Accelerated and Barnert because these are world-class ASC facilities with sterling reputations, or for any other reason in consideration of the quality of care they provide.  On the contrary, and as previously discussed, Accelerated was cited by the NJDOH in 2013 for committing serious violations of applicable New Jersey ASC rules that, *inter alia*, endangered patients' health and safety.  The same 2013 Statement of Deficiencies of the NJDOH also noted evidence of the interchangeability of Accelerated and Barnert.  Since that time, the Defendant ASCs have also been sued for fraud and other No-Fault malfeasance by

other major insurers.  Given the availability of suitable ASCs or (when appropriate) OBSPs or office settings in New York which lack the checkered regulatory or litigation history of Accelerated and Barnert, it is clear that these patients were only sent to the Defendant ASCs in New Jersey to serve the greed of the fraudulent enterprise's participants, including the Defendants.

## IV.      The Defendants' Fraudulent Scheme to Bill for Unnecessary Pain Management Injections

273.   The Defendants in this action have routinely billed Allstate for epidural steroid injections (ESI) and other minor pain management injection procedures, often performed at the financially related Defendant ASCs.  Before even considering the added costs, dangers, and inconvenience of transporting patients from New York to the Defendant ASCs in New Jersey for a procedure with unnecessary anesthesia, many if not most of the injection procedures for which the Defendants have billed Allstate for performing – and for which the Defendant ASCs have billed Allstate for facility fees – were simply inappropriate for treatment of the patients' injuries, and/or were otherwise medically unnecessary in the first place.

274.   For example, patient A.S. identified by claim number 0302868401-01 underwent no fewer than ten (10) pain management injection procedures for their cervical and lumbar spine, in each case as performed by the Defendant Alladin PC at one of the Defendant ASCs or in an OBSP or office setting.  With at least three levels per injection and sometimes more, patient A.S. was subjected to as many as fifty (50) needle introductions into her spine within the year after the auto accident in which she was allegedly injured.  However, the results of MRIs taken of the lumbar and cervical spine of patient A.S. shortly after the auto accident show that none of these injections was medically necessary.

275. Patient N.S. identified by claim number 0542952940-01 was subjected to spinal epidural steroid injection (ESI) and trigger point injection (TPI) procedures, as performed by the Defendant Riverside at the Accelerated ASC on no fewer than four (4) occasions during 2019. Despite the advanced age of patient N.S. (69), they were made to travel to New Jersey for these procedures, each of which was performed under dangerous and unnecessary anesthesia. The procedures were purportedly performed for Riverside by the Defendants Gorman (as its employee) and Sangavaram (then its nominal owner).However, MRIs of patient N.S. reflected only chronic conditions, and no relevant spinal injuries that could have resulted from the low-speed auto collision. There was also no connection between the reported pain pattern of patient N.S. and the use of ESI as a primary mode of treatment.

276. Patient T.W. identified by claim number 0506091610-03 was subjected to spinal ESI and TPI procedures, as provided by the Defendant Tristate on at least four (4) occasions during 2018: three times at the Accelerated ASC, and once at the related non-party Avicenna ASC. The procedures were purportedly performed for Tristate by the Defendants Gorman (as its employee) and Weissman (then its nominal owner). Once again, however, any need for such ESI procedures is weakly substantiated by the diagnostic results and treatment notes for patient T.W., who began receiving ESI under anesthesia within a little over two months after the relevant auto accident, having had insufficient time to adequately attempt more conservative treatments.

277. Moreover, the Defendants have subjected the patients undergoing these minor pain management procedures at Accelerated and Barnert to sedation beyond local anesthesia, at significant cost and risk to their patients' health and safety. This is ostensibly a way for the Defendants to justify the use of the Defendant ASCs for procedures which could have and should have been performed in an OBSP or office setting, where local or no anesthesia would be typical.

278.  As noted in the Journal of Pain Research, "the American Society of Anesthesiology clearly stated [] that the majority of minor pain procedures, under most routine circumstances, do not require anesthesia care other than local anesthesia."  Kohan, L, et al., *A review and survey of policies utilized for interventional pain procedures: a need for consensus,* J. Pain Res. 2017; 10:625-634,  https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5364016/ (citing ASA Cmte. on Pain Medicine, *Statement on Anesthetic Care During Interventional Pain Procedures for Adults* (rev. Oct. 26, 2016)).  According to the American Society of Anesthesiology, "[e]xamples of procedures that typically do not require sedation include but are not limited to epidural steroid injections, epidural blood patch, trigger point injections, injections into the shoulder, hip, knee, facet, and sacroiliac joints, and occipital nerve blocks."  These are precisely the types of procedures for which the Defendants' patients have been subjected to excessive anesthesia.

279.  The threat to the public health perpetrated by these Defendants is truly outrageous. Determined to drive up their billing revenues, the Defendants subjected many patients to an alarming frequency of injection procedures under excessive anesthesia.   For example, the Defendants sent patient N.A. identified by claim number 0551163678-02, a New York resident, to the Defendant ASCs in New Jersey for injection procedures with excessive anesthesia on five (5) occasions within a period of approximately two months:

    a.  The Defendant Riverside mailed to Allstate a bill totaling $953.63 for epidural steroid injections provided to patient N.A. at the Defendant ASC Accelerated on August 14, 2019, and the bill was mailed on or about its date of August 29, 2019. Riverside also mailed to Allstate a bill totaling $162.06 for related anesthesia services, and that bill was mailed on or about its date of August 29, 2019.  The Defendant Accelerated also mailed to Allstate a bill for ASC facility fees totaling $1,518.45, and the bill was mailed on or about its date of August 19, 2019.

    b.  Riverside mailed to Allstate a bill totaling $1,067.28 for trigger point and epidural steroid injections provided to patient N.A. at Accelerated on September 18, 2019, and the bill was mailed on or about its date of October 3, 2019.  Riverside also mailed to Allstate a bill totaling $162.06 for related anesthesia services, and that bill was mailed on or about its date of October 3, 2019.  Accelerated also mailed

to Allstate a bill for ASC facility fees totaling $1,679.94, and the bill was mailed on or about its date of September 24, 2019.

c. Riverside mailed to Allstate a bill totaling $826.79 for trigger point and epidural steroid injections provided to patient N.A. at Accelerated on October 9, 2019, and the bill was mailed on or about its date of October 22, 2019.  Riverside also mailed to Allstate a bill totaling $189.07 for related anesthesia services, and that bill was mailed on or about its date of October 22, 2019.  Accelerated also mailed to Allstate a bill for ASC facility fees totaling $1,679.94, and the bill was mailed on or about its date of October 14, 2019.

d. Riverside mailed to Allstate a bill totaling $1,014.60 for trigger point and epidural steroid injections provided to patient N.A. at the Defendant ASC Barnert on October 23, 2019, and the bill was mailed on or about its date of November 14, 2019.  Riverside also mailed to Allstate a bill totaling $162.06 for related anesthesia services, and that bill was mailed on or about its date of November 14, 2019.  Barnert also mailed to Allstate a bill for ASC facility fees totaling $1,679.94, and the bill was mailed on or about its date of October 29, 2019.

e. Riverside mailed to Allstate a bill totaling $826.79 for trigger point and epidural steroid injections provided to patient N.A.at Accelerated on November 6, 2019, and the bill was mailed on or about its date of December 4, 2019.  Riverside also mailed to Allstate a bill totaling $162.06 for related anesthesia services, and that bill was mailed on or about its date of December 4, 2019.  Accelerated also mailed to Allstate a bill for ASC facility fees totaling $1,679.94, and the bill was mailed on or about its date of September 24, 2019.

280. The Defendants sent patient N.S. identified by claim number 0542952940-01, a New York resident, to the Defendant ASCs in New Jersey for injection procedures with excessive anesthesia on seven (7) occasions within a period of approximately four months:

a. The Defendant Riverside mailed to Allstate a bill totaling $906.95 for epidural steroid injections provided to patient N.S. at Accelerated on June 26, 2019, and the bill was mailed on or about its date of July 15, 2019. Riverside also mailed to Allstate a bill totaling $162.06 for related anesthesia services, and that bill was mailed on or about its date of July 15, 2019.  The Defendant Accelerated also mailed to Allstate a bill for ASC facility fees totaling $1,518.48, and the bill was mailed on or about its date of August 9, 2019.

b. Riverside mailed to Allstate a bill totaling $1,067.28 for trigger point and epidural steroid injections provided to patient N.S. at Accelerated on July 16, 2019, and the bill was mailed on or about its date of July 29, 2019. Riverside also mailed to Allstate a bill totaling $162.06 for related anesthesia services, and that bill was mailed on or about its date of July 29, 2019.  Accelerated also mailed to Allstate a

bill for ASC facility fees totaling $1,679.94, and the bill was mailed on or about its date of July 29, 2019.

c.  Riverside mailed to Allstate a bill totaling $1,067.28 for trigger point and epidural steroid injections provided to patient N.S. at Accelerated on August 7, 2019, and the bill was mailed on or about its date of August 29, 2019.  Riverside also mailed to Allstate a bill totaling $162.06 for related anesthesia services, and that bill was mailed on or about its date of August 29, 2019.  Accelerated also mailed to Allstate a bill for ASC facility fees totaling $1,679.94, and the bill was mailed on or about its date of August 13, 2019.

d.  Riverside mailed to Allstate a bill totaling $1,014.60 for trigger point and epidural steroid injections provided to patient N.S. at Accelerated on August 21, 2019, and the bill was mailed on or about its date of August 29, 2019.  Riverside also mailed to Allstate a bill totaling $162.06 for related anesthesia services, and that bill was mailed on or about its date of August 29, 2019.  Accelerated also mailed to Allstate a bill for ASC facility fees totaling $1,679.94, and the bill was mailed on or about its date of August 26, 2019.

e.  Riverside mailed to Allstate a bill totaling $1,067.28 for trigger point and epidural steroid injections provided to patient N.S. at Accelerated on September 11, 2019, with Sangavaram signing the bill as Riverside's owner, and the bill was mailed on or about its date of September 20, 2019.  Riverside also mailed to Allstate a bill totaling $162.06 for related anesthesia services, and that bill was mailed on or about its date of September 20, 2019.  Accelerated also mailed to Allstate a bill for ASC facility fees totaling $1,679.94, and the bill was mailed on or about its date of September 17, 2019.

f.  Riverside mailed to Allstate a bill totaling $826.79 for trigger point and epidural steroid injections provided to patient N.S. at Accelerated on October 16, 2019, and the bill was mailed on or about its date of November 14, 2019.  Riverside also mailed to Allstate a bill totaling $189.07 for related anesthesia services, and that bill was mailed on or about its date of November 14, 2019.  Accelerated also mailed to Allstate a bill for ASC facility fees totaling $1,679.94, and the bill was mailed on or about its date of October 26, 2019.

g.  Riverside mailed to Allstate a bill totaling $119.10 for trigger point injections only (without epidural) provided to patient N.S. at Barnert on October 23, 2019, and the bill was mailed on or about its date of November 15, 2019.  Riverside also mailed to Allstate a bill totaling $162.06 for related anesthesia services, and that bill was mailed on or about its date of November 15, 2019.  The Defendant Barnert also mailed to Allstate a bill for ASC facility fees totaling $161.46, and the bill was mailed on or about its date of November 3, 2019.

281. None of the above-billed procedures for injections provided by the Defendants Riverside, Gorman, and Sangavaram required the use of an ASC, let alone an ASC in

New Jersey such as Accelerated or Barnert. This is particularly true in the case of the final procedure for patient N.S. above, who underwent only trigger point injections, without ESI or epidurography, a procedure which the Defendants have routinely performed in an office setting in New York.

282. The Defendants have advertised to New York patients that they offer, in an OBSP or office setting in New York, the same kinds of services they perform at the Defendant ASCs in New Jersey. For example, among the services listed on the website of the Defendant Alladin, owner of the Defendants Alladin PC and Bailey, are trigger point injections and intra-articular injections. The website advertises that these services are available from Alladin at five locations in New York, but none of them is an ASC. Testifying at the EUO of Bailey, Alladin confirmed that he has provided trigger point and intra-articular injections in an office setting in New York.

283. Underscoring the lack of any medical reason for sending patients to an ASC in another State for low-complexity procedures which could have been performed at an OBSP in New York, some of the Defendants' patients have undergone the same or similar injection procedures in both settings. These instances also demonstrate how much more may be charged – and by how much more a patient's available coverage may be depleted – by using an ASC rather than an OBSP.

284. For example, the Defendant Bailey mailed to Allstate a bill totaling $1,532.60 for a lumbar/sacral spine injection procedure provided to patient C.E. identified by claim number 0555840370-02, as performed at the Defendant ASC Barnert on January 4, 2020, and the bill was mailed on or about its date of January 29, 2020. Barnert also mailed to Allstate a bill totaling $1,518.48 for related facility fees, and the bill was mailed on or about its date of January 29, 2020. Related non-party University Anesthesia Services, P.C.

("University Anesthesia") also billed $518.82 to Allstate for providing anesthesia, and the bill was mailed on or about its date of February 1, 2020.  In total, these three providers billed $3,569.90 for the January 4, 2020 procedure performed by Bailey at Barnert.

285.  Allstate then received a bill from related non-party Physical Medicine & Rehabilitation of New York, P.C. ("PMRNY") for a lumbar/sacral spine injection procedure provided to this same patient C.E. on September 22, 2020 at its office, located at 3815 Putnam Avenue West, North Bronx, NY 10463, and the bill was mailed on or about its date of October 13, 2020.  The total amount of this bill was $862.53, and the patient was not subjected to the additional charges or inconvenience of going to an ASC in New Jersey.

286.  By way of further example, the Defendant Alladin PC mailed to Allstate a bill totaling $3,173.35 for injections provided to patient D.F. identified by claim number 0395841521-02 at Accelerated on May 16, 2016, and the bill was mailed on or about its date of June 9, 2016.  Accelerated also mailed to Allstate a bill totaling $2,295.32 for related facility fees, and the bill was mailed on or about its date of June 3, 2016.  Related non-party MEDICSURG also billed $4,125.00 to Allstate for providing anesthesia, and the bill was mailed on or about its date of June 11, 2016.  In total, these three providers billed $9,593.67 for the May 16, 2016 procedure.

287.  Allstate then received a bill from Alladin PC for injections provided to this same patient D.F. just one week later, on May 23, 2016, as provided by Alladin in an office located at 3626 Bailey Avenue, Bronx, NY 10463, and the bill was mailed on or about its date of June 8, 2016.  The total amount of this bill was $3,115.70, and the patient was not subjected to the additional charges or inconvenience of going to an ASC in New Jersey.

V.      **The Defendants' Fraudulent Scheme to Bill for
Unnecessary Manipulation Under Anesthesia (MUA)**

288. MUA involves a series of stretches and manipulations performed on a patient's musculoskeletal system, while the patient is under sedation or general anesthesia.  Anesthesia is purportedly used to reduce pain, spasms, and muscle guarding that otherwise might occur in a waking patient.  However, as a result of being under anesthesia, the patient cannot consciously provide information as to whether the manipulation, which usually includes the cervical spine or neck area, may be causing discomfort, pain, or possible injury.

289. MUA is a moderately accepted treatment for a limited set of isolated joint conditions, such as frozen shoulder.  MUA when done by chiropractors, or when done routinely on patient after patient, is inappropriate, and billing for it is fraudulent.  There are no randomized controlled trials or published cohort studies on management of specific diagnoses of the spine, hip, or shoulder via MUA.  No evidence exists showing the long-term benefits of MUA.

290. The MUA patients had typically sustained only relatively minor soft tissue injuries from car accidents, to the extent they had sustained any injury at all.  Such soft tissue injuries including mere sprains and strains will, according to prevailing medical guidance and standards of care, typically resolve within weeks without any treatment or with conventional chiropractic or physical therapy modalities or pain medication. Such treatment avoids subjecting the patient to the needless costs and risks of anesthesia and more intensive and invasive treatments or procedures.  However, despite the availability of such low-risk and lower cost treatments, the Defendants' patients were routinely subjected to more intense, and unnecessary treatments and procedures, including spinal pain injections and pre-determined three-day courses of MUA, even though the patients had not tried traditional and/or more conservative forms of treatment.

291.  In *Global Liberty Insurance Company v. Accelerated Surgical Center*, No. 23450/2017E (Sup. Ct. Bronx Apr. 28, 2017), the plaintiff No-Fault insurer sought a judgment declaring that the defendants in that action, including the Defendant ASC Accelerated and (non-party here) MEDICSURG, were not entitled to reimbursement for medically unnecessary MUA purportedly provided to two patients.  Each of the *Global Liberty* defendants defaulted in the action despite receiving proper notice, and declaratory judgment was entered against them, with costs, on February 9, 2018.

292.  Nonetheless, for the better part of a decade, both of the Defendant ASCs Accelerated and Barnert repeatedly billed facility fees to Allstate for MUA performed on their premises by related non-party chiropractors and/or other professionals.  In most or all cases, Accelerated and Barnert billed for MUA of the spine (CPT 22505) and/or MUA of the pelvis (CPT 27194, 27198), as performed improperly by a chiropractor, often related non-parties Khait and/or his associate Weinberger.  In many cases, the same patient was subjected to MUA at both of the Defendant ASCs during the course of their treatment.  For example:

a)  Barnert mailed to Allstate a bill totaling $7,700.00 for facility fees based on MUA of the spine and pelvis provided to patient B.W. identified by claim number 0317309045-01, as performed at the Barnert ASC on August 4, 2014 by non-party chiropractor Curtis Blumenthal, DC, and the bill was mailed on or about its date of September 3, 2014.

b)  Barnert mailed to Allstate a bill totaling $6,500.00 for facility fees based on MUA of the spine and pelvis provided to patient R.B. identified by claim number 0402937361-01, as performed at the Barnert ASC on April 14, 2016 by Khait, and the bill was mailed on or about its date of April 22, 2016.

c)  Accelerated mailed to Allstate a bill totaling $5,000.00 for facility fees based on MUA of the spine and pelvis provided to patient R.B. identified by claim number 0402937361-01, as performed at the Accelerated ASC on April 25, 2016 by Khait, and the bill was mailed on or about its date of May 16, 2016.

d)  Barnert mailed to Allstate a bill totaling $6,500.00 for facility fees based on MUA of the spine, pelvis, and shoulder provided to patient L.F. identified by claim number 0399812865-01, as performed at the Barnert ASC on July 9, 2016 by

non-party chiropractor Glenn Rosenberg, DC, and the bill was mailed on or about its date of March 29, 2018.

e)   Barnert mailed to Allstate a bill totaling $6,500.00 for facility fees based on MUA of the spine and pelvis provided to patient S.J. identified by claim number 0422068007-01, as performed at the Barnert ASC on November 10, 2016 by Weinberger, and the bill was mailed on or about its date of December 10, 2016.

f)   Barnert mailed to Allstate a bill totaling $6,500.00 for facility fees based on MUA of the spine and pelvis provided to patient I.M. identified by claim number 0429789927-01, as performed at the Barnert ASC on February 8, 2017 by Khait, and the bill was mailed on or about its date of February 13, 2017.

g)   Accelerated mailed to Allstate a bill totaling $5,000.00 for facility fees based on MUA of the spine and pelvis provided to patient R.N. identified by claim number 0443823414-02, as performed at the Accelerated ASC on April 7, 2017 by Khait and Weinberger, and the bill was mailed on or about its date of April 14, 2017.

h)   Accelerated mailed to Allstate a bill totaling $9,000.00 for facility fees based on MUA of the spine and pelvis provided to patient J.V. identified by claim number 0449353200-02, as performed at the Accelerated ASC on April 25, 2017 by Weinberger, and the bill was mailed on or about its date of May 3, 2017.

i)   Accelerated mailed to Allstate a bill totaling $9,000 for facility fees based on MUA of the spine and pelvis provided to patient M.V. identified by claim number 0476536008-02, as performed at the Accelerated ASC on November 17, 2017 by non-party chiropractor Henry Estrada, DC ("Estrada"), and the bill was mailed on or about its date of November 20, 2017.

j)   Accelerated mailed to Allstate a bill totaling $9,335.52 for facility fees based on MUA of the spine, pelvis, and shoulder (CPT 23700) provided to patient R.I. identified by claim number 0477637250-02, as performed at the Accelerated ASC on March 15, 2018 by Estrada, and the bill was mailed on or about its date of March 29, 2018.

293.   There was no medical basis to perform the MUA.   MUAs have no established benefits for the diagnoses established in any of these patients – there was no reason at all in any case for any of their body parts to be managed by MUA.   MUA could have been harmful in some of these cases and was risky for some of the patients.   All MUAs subjected the patients to the risk of anesthesia without necessity.

294.  The risks of manipulation and harm to patients depend upon the body part being manipulated.  Cervical spine manipulation carries special risks of fracture and paralysis.  The first two cervical vertebrae are connected by ligaments that may be loose and unstable.  There can be disk herniations that may be worsened with manipulation.  The waking patient may be able to warn the chiropractor if he is manipulating the spine too forcefully or is causing pain or discomfort, but the unconscious patient has no ability to communicate protective sensation.

295.  In the thoracic spine, MUA makes even less sense medically, as the ability to move thoracic segments is limited by the attachment of ribs to the spine.  If light force is applied, the vertebrae will not move appreciably and the manipulation does not actually move vertebrae.  If the manipulation was in theory strong enough to actually move the vertebrae, there would be risk of rib fracture.

296.  The lumbar spine manipulation is less risky than cervical as the room for spinal nerves to sustain compression is greater, but the same lack of protective sensation applies.

297.  Pelvic manipulation is most likely useless.  It would take tremendous force to actually manipulate the pelvis, and it is unlikely that any actual therapeutic effect is imparted to the patient by it.

298.  Shoulder manipulation carries known risks of fracture of the humeral head and glenoid socket. There is a real risk of dislocation and soft tissue injury, such as labrum tears or rotator cuff injury.  Manipulation for adhesive capsulitis is a very special process and only an orthopedic surgeon should perform it.  The axillary nerve is at risk if MUA is performed improperly.

299.  Hip manipulation is likely more useless than dangerous.  The iliofemoral ligaments are extremely strong and they will not yield to manual therapy.  There is a risk of fracture to the acetabulum and possibly the proximal femur with MUA.

300. Patient R.N. identified by claim number 0443823414-02 was subjected to dangerous and unnecessary MUA as performed at the Accelerated ASC by non-party chiropractors Khait and Weinberger on three dates in close succession: April 7, 2017; April 21, 2017; and April 24, 2017.  On each of these three occasions, Accelerated billed Allstate for facility fees relating to MUA of the cervical, thoracic, and lumbar spine, and the bills were mailed on or about their shared date of August 14, 2017.  However, MRIs of the cervical and lumbosacral spine sections did not indicate that patient R.N. had any condition that could be appropriately treated by MUA, or any spinal pathology that actually resulted from the relevant auto accident.  Other than the minor insertion of details, the relevant MUA operative reports intended to support these repetitive and unnecessary services are largely identical and suggest a pattern by the relevant providers of performing three dates of MUA, regardless of the patient's condition, course of care, and other objective findings.

301.  Similarly, Patient I.M. identified by claim number 0429789927-01 was subjected to dangerous and unnecessary MUA under anesthesia as performed at the Barnert ASC by non-party chiropractors Khait and Weinberger on three dates in close succession: December 14, 2016; February 8, 2017; and February 10, 2017.  On each of these three occasions, Accelerated billed Allstate for facility fees relating to MUA of the cervical, thoracic, and lumbosacral spine, and the bills were mailed on or about their respective dates of December 22, 2016; February 13, 2017; and February 13, 2017.  However, patient I.M. sustained at most some muscle sprains, and no severe or permanent injury, from the relevant auto accident and, in any case, no injuries for

which MUA would be appropriate.  Once again, the relevant MUA operative reports intended to support these services are largely copied from one procedure date to another, regardless of the patient's condition, course of care, and other objective findings.

302. This was a dangerous pattern that was engaged in by the Defendants and related providers in order to generate unnecessary No-Fault billing, which in turn depleted the patients' insurance coverage if it was paid.

**VI.     The Defendants' Fraudulent Scheme to Bill for
          Unnecessary ROM Testing, MMT, and ALM**

303. The Defendants Elmwood and Molnar, both nominally owned by the Defendant Sangavaram but secretly owned by the Defendant Zaitsev, have perhaps the narrowest scope of practice of any of the Defendant PCs.   Almost without exception, the hyper-specialized Elmwood and Molnar have billed for just three types of services: range of motion (ROM) testing under CPT 95851; manual muscle testing (MMT) under CPT 95831; and activity limitation measurement (ALM) under CPT 97799 (or in very few cases under CPT 97139).

304. Elmwood and Molnar are sham PCs, conceived for the special and seemingly exclusive purpose of driving up billing for what are normally mundane services.  ROM testing, MMT, and ALM are services which are usually provided in the context of a clinical examination of the patient, as performed by a provider that typically also bills for one or more other services. In the case of Elmwood and Molnar, however, these three services are the only ones ever billed for by these providers.

305. Elmwood and Molnar were thus set up and operated to enrich the Defendants with repetitive billing for a pre-determined course of testing services which were unnecessary, to the extent they were provided at all.  The vast majority of their patients purportedly receive all three

types of testing, and usually more than once. Apart from the provider's identity, the bills of Elmwood and Molnar are identical, including the representation that all services are purportedly performed by Sangavaram personally.

306. Despite their relatively short periods of operation, Elmwood and Molnar have purportedly provided these three types of services to their patients with incredible frequency.

307. During a period of less than four months, between November 2, 2018 and February 18, 2019, Elmwood billed Allstate at least $170,877.03 for ROM testing, MMT, and/or ALM provided to at least 115 No-Fault patients, with at least 100 of those patients receiving all three types of services.

308. Just one day after Elmwood's final bill to Allstate on February 18, 2019, Molnar took over Elmwood's practice and all of its patients. Although Sangavaram ultimately billed Allstate through Molnar for services during a shorter time period than he had with Elmwood, he then ramped up the operation with Molnar, which billed at a significantly faster pace. Within a period of just 39 days, between February 19, 2019 and March 29, 2019, Molnar billed Allstate at least $89,562.52 for ROM testing, MMT, and/or ALM provided to at least 73 No-Fault patients, with at least 51 of those patients receiving all three types of services.

309. Most of the patients for whom Molnar purportedly provided services were previously patients of Elmwood. These patients purportedly continued to receive the same types of treatment with Molnar as they had with Elmwood, at the same respective locations, and in each and every case, with Sangavaram purportedly rendering the service himself. Indeed, with the exception of the name of the provider PC and its tax identification number (TIN), the bills submitted to Allstate by Elmwood and Molnar are indistinguishable.

310.  The CPT codes under which Elmwood and Molnar have billed Allstate for MMT (96831) and ROM testing (95851) require a "report" on those services.  ALM has been billed by Elmwood and Molnar under CPT 97799, whose description is "Unlisted physical medicine/rehabilitation service or procedure," also calling for a description from the provider.  However, Elmwood and Molnar consistently failed to submit any reports, notes, or other documentation of any kind to Allstate that could substantiate their billing for ROM testing and MMT, or ALM for that matter.

311.  In entering a RICO and declaratory judgment against Elmwood, Molnar, and their record owner Sangavaram, the District Court in *GEICO v. Elmwood Park* determined that during the same time period in which they were billing Allstate, Elmwood and Molnar had submitted No-Fault bills to GEICO for services performed (if at all) by independent contractors: specifically ROM testing, MMT, and ALM.  These are precisely the same three services which comprise all or nearly all of the bills submitted by Elmwood and Molnar to Allstate.

312. As with the claims at issue in this Complaint, the court in *Elmwood Park* determined that to the extent such services were provided at all, they were duplicative of examinations and testing the patients had already received.  Elmwood and Molnar had also "unbundled" or otherwise improperly maximized their billing, as well as falsely representing that such billing was supported by corresponding written, interpretive reports, which they were not.

313.  Also of relevance here, the *Elmwood Park* court held further that Elmwood and Molnar had submitted No-Fault bills to GEICO for ROM testing, MMT, and ALM which were invalidated by licensing violations.  Specifically, the court found, *inter alia*, that Elmwood and Molnar were formed, funded, and controlled by non-physicians rather than Sangavaram, their

nominal owner. This has been true of all six (6) Defendant PCs nominally owned by Sangavaram.

314. Accordingly, Elmwood and Molnar are not eligible for reimbursement on their No-Fault claims because: (a) the billed-for ROM testing, MMT, and ALM services were improperly performed or not performed at all; (b) Elmwood and Molnar are ineligible for reimbursement by reason of licensing violations; and (c) the billed-for services were actually rendered by independent contractors rather than employees.

## VII.   The Defendant Providers' Failure to Verify their Claims

315. The Defendants have submitted No-Fault claims to Allstate, which has sought to verify their claims and ascertain the basis(es) or lack thereof for such billing. Allstate has made numerous written verification requests which have been ignored or answered only in part. Allstate has also requested the examinations under oath (EUOs) of several of the Defendants who have failed to appear for such EUOs, and who have thereby violated a policy condition.

316. The Plaintiffs have tried again and again to get answers from the Defendants to questions bearing on the veracity and eligibility of their No-Fault billing. Several of the Defendant providers have failed to respond to Allstate's requests for written verification, and/or to appear for EUOs.

317. The Defendant Bailey appeared for an EUO taken by Allstate on April 29, 2022. However, Bailey has failed to respond to any of Allstate's requests for written verification. For example:

> a) On or about February 3, 2021, Allstate mailed a request to Bailey for written verification regarding billing for services provided on December 22, 2020 for patient H.J. identified by claim number 0607904422, but no response has been received from Bailey.

b) On or about February 11, 2021, Allstate mailed a request to Bailey for written verification regarding billing for services provided on January 12, 2021 for patient J.W. identified by claim number 0599738258, but no response has been received from Bailey.

c) On or about March 25, 2021, Allstate mailed a request to Bailey for written verification regarding billing for services provided on February 23, 2021 for patient X.S. identified by claim number 0614761500, but no response has been received from Bailey.

d) On or about April 21, 2021, Allstate mailed a request to Bailey for written verification regarding billing for services provided on March 2, 2021 for patient D.S. identified by claim number 0615669074, but no response has been received from Bailey.

e) On or about April 28, 2021, Allstate mailed a request to Bailey for written verification regarding billing for services provided on January 14, 2021 for patient B.G. identified by claim number 0608420790, but no response has been received from Bailey.

318. The Defendant Bedford has failed to appear for an EUO by Allstate. Bedford has also failed to respond to any of Allstate's requests for written verification. For example:

a) On or about April 6, 2021, Allstate mailed a request to Bedford for written verification regarding billing for services provided on February 25, 2021, for patient M.A. identified by claim number 0600739023, but no response has been received from Bedford.

b) On or about April 15, 2021, Allstate mailed a request to Bedford for written verification regarding billing for services provided on February 23, 2021, for patient P.C. identified by claim number 0605268283, but no response has been received from Bedford.

c) On or about April 23, 2021, Allstate mailed a request to Bedford for written verification regarding billing for services provided on March 11, 2021, for patient Y.L. identified by claim number 0599497251, but no response has been received from Bedford.

d) On or about May 11, 2021, Allstate mailed a request to Bedford for written verification regarding billing for services provided on March 15, 2021, for patient R.J identified by claim number 0611065657, but no response has been received from Bedford.

e) On or about June 17, 2021, Allstate mailed a request to Bedford for written verification regarding billing for services provided on April 1, 2021, for

patient L.C. identified by claim number 0611667064, but no response has been received from Bedford.

319. The Defendant Ridgewood has failed to respond numerous requests for written verification by Allstate.  For example:

    a) On or about March 9, 2022, Allstate mailed a request to Ridgewood for written verification regarding billing for services provided on December 15, 2021 for patient N.M., identified by claim number 0627358914, but no response has been received from Ridgewood.

    b) On or about March 9, 2022, Allstate mailed a request to Ridgewood for written verification regarding billing for services provided on December 2, 2021 for patient K.D., identified by claim number 0634539670, but no response has been received from Ridgewood.

    c) On or about March 9, 2022, Allstate mailed a request to Ridgewood for written verification regarding billing for services provided on November 30, 2021 for patient J.S., identified by claim number 0632012670, but no response has been received from Ridgewood.

    d) On or about March 9, 2022, Allstate mailed a request to Ridgewood for written verification regarding billing for services provided on November 16, 2021 for patient E.C., identified by claim number 0627941412, but no response has been received from Ridgewood.

    e) On or about March 9, 2022, Allstate mailed a request to Ridgewood for written verification regarding billing for services provided on December 2, 2021 for patient I.A., identified by claim number 0629217621, but no response has been received from Ridgewood.

320. The Defendant Riverside has failed to appear for an EUO by Allstate.  Riverside has also responded only to two (2) of Allstate's thirteen (13) requests for written verification. For example:

    a) On or about November 1, 2019, Allstate mailed a request to Riverside for written verification regarding billing for services provided on September 18, 2019 for patient K.A., identified by claim number 0551163678, but no response has been received from Riverside.

    b) On or about November 18, 2019, Allstate mailed a request to Riverside for written verification regarding billing for services provided on October 9, 2019 for patient S.H., identified by claim number 0557840410, but no response has been received from Riverside.

c) On or about December 17, 2019, Allstate mailed a request to Riverside for written verification regarding billing for services provided on October 23, 2019 for patient V.F., identified by claim number 0547039651, but no response has been received from Riverside.

d) On or about January 7, 2020, Allstate mailed a request to Riverside for written verification regarding billing for services provided on November 6, 2019 for patient K.A., identified by claim number 0551163678, but no response has been received from Riverside.

e) On or about January 28, 2020, Allstate mailed a request to Riverside for written verification regarding billing for services provided on November 27, 2019 for patient V.F., identified by claim number 0547039651, but no response has been received from Riverside.

321. The Defendant Tristate has failed to appear for an EUO by Allstate. Tristate has also responded only to eight (8) of Allstate's eighty-three (83) requests for written verification. For example:

a) On or about November 12, 2018, Allstate mailed a request to Tristate for written verification regarding billing for services provided on October 10, 2018 for patient I.T., identified by claim number 0508799664, but no response has been received from Tristate.

b) On or about January 16, 2019, Allstate mailed a request to Tristate for written verification regarding billing for services provided on December 3, 2018 for patient R.P., identified by claim number 0518356043, but no response has been received from Tristate.

c) On or about February 1, 2019, Allstate mailed a request to Tristate for written verification regarding billing for services provided on December 26, 2018 for patient J.M., identified by claim number 0522619618, but no response has been received from Tristate.

d) On or about March 16, 2019, Allstate mailed a request to Tristate for written verification regarding billing for services provided on January 14, 2019 for patient R.A., identified by claim number 0500896815, but no response has been received from Tristate.

e) On or about December 20, 2019, Allstate mailed a request to Tristate for written verification regarding billing for services provided on November 11, 2019 for patient E.M., identified by claim number 0535572044, but no response has been received from Tristate.

322.  As a result of these and other failures to respond to verification requests, the Defendants failed to provide requested verification, they violated a policy condition and their claims never became overdue and in numerous cases were denied for failure to comply with the requests and policy conditions.

## VIII.       The Defendants' Fraudulent Scheme to Bill in Violation of the Fee Schedule

323.  Through the Defendants' routine transport New York resident patients to New Jersey for health care services they could have received in New York, the Defendants have submitted excessive billing that depleted the patients' insurance coverage and contributed to the cost of No Fault insurance for consumers.

324.  As DFS stated on October 10, 2017, "certain providers have assumed a practice of charging the prevailing fee, or more, in their geographical location outside of New York, which exceeds New York limits and is believed to lead to inflated claims, depleted coverage, increased litigation and higher premiums." DFS expressed its concern that "New York residents eligible for No-Fault benefits for their physical injuries often are influenced to seek healthcare services from non-New York providers that engage in such practice."

325.  In this pattern of inflated and unnecessary services, the Defendants regularly submitted inflated and unnecessary billing to Allstate.  Most of the services at the Defendant ASCs did not need to be provided in an ASC (if they even needed to be provided at all), and there was no basis for the billing of unnecessary facility fees other than to enrich the Defendants at the expense of the patients' insurance coverage.

326.  The Defendant ASCs can only bill for services that appear in the New Jersey fee schedule, codified at Section 11:3-29.1, *et seq.*, of the New Jersey Administrative Code.

327.  Another similarly lucrative and interstate dimension of the Defendants' fraudulent schemes has been to refer their patients to the Defendant Ridgewood for drug testing and other clinical laboratory services pursuant to a pre-determined protocol.  As set forth more fully in the following section, these referrals have been made to patients without any need for drug testing, often repeatedly for the same patient, and the patients' test results are often not even available until several days after the ASC procedure for which it was purportedly required.

328.  Moreover, even if such drug testing were appropriate as ordered – which it is not – Ridgewood has consistently overbilled for those tests, frequently charging in excess of $4,000 for preparing a single drug testing report, and usually for a patient who did not need testing at all. Ridgewood has attained such astronomical amounts through the improper and systematic "unbundling" of line items for drug testing services on its bills.

329. In order to maximize the revenue derived from this scheme, Ridgewood has typically "unbundled" its billing for this comprehensive testing, such that a single comprehensive, multi-substance test is billed with 20 or more line items, each corresponding to one type of drug being tested.  In other words, Ridgewood billed for each test as if it had consisted of 20 or more standalone tests for individual drugs, rather than one comprehensive test. Each of the line items in these unbundled, comprehensive bills corresponds to a different CPT Code and standalone drug test, encompassing a vast array of drugs (*e.g.*, amphetamines, barbiturates, MDMA, and PCP) which were entirely unrelated to their patients' histories and needs.

330.  Ridgewood often submitted a second, "bundled" and significantly smaller bill for drug testing purportedly rendered on the same date as the unbundled services in the

comprehensive testing bill.  By doing so, however, Ridgewood was actually billing twice for services on which it was already overbilling with the comprehensive testing bill.

## IX.        The Defendants' Fraudulent Scheme to Bill for Unnecessary Drug Testing

331.   The Defendants have devised and executed a scheme to bill Allstate for frequent and unnecessary clinical laboratory services, especially including comprehensive drug testing, provided by the Defendant Ridgewood, which has received routine referrals of patients from the Defendant PCs, especially the Zaitsev PCs.   In many cases, the patient samples used by Ridgewood for such testing are collected at Accelerated or Barnert in connection with, and on the same date as, an ASC procedure such as pain management injection, arthroscopy, or MUA.

332.   As noted in the preceding section, Ridgewood has engaged in the improper unbundling of claims for drug testing in order to claim reimbursement in an amount far exceeding what is allowed under the fee schedule.   Furthermore, the testing itself has been performed needlessly and excessively, solely to generate No-Fault billing revenue for Ridgewood, and pursuant to a pre-determined testing protocol without regard for individual patients' needs or histories.

333.   While Ridgewood's drug testing was ostensibly done to clear a patient for a surgical or other procedure, the samples were usually collected on or around the date of the procedure (in many cases at the ASC where the relevant procedure was held), and the results were generally provided days after the surgeries had already been performed.   In that regard, Ridgewood's bills frequently misrepresented that it had performed such testing on the date of the procedure, when in fact its own reports demonstrate that Ridgewood did not usually even receive the patient samples until one or more days after the procedure.   As the Defendant Weissman previously pointed out in the Weissman Affirmation, under these circumstances the testing was

completely useless.  Its only purpose was fraud at the expense of the Plaintiffs and the limited insurance coverage of the insureds.

334.  For example, the Defendant Riverside mailed to Allstate a bill totaling $719.14 for epidural steroid injections and epidurography provided to patient N.F. identified by claim number 0544660608-06 at the Defendant ASC Accelerated on July 10, 2019, as well as a bill totaling $162.06 for the related anesthesia services, and the bills were mailed on or about their date of July 30, 2019.  Ridgewood mailed to Allstate a bundled bill totaling $884.80 for drug screening and a second, unbundled bill totaling $4,167.98 for drug screening as provided on the same date as the procedure, July 10, 2020, and the Ridgewood bill was mailed on or about its date of July 22, 2020.  However, the related laboratory report of Ridgewood indicates that the sample for patient N.F. had only been collected by Sangavaram at Accelerated on the date of the procedure, July 10, 2020; the sample was not received by Ridgewood until the next day July 11, 2020, and the report was not completed until July 12, 2020, two (2) days after the procedure at Accelerated.

335. The Defendant ASC Barnert mailed to Allstate a bill for facility fees totaling $21,419.90 for a spinal discectomy procedure provided to patient A.P. identified by claim number 0569141799-10, as performed at the Barnert ASC on February 15, 2020, and the bill was mailed on or about its date of February 21, 2020.  Ridgewood mailed to Allstate a bill totaling $884.80 for drug screening, as performed on the same date as the procedure, February 15, 2020, and the Ridgewood bill was mailed on or about its date of March 10, 2020.  However, the related laboratory report of Ridgewood indicates that the sample for patient A.P. had only been collected at Barnert on the date of the procedure, February 15, 2020; the sample was not received by

Ridgewood until February 24, 2020, and the report was not completed until February 26, 2020, eleven (11) days after the procedure at Barnert.

336.  Ridgewood often billed for the same drug screening provided to the same patient on several occasions within a short timeframe, without any apparent medical or other reason, apart from generating additional billing.  For example:

    a. Ridgewood mailed to Allstate two bills to Allstate totaling $5,052.78 for toxicology screening provided to patient N.V. identified by claim number 0547039651-02 on May 30, 2019, and the bills were mailed on or about their date of August 1, 2019.

    b. Ridgewood mailed to Allstate two bills totaling $5,052.78 for toxicology screening provided to patient N.V. on July 24, 2019, and the bills were mailed on or about their date of August 1, 2019.

    c. Ridgewood mailed to Allstate two bills totaling $5,016.06 for toxicology screening provided to patient N.V. on October 2, 2019, and the bills were mailed on or about their date of October 16, 2019.

    d. Ridgewood mailed to Allstate two bills totaling $5,016.06 for toxicology screening provided to patient N.V. on October 23, 2019, and the bills were mailed on or about their date of November 1, 2019.

    e. Ridgewood mailed to Allstate two bills totaling $5,016.06 for toxicology screening provided to patient N.V. on November 6, 2019, and the bills were mailed on or about their date of November 15, 2019.

    f. Ridgewood mailed to Allstate two bills totaling $5,016.06 for toxicology screening provided to patient N.V. on November 27, 2019, and the bills were mailed on or about their date of December 6, 2019.

337. As shown above, Ridgewood has billed Allstate for drug screening of this same patient N.V. on six occasions within a six-month period, for a total amount of $30,169.80.  On this claim, Ridgewood's billing alone would have exhausted most of the claimant's available No-Fault coverage, before even considering the charges by other providers for the surgical procedures themselves, in support of which the Ridgewood testing was purportedly ordered. This is antithetical to the interests of the patient.

112

338.  In another example, Ridgewood mailed to Allstate at least 16 bills for drug testing provided to patient J.M. identified by claim number 0594557639-02 within a time period of about two and a half months, between February 17 and April 29, 2021.  Within the same time period, Ridgewood also mailed to Allstate at least 10 bills for COVID-19 testing, billing separately for sample collection and testing on each of five occasions.  The referrals for all of this testing came from the Defendants Bedford and/or Sangavaram, including comprehensive, quantitative drug testing on three dates – February 23; March 23; and April 6, 2021 – when Sangavaram purportedly performed pain management injections for the patient at the ASC operated by non-party Integrated Specialty ASC, LLC f/k/a HealthPlus Surgery Center, LLC ("Integrated") in Saddle Brook, New Jersey.  Bedford mailed to Allstate bills for these injections in the total amounts of $690.34, $599.62, and $599.62, and the bills were mailed on or about their dates of March 16, March 31, and April 19, 2021, respectively.

339.  Moreover, in some instances, Ridgewood performed and billed for the same drug testing of the same patient as was performed and billed for by another provider on or about the same date.

340.  For example, Ridgewood mailed to Allstate a bill totaling $4,077.98 for drug screening provided to patient K.C. identified by claim number 0485913826-02 on January 16, 2019, and the bill was mailed on or about its date of February 14, 2019.  Allstate then also received a bill from related non-party Metropolitan Medical & Surgical, P.C. ("Metro Med"), which is owned by related non-party Mark Gladstein, M.D. ("Gladstein"), for drug screening totaling $399.58, as provided to patient K.C. on January 16, 2019, and the bill was mailed by Metro Med on or about its date of February 4, 2019.  The relevant toxicology reports of Ridgewood and Metro Med both confirm the absence of any tested substances.

341.  Ridgewood then submitted another bill totaling $4,077.98 for drug screening, as provided to patient K.C. on April 18, 2019, and the bill was mailed on or about its date of April 29, 2019.  Allstate then once again received a bill from Metro Med for drug screening totaling $399.58, as provided to patient K.C. on April 16, 2019, and the bill was mailed by Metro Med on or about its date of April 25, 2019.  The relevant toxicology reports of Ridgewood and Metro Med both confirm the absence of any tested substances.

342.  In another example, Ridgewood mailed to Allstate a bill totaling $4,077.98 for drug screening provided to patient C.C. identified by claim number 0523637956-01 on January 29, 2019, and the bill was mailed on or about its date of February 8, 2019.  Allstate then also received a bill from Metro Med for drug screening totaling $387.12, as provided to patient C.C. on the same date, January 29, 2019, and the bill was mailed by Metro Med on or about its date of February 14, 2019.  The corresponding Ridgewood report indicates that the referring provider was Gladstein, and that he collected the sample for Ridgewood from patient C.C. on the same date, January 29, 2019, specifying that the collection location was "Pain Medicine of New York," which is the registered assumed name of Metro Med as well as Alladin PC.  The relevant toxicology reports of Ridgewood and Metro Med both confirm the absence of any tested substances.

343.  By way of further example, Ridgewood mailed to Allstate a bill totaling $4,077.98 for drug screening provided to patient Y.R. identified by claim number 0504915935-01 on February 20, 2019, and the bill was mailed on or about its date of March 20, 2019.  Allstate also received a bill from Metro Med for drug screening totaling $387.12, as provided to patient Y.R. on the same date, February 20, 2019, and the bill was mailed by Metro Med on or about its date of March 4, 2019.  The Metro Med bill for drug testing also includes charges for spinal injections

totaling $1,052.38, as performed by Gladstein on the same date, February 20, 2019.   The corresponding Ridgewood report indicates that the referring provider was Gladstein, and that he collected the sample for Ridgewood from patient Y.R. on the same date he performed the injection procedure, February 20, 2019, specifying that the collection location was "Pain Medicine of New York," which is the registered assumed name of Metro Med as well as Alladin PC.   Additionally, insofar as the Ridgewood drug testing was ordered by Gladstein to evaluate the safety or suitability of the injection procedure for patient Y.R., the Ridgewood report indicates that the February 20, 2019 sample was not received by Ridgewood until March 1, 2019, and that the report was not completed until March 5, 2019.

344.   Ridgewood then submitted another bill totaling $4,077.98 for drug screening provided to patient Y.R. on March 6, 2019, and the bill was mailed on or about its date of March 20, 2019.   Allstate then once again received a bill from Metro Med, for drug screening totaling $387.12, as provided to patient Y.R. on the same date, March 6, 2019, and the bill was mailed by Metro Med on or about its date of March 20, 2019.   The Metro Med bill for drug testing also includes charges for spinal injections totaling $1,052.38, as performed by Gladstein on the same date, March 6, 2019.   The corresponding Ridgewood report indicates that the referring provider was Gladstein, and that he collected the sample for Ridgewood from patient Y.R. on the same date he performed the injection procedure, March 6, 2019, specifying that the collection location was "Pain Medicine of New York," which is the registered assumed name of Metro Med as well as Alladin PC.   Additionally, insofar as the Ridgewood drug testing was ordered by Gladstein to evaluate the safety or suitability of the injection procedure for patient Y.R., the Ridgewood report indicates that the March 6, 2019 sample was not received by Ridgewood until March 7, 2019, and that the report was not completed until March 8, 2019.

345.  In another example, Ridgewood mailed to Allstate a bill totaling $4,077.98 for drug screening provided to patient V.D. identified by claim number 0538434119-02 on May 29, 2019, and the bill was mailed on or about its date of June 11, 2019.  Allstate also received a bill totaling $387.12 from Metro Med for drug screening provided to patient V.D. on the same date, May 29, 2019, and the bill was mailed by Metro Med on or about its date of June 6, 2019. Separately, Allstate received another bill from Metro Med totaling $931.85 for spinal injections performed on the same date, May 29, 2019, at the ASC operated by non-party SCOB, LLC.  The corresponding Ridgewood report indicates that the referring provider was Gladstein, and that Metro Med collected the sample for Ridgewood from patient C.C. on the same date as the injection procedure, May 29, 2019, specifying that the collection location was "Pain Medicine of New York," which is the registered assumed name of Metro Med as well as Alladin PC. Additionally, insofar as the Ridgewood drug testing was ordered by Gladstein to evaluate the safety or suitability of the injection procedure for patient C.C., the Ridgewood report indicates that the May 29, 2019 sample was not received by Ridgewood until May 31, 2019, and that the report was not completed until June 4, 2019.

346.  Ridgewood has billed for comprehensive drug testing without regard for medical necessity and accepted drug testing protocols.  Ridgewood and referring providers have disregarded recommendations of the Centers for Disease Control and Prevention (CDC) in ordering and performing urine drug testing on patients who had not been prescribed any opiates or other controlled substances.  Notably, Ridgewood has submitted bills to Allstate using the fraudulent diagnosis code Z79.891 for "long term (current) use of opiate analgesic," despite the fact that records for many or all of these patients contained no evidence that they had been prescribed or provided such substances, or otherwise that there was any need for such testing.

347.  For example, Ridgewood mailed to Allstate a bundled bill totaling $884.80 for drug screening and a second, unbundled bill totaling $4,131.26 for drug screening as provided to patient M.B. identified by claim number 0569401870-03 on December 5, 2019, and the Ridgewood bills were mailed on or about their date of December 17, 2019.  On the form used for each bill, Box 5 labeled "Diagnosis and Concurrent Conditions" contains the diagnostic code Z79.891 with the description "long term (current) use of opiate analgesic," and the diagnostic code M54.5 with the description "low back pain."  Only one of these diagnostic codes, Z79.891, could be sufficient to justify urine drug testing, and Ridgewood billed with this diagnostic code fraudulently.  The medical records and reports of Ridgewood and the referring provider, the Defendant Gorman, contained no indication that patient M.B. had been taking any opiates.

348.  Similarly, Ridgewood mailed to Allstate a bundled bill totaling $884.80 for drug screening and a second, unbundled bill totaling $4,131.26 for drug screening provided to patient V.S. identified by claim number 0564587152-02 on October 15, 2019, and the Ridgewood bills were mailed on or about their date of November 13, 2019.  Once again, Ridgewood used the diagnostic codes M54.5 and Z79.891, and the latter code was fraudulent insofar as the medical records and reports of Ridgewood and the referring provider contained no indication that patient V.S. had been taking any opiates.

349.  In the case of many or most of Ridgewood's patients, the toxicology referral form, by which several of the Defendants and other referring providers order drug testing of patient samples by Ridgewood, fails to contain the required indication that a physician had properly assessed the medical necessity of such testing.  This form, titled "Toxicology Test Requisition," is often submitted without the signature of the referring provider.  Instead, the referring provider leaves a blank line next to "Ordering Physician Signature" at the bottom of the form.

350. Ridgewood's Toxicology Test Requisition form also contains a box labeled "Medical Necessity," with checkboxes for four options: "New patient baseline screening"; "Long-term use of medications"; "Medication Compliance Monitoring"; and "High-risk Group Patient Monitoring." There is also a blank line to specify an "Other" option. However, the "Medical Necessity" box is frequently left blank by the Defendants and other referring providers.

351. Even in the relatively rare case where the "Medical Necessity" box is completed by Ridgewood's referring provider, and where one of the four checkboxes is actually selected, such designation has not been supported by the patient's medical records and history. For example, Ridgewood mailed to Allstate a bill totaling $4,077.98 for drug testing as provided to patient V.D. identified by claim number 0538434119-02 on May 29, 2019, and the bill was mailed on or about its date of June 11, 2019. The corresponding Toxicology Test Requisition form, submitted to Ridgewood by referring non-party Gladstein, contains a checkmark for "High-risk Group Patient Monitoring" in the "Medical Necessity" box. Despite that designation, however, the resulting Ridgewood toxicology report indicates that patient V.D. had no detectable drugs in their system. Nor did medical records or history for patient V.D. support inclusion in the high-risk group: the patient had not been prescribed any medication by the referring physician Gladstein; the patient was not taking any controlled substances at the time of testing; the patient was not screened for addiction; and the patient had no history of use or abuse of controlled substances.

352. In many cases, Ridgewood billed for drug testing of a patient sample collected by a referring provider on the same date as the patient's initial visit with the provider, and without any reflection of the need for such testing in the referring provider's reports and notes. For example, the Defendant Riverside mailed to Allstate a bill totaling $200.68 for an initial evaluation

118

provided to patient J.M. identified by claim number 0557318029-02 on August 21, 2019 at the Kenilworth Clinic by purported employee Kwon, and the bill was mailed on or about its date of September 6, 2019.  Ridgewood mailed to Allstate a bill totaling $4,167.98 for drug testing provided to patient J.M. on the same date, August 21, 2019, and the bill was mailed on or about its date of September 5, 2019.  The corresponding Toxicology Test Requisition form indicates that the sample was collected on August 21, 2019, the same date as the patient's initial visit with Riverside, and that the referring provider was Kwon at the Kenilworth Clinic.  Ridgewood's resulting drug testing report dated August 27, 2019 likewise indicates that the patient's sample was collected on August 21, 2019, and that the referring provider was Kwon at the Kenilworth Clinic.  Riverside's Initial Comprehensive Medical Examination report dated August 21, 2019, purportedly signed by Kwon, does not even mention drug testing, and it indicates no history of drug or narcotic abuse for this patient.

353. In another example, the Defendant Tremont mailed to Allstate a bill totaling $200.68 for an initial evaluation provided to patient H.W. identified by claim number 0569401870-02 on December 3, 2019 at the Kenilworth Clinic by non-party employee Melissa Evans, FNP ("Evans"), and the bill was mailed on or about its date of January 7, 2020. Ridgewood mailed to Allstate two bills totaling $5,016.06 for drug testing provided to patient H.W. on the same date, December 3, 2019, and the bills were mailed on or about their date of December 18, 2019.  The corresponding Toxicology Test Requisition form indicates that the sample was collected on December 3, 2019, the same date as the patient's initial visit with Tremont, and that the referring provider was Evans at the Kenilworth Clinic (with the name of the Defendant Gorman also handwritten above Evans' name).  Ridgewood's resulting drug testing report dated December 11, 2019 indicates that the patient's sample was collected on

December 3, 2019, and that the referring provider was Gorman at the Kenilworth Clinic. Tremont's Initial Comprehensive Medical Examination report dated August 21, 2019, purportedly signed by Evans as well as the Defendant Sangavaram, does not even mention drug testing, and it indicates no history of drug or narcotic abuse for this patient.

354.  In most instances, the date of service on Ridgewood's bills for drug testing matches the same as the date when the patient's sample was collected, but sometimes the date of the resulting report is used instead, possibly in an attempt to conceal this pattern.  For example, the Defendant Bedford mailed to Allstate a bill totaling $275.00 for an initial visit provided to patient K.C. identified by claim number 0604553222-02 on October 29, 2019 by purported employee Su Jung Lee, FNP at the Kenilworth clinic, and the bill was mailed on or about its date of December 22, 2020.  Ridgewood then mailed to Allstate two bills totaling $5,016.06 for drug testing provided to patient K.C. on November 5, 2020, and the bills were mailed on or about their date of February 1, 2021.  The corresponding Toxicology Test Requisition form indicates that the sample was collected on October 29, 2019, the same date as the patient's initial visit with Bedford, and that the referring provider was Su Jung Lee at the Kenilworth clinic.  Ridgewood's resulting drug testing report dated November 5, 2020 likewise indicates that the patient's sample was collected on October 29, 2019, and that the referring provider was Su Jung Lee at the Kenilworth clinic.   Bedford's Initial Examination report dated October 29, 2020, purportedly signed by Su Jung Lee, contains boilerplate language that "[d]rug testing and narcotic issues were covered as well as history of usage," but then explicitly notes that this patient reported no history of drug or narcotic abuse.

355. Even if drug testing were warranted for any of Ridgewood's patients, the less expensive type known as "qualitative" testing would be sufficient, while the more expensive type

known as "quantitative" testing would be superfluous.  A qualitative test provides a simple yes or no answer to whether a tested substance is present at all in a patient's sample.  If the presence of a substance is detected through qualitative testing, and if there is any relevant need for further detail, a quantitative test may then be ordered to measure the amount of that substance in the sample. However, Ridgewood routinely billed for purportedly performing quantitative testing as to numerous drugs, despite negative tests for those drugs in the qualitative testing.  In fact, for many if not all of its patients, Ridgewood billed for performing both modes of testing – qualitative *and* quantitative – on the same date, and the results of both types of testing were reported simultaneously.  .  Plainly, Ridgewood did not perform quantitative tests after the referring physician had already reviewed the results of the qualitative test.

356. As set forth in the March 15, 2016 report of the CDC titled "CDC Guideline for Prescribing Opioids for Chronic Pain – United States, 2016," there are typically two reasons a physician might order urine drug testing: (a) before prescribing an opiate or controlled substance, to determine if the patient is already taking such a drug; and (b) after prescribing an opiate or controlled substance, to determine if the patient is actually taking the drug as prescribed.  In either case, "qualitative" drug testing would suffice for these purposes.

357. A "quantitative" test would only be necessary if qualitative testing had already been performed and demonstrated the need for further testing.  To perform quantitative urine drug testing on all patients even if the qualitative screen is normal – as Ridgewood has done – greatly increases the cost of care with no benefit to patients.

358. Moreover, the tests performed by Ridgewood assess far too many drugs, with no apparent purpose other than to increase billing.  If the referring physician has a reason to test for a specific drug (whether prescribed or illicit), and if a qualitative test raises alarm about a

particular drug, the physician could order quantitative testing that targets the specific drug. However, Ridgewood routinely orders both qualitative and quantitative testing for dozens of drugs, without any indication that the referring physician has any reason to test for such drugs.

359.   For example, referring again to patient M.B. identified by claim number 0569401870-03 and the drug testing purportedly performed by Ridgewood on December 5, 2019, this patient's medical history indicated that she was only taking Motrin (ibuprofen), a non-steroidal anti-inflammatory drug (NSAID) which is not a controlled substance.  The medical records and reports of Ridgewood and the referring physician, the Defendant Gorman, contain no indication that patient M.B. had ever previously used or abused any controlled substance, or that they had ever used illicit drugs, or that they was expected to start taking any controlled substance in the future.  Nonetheless, Ridgewood purportedly performed and billed for quantitative testing of 68 different drugs.  Unsurprisingly, patient M.B. tested negative for all 68 substances.

360.   Similarly, referring again to patient V.S. identified by claim number 0564587152-02 and the drug testing purportedly performed by Ridgewood on October 15, 2019, this patient was also tested for 68 different drugs, across nine pharmaceutical categories.  As with patient M.B., patient V.S. had no indication in their medical chart of being prescribed any medication by any physician, or that they had used or abused any controlled substance, and there was no follow-up note or report concerning the results of such testing.  In fact, patient V.S. had not been seen by any physician prior to the collection of the Ridgewood testing sample on October 15, 2019.

361.   The origin and mechanics of this scheme, as well Zaitsev's illegal direction of the same, are detailed in the December 9, 2020 Weissman Affirmation filed in *GEICO v. Zaitsev*. According to Weissman's written testimony, his decision to resign as the nominal owner of the

Defendants Riverside and Tristate was based in part on his realization that referrals made by Tristate and Riverside to Ridgewood for drug testing were pursuant to a protocol directed by Dr. Zaitsev which was unrelated to medical necessity.

362.  Weissman explained that drug testing is generally appropriate only where a pain management patient was being prescribed narcotics, or where the patient was undergoing a procedure with anesthesia and there were concerns about a possible interaction between the anesthesia and unknown drugs.  However, Weissman stated that he and the Defendant Gorman – the two pain management physicians then providing services at Riverside and Tristate – seldom prescribed narcotics to patients, and moreover that they generally employed point of service urine testing at the ambulatory surgical centers that provided results prior to performing the procedures.  In contrast, where samples were sent to Ridgewood from an ASC on the date of the relevant procedure, the samples were often not tested and the results were not communicated until several days after the procedures were performed.

363.  Nonetheless, Weissman's Affirmation stated that even in cases where he or Gorman ordered or performed same-day or in-house urinalysis drug testing, whose results could be evaluated prior to the procedure (a service for which Riverside and Tristate also billed separately), and even where there was no reason to suspect the patient's use of narcotics or any negative interaction with anesthesia, Zaitsev's treatment protocol dictated that there was to be a referral to Ridgewood for presumptive and definitive drug testing on virtually all procedures performed under anesthesia.  Indeed, Riverside and Tristate even made such referrals to Ridgewood where the patient had already undergone such testing on one or more occasions within a few weeks prior to the relevant surgical procedure.

364.  Demonstrating the degree of control exerted by Zaitsev over Riverside and Tristate, Weissman stated in his Affirmation that he had reviewed a representative sample of referrals purportedly made in his name to Ridgewood, and that they had all been submitted without his knowledge or consent, pursuant to Zaitsev's pre-determined drug testing protocols.   These referrals, he added, could not be justified upon his own review.   Moreover, Weissman eventually came to learn that the bills Ridgewood submitted to GEICO – like those it submitted to Allstate – improperly unbundled services, utilizing as many as 20 or more separate CPT codes for testing of a single patient sample.

365.  Despite frequently making referrals to Ridgewood for drug testing, several of the Defendants and other related providers have billed for purportedly performing their own toxicology analyses of their patients.   Each of these bills charged a significantly lower total amount than Ridgewood for drug testing services, and unlike Ridgewood, such drug testing was purportedly completed on the same date as the related surgical procedure.   For example:

a)  The Defendant Tristate mailed to Allstate a bill totaling $1,298.07 for ESI and epidurography provided to patient D.T. identified by claim number 0500473053-01 on July 11, 2018 at the Defendant ASC Accelerated, and the bill was mailed on or about its date of July 24, 2018.   Tristate then mailed a bill totaling $385.00 for drug testing (CPT 80305) as performed by the Defendant Weissman (then Tristate's nominal owner) at the Accelerated ASC, and the bill was mailed on or about its date of September 12, 2018.

b)  Tristate mailed to Allstate a bill totaling $1,427.76 for trigger point injections, ESI, and epidurography provided to patient A.A. identified by claim number 0507396223-01 on August 21, 2018 by the Defendant Gorman (as a Tristate employee) at the Avicenna ASC, and the bill was mailed on or about its date of September 11, 2018.   Tristate then mailed a bill totaling $385.00 for drug testing (CPT 80305) as performed by Weissman at the Avicenna ASC, and the bill was mailed on or about its date of September 12, 2018.

X.      **The Defendants' Fraudulent Scheme to Bill for**
        **Services Rendered by Independent Contractors**

366. Under the No-Fault Law, a health care provider is not entitled to payment from insurers for services provided by independent contractors.  The applicable DFS Regulations provide, in pertinent part, for "pay[ment of] benefits <u>directly to providers</u> of health care services."  11 NYCRR 65-3.11(a) (emphasis added).  In the leading decision on this question, the Appellate Division, Second Department held that "11 NYCRR 65-3.11(a) does not authorize direct payment to a medical provider which submits a bill identifying the treating provider as an independent contractor."  *A.M. Med. Servs. v. Progressive Cas. Ins. Co*., 101 A.D.3d 53, 62 (2nd Dep't 2012).

367. The DFS and its predecessor the Insurance Department have issued a series of opinion letters setting forth their position that professional corporations (PCs) cannot submit bills in their own name for services provided by independent contractors, and those opinions are entitled to deference by the courts unless irrational or unreasonable.  *See Marin v. Apple-Metro, Inc.*, No. 12-cv-5274 (ENV) (CLP), 2020 U.S. Dist. LEXIS 195258, at *34-35 (E.D.N.Y. Oct. 7, 2020) ("Deference extends even to informal opinion letters that 'represent[] the position' of the relevant agency.") (quoting *A.M. Medical*, 101 A.D.3d at 64).

368. The decision of the Appellate Division in *A.M. Medical* was rendered in deference to a February 21, 2001 informal opinion letter of the General Counsel of the Insurance Department.  In that letter, the General Counsel stated that "[w]here the health services are performed by a provider who is an independent contractor with [a (PC)] and is not an employee under the direct supervision of a PC owner, the PC is not authorized to bill under No-Fault as a licensed provider of those services."  *A.M Medical*, 101 A.D.3d at 63.  The Appellate Division quoted at length from the February 21, 2001 opinion letter:

Such direct billing by the PC, due to the lack of supervisory control by the PC, may facilitate fraud, since the PC might bill under its own fee schedule as a specialist rather than the general practitioner fee schedule of the independent contractor, who actually provided the service. In addition, the patient may wrongfully believe the independent contractor's actions are under the supervision of the PC.

Since New York Education Law § 6509-a specifically authorizes shareholders and employees to contribute to the income of a PC, and is separate with respect to independent contractors, allowing the PC to bill for the independent contractor may constitute unlawful fee splitting....

Accordingly, since the control, and therefore the liability, of the principal for the acts of the independent contractor is attenuated, and in order to preserve the integrity of the No-Fault and physician licensing systems, this Department has determined that, when the services are provided by an independent contractor, the PC should not be considered as the 'licensed provider' authorized to bill under No-Fault."

*Id.* (quoting Ops. Gen. Counsel NY Ins. Dep't No. 01-02-13 (Feb. 21, 2001)).

369.  The Insurance Department (now the DFS) upheld and reaffirmed the 2001 opinion regarding billing for services performed by independent contractors in subsequent opinion letters, including without limitation letters dated February 5, 2002; March 11, 2002; October 29, 2003; and March 21, 2005.

370. In order to permit insurers to know whether services have been provided by employees or independent contractors, DFS promulgated a prescribed claim form – Form NF-3 – that requires a health care provider to disclose whether the billed-for services were provided by employees or independent contractors.

371. At least four of the Defendant PCs, namely Elmwood, Molnar, Riverside, and Tristate, have billed Allstate for the services of a number of independent contractors.

372. As discussed above, in entering a RICO and declaratory judgment against Elmwood, Molnar, and their record owner Sangavaram, the District Court in *GEICO v. Elmwood Park* determined that Elmwood and Molnar have submitted No-Fault bills to GEICO

126

for services actually performed (if at all) by independent contractors, specifically range of motion (ROM) testing, manual muscle testing (MMT), and activity limitation measurement (ALM).

373.  Elmwood and Molnar have both also billed Allstate for the same services – ROM testing, MMT, and ALM – which were established in *GEICO v. Elmwood Park* to have been performed by technicians as independent contractors rather than employees of Elmwood and Molnar.

374.  For example, Elmwood mailed to Allstate a bill totaling $475.00 for ALM provided to patient N.G. identified by claim number 0528366230-02 on January 8, 2019.  Elmwood also mailed a bill totaling $502.81 for ROM testing provided to patient N.G. on the same date, and a bill totaling $392.40 for MMT provided to patient N.G. on the same date.  All three bills were mailed on or about their date of February 12, 2019.

375.  Molnar mailed to Allstate a bill totaling $475.00 for ALM provided to patient A.M. identified by claim number 0535956502-01 on March 12, 2019.  Molnar also mailed a bill totaling $411.39 for ROM testing provided to patient A.M. on the same date, and a bill totaling $218.00 for MMT provided to patient A.M. on the same date.  All three bills were mailed on or about their date of April 14, 2019.

376.  Regarding billing by Riverside and Tristate for services performed by independent contractors, this is one of the central issues in *GEICO v. Zaitsev*, and one of the bases for the July 27, 2021 preliminary injunction staying these PCs' collection activities against GEICO.  In granting the injunctive relief, the District Court relied not only on the well-pleaded Complaint and its examples of specific patients and treatment dates, but also on the statements made by the

Defendant Weissman, the former record owner of Riverside and Tristate, in the Weissman Affirmation.

377. The Weissman Affirmation provides support for GEICO's allegations that certain nurse practitioner and physician's assistant defendants (non-parties here) have performed services as independent contractors which were billed for by Riverside and Tristate, as well as by related non-party Crosstown. Specifically, the "NP-PA" defendants in *GEICO v. Zaitsev* are Stella Amanze, PA ("Amanze"), Frida Isakov, PA ("Isakov"), Lucknie Ovincy, PA ("Ovincy"), Emily Bakerman, NP ("Bakerman"), Evans, Mini Mathew, NP ("Mathew"), Angela Pullock, NP ("Pullock"), Linda Santa Maria, NP ("Santa Maria"), and Rivka Weiss, NP ("Weiss").

378. Every single one of the "NP-PA" defendants in *GEICO v. Zaitsev* has also performed services for which one or more of the Defendant PCs (including but not limited to Riverside and Tristate) have billed Allstate. For example:

a) The Defendant Riverside mailed to Allstate a bill totaling $200.68 for a new patient consultation provided by Amanze to patient D.S. identified by claim number 0542417928-03 on June 12, 2019, and the bill was mailed on or about its date of June 27, 2019.

b) The Defendant Tremont mailed to Allstate a bill totaling $200.68 for a new patient consultation provided by Amanze to patient F.G. identified by claim number 0557840410-02 on November 5, 2019, and the bill was mailed on or about its date of November 12, 2019.

c) The Defendant Tristate mailed to Allstate a bill totaling $148.69 for a follow-up consultation provided by Isakov to patient D.W. identified by claim number 0539482851-01 on August 29, 2018, and the bill was mailed on or about its date of August 20, 2018.

d) The Defendant Riverside mailed to Allstate a bill totaling $200.68 for a new patient consultation provided by Ovincy to patient A.A. identified by claim number 0529415648-03 on April 9, 2019, and the bill was mailed on or about its date of April 25, 2019.

e) The Defendant Tristate mailed to Allstate a bill totaling $200.68 for a new patient consultation provided by Ovincy to patient F.R. identified by claim number

0525884631-02 on November 26, 2018, and the bill was mailed on or about its date of December 31, 2018.

f)  The Defendant Riverside mailed to Allstate a bill totaling $200.68 for a new patient consultation provided by Bakerman to patient C.J. identified by claim number 0527736052-01 on February 6, 2019, and the bill was mailed on or about its date of February 21, 2019.

g)  The Defendant Tristate mailed to Allstate a bill totaling $148.69 for a follow-up consultation provided by Bakerman to patient M.W. identified by claim number 0507488996-02 on August 17, 2018, and the bill was mailed on or about its date of September 19, 2018.

h)  The Defendant Riverside mailed to Allstate a bill totaling $200.68 for a new patient consultation provided by Evans to patient A.E. identified by claim number 0542955760-02 on June 4, 2019, and the bill was mailed on or about its date of June 21, 2019.

i)  The Defendant Tristate mailed to Allstate a bill totaling $200.68 for a new patient consultation provided by Evans to patient T.M. identified by claim number 0508559028-03 on July 6, 2018, and the bill was mailed on or about its date of July 26, 2018.

j)  The Defendant Tremont mailed to Allstate a bill totaling $148.69 for a follow-up consultation provided by Evans to patient C.O. identified by claim number 0563087337-01 on January 21, 2020, and the bill was mailed on or about its date of February 11, 2020.

k)  The Defendant Riverside mailed to Allstate a bill totaling $200.68 for a new patient consultation provided by Mathew to patient T.Y. identified by claim number 0539321117-02 on March 20, 2019, and the bill was mailed on or about its date of May 9, 2019.

l)  The Defendant Tristate mailed to Allstate a bill totaling $148.69 for a follow-up consultation provided by Mathew to patient T.M. identified by claim number 0508559028-03 on August 2, 2018, and the bill was mailed on or about its date of August 21, 2018.

m)  The Defendant Riverside mailed to Allstate a bill totaling $200.68 for a new patient consultation provided by Pullock to patient J.A. identified by claim number 0547622290-01 on July 17, 2019, and the bill was mailed on or about its date of July 29, 2019.

n)  The Defendant Tristate mailed to Allstate a bill totaling $148.69 for a follow-up consultation provided by Pullock to patient F.R. identified by claim number 0525884631-02 on May 1, 2019, and the bill was mailed on or about its date of May 16, 2019.

o)  The Defendant Tremont mailed to Allstate a bill totaling $148.69 for a follow-up consultation provided by Pullock to patient B.E. identified by claim number 0561361940-02 on December 17, 2019, and the bill was mailed on or about its date of January 15, 2020.

p)  The Defendant Tristate mailed to Allstate a bill totaling $200.68 for a new patient consultation provided by Santa Maria to patient F.R. identified by claim number 0525884631-02 on February 28, 2019, and the bill was mailed on or about its date of March 27, 2019.

q)  The Defendant Tremont mailed to Allstate a bill totaling $148.69 for a follow-up consultation provided by Santa Maria to patient B.E. identified by claim number 0561361940-02 on December 11, 2019, and the bill was mailed on or about its date of December 23, 2019.

r)  The Defendant Riverside mailed to Allstate a bill totaling $200.68 for a new patient consultation provided by Weiss to patient N.V. identified by claim number 0529415648-03 on July 24, 2019, and the bill was mailed on or about its date of August 13, 2019.

## XI.      The Defendants' Expansive Network of Interrelationships and Self-Referrals

379.  The referral network and the payments to referring providers were the foundation of this scheme.  Without a source of referrals from New York providers, the Defendant ASCs Accelerated and Barnert, as well as Zaitsev's clinical laboratory Ridgewood, would never have had access to hundreds of New York residents as patients.  The referrals and cross-referrals have enabled additional unnecessary and excessive billing by the other Defendants as well.

380. Under Section 238-d of the New York Public Health Law, referrals between financially related providers are generally prohibited, except where that financial relationship is disclosed to the patient.  Courts have interpreted this statute as prescribing a non-precudable defense for insurers against No-Fault claims.  *See Fair Price Med. Supp. Corp. v. ELRAC Inc.*, 12 Misc. 3d 119, 121-22, 820 N.Y.S.2d 679, 681 (App. Term 2nd Dep't 2006).

381.  Moreover, for certain enumerated health care services, even disclosure of a relationship to patients will not cure a self-referral violation.  Section 238-a(1) of the Public

Health Law forbids a provider from referring patients to another provider with which it has a financial relationship for clinical laboratory services, pharmacy services, radiation therapy services, physical therapy (PT) services, and x-ray or imaging services.  Any billing for services resulting from such a referral is also prohibited by Section 238-a(2).  Such referrals and billing are illegal even with disclosure to the patient of a financial relationship between the providers.

A.     Illegal Referrals to the Defendant ASCs (P.H.L. § 238-d)

382.  The owners of the Defendant ASCs, and/or PCs they also own or control, have repeatedly sent their patients to Accelerated and Barnert for surgical procedures without disclosure to patients of their ownership, in violation of Section 238-d of the Public Health Law.

383.  Alladin has been a central figure in the Defendants' network of undisclosed or otherwise improper referrals for surgical services, as the majority owner of the Defendant ASCs Accelerated (82.02%) and Barnert (91.00%), and as the Medical Director for both.  The Defendants Alladin PC and Bailey, both of which are also owned by Alladin, have sent their patients to the both Accelerated and Barnert for surgical services billed for by Alladin's PCs. However, Alladin's ownership interests in Accelerated and Barnert have not been disclosed to patients, in violation of Section 238-d of the Public Health Law.

384.  The Defendant ASCs have used two methods in particular to obtain referrals of patients from New York.  First, each of the Defendant ASCs provides its highest-volume referring providers and surgeons with partial ownership in Accelerated and/or Barnert, which provide(s) a financial return as compensation for such providers' referrals of patients.  Second, the Defendants and related non-parties operate an extensive network of interrelated providers

who/that refer patients to each other for a broad, compartmentalized menu of excessive and/or unnecessary tests and treatments.

385.  The referral of patients between these financially related entities was illegal under both New York and New Jersey law.  The true nature and extent of the interrelationships were not disclosed to patients.  While Accelerated and Barnert have claimed to have made disclosure through a posting on the wall of their facilities as well as disclosure forms setting forth their owners' shares, such disclosure not only fails to comply with New York law, but it also fails, in its omission of the full scope of referral and other relationships of treating providers, to apprise patients of any financial incentives and arrangements which may affect their course of treatment. Patients' coverage was billed excessively, risking the depletion of insurance coverage if it was needed for anything else, and the Defendants repeatedly billed excessively for unnecessary services.  Numerous false representations were made by the Defendants in submitting such billing, including that the services and billing were necessitated by covered automobile accidents, and that the injuries purportedly being treated resulted solely from those accidents.

386.  As discussed above, there is evidence that the two Defendant ASCs Accelerated and Barnert have been used interchangeably, including without limitation: their common address at 680 Broadway in Paterson, New Jersey; their common ownership by the Defendants Alladin, Rahat, and Zaitsev; matching ownership shares of the Defendants Gorman and Weissman in Accelerated and Barnert, respectively; Alladin's position as Medical Director for both of the Defendant ASCs; Rahat's position as Administrator and CEO for both of the Defendant ASCs; and the use or misuse of shared forms and templates by Accelerated and Barnert.

387.  Under New Jersey law, ASC operators are required to disclose to the New Jersey Department of Health, in connection with license applications and renewals, any ownership,

management, or operational interests held by any of their principals. However, the Defendant Barnert has consistently failed to disclose the interest of Rahat in the Princeton ASC in its License Renewal Questionnaires, notwithstanding that Rahat is Barnert's CEO and part owner. The omission is made all the more egregious by the fact that it is Rahat himself who has signed each and every License Renewal Questionnaire on behalf of Barnert, in each case executing a Certification of the truth of such disclosure under pain of civil penalties.

B.    Illegal Referrals for Physical Therapy (P.H.L. § 238-a)

388.   The Defendants Bedford, Riverside, Tremont, and Tristate, each nominally owned by Sangavaram but secretly owned by Zaitsev, have routinely referred their patients to a physical therapist with which they and/or their owners have a financial relationship, in violation of Section 238-a of the Public Health Law.

389.   Bedford, Riverside, Tremont, and Tristate all share a clinical location at the Kenilworth Clinic, and they have all written physical therapy referrals for their patients at that location. In all or almost all cases, these patients use the PT referrals to begin treatment with non-party ESM Rehab PT, P.C. ("ESM Rehab"), owned by non-party Essam Mostafa, P.T. ("Mostafa"), which shares space with the four Defendant PCs at the same 108 Kenilworth location.

390.   Each of the four Defendant PCs at 108 Kenilworth uses the same "Referral for Physical Therapy Form," giving the same address at 108 Kenilworth and the same telephone and fax numbers, with only the letterhead modified to reflect whether the referral is made for Bedford, Riverside, Tremont, or Tristate. These referrals are usually if not always made by an employee nurse practitioner, rather than by Weissman, Sangavaram, or any other physician.

391. For example, the Defendant Bedford mailed to Allstate a bill totaling $275.00 for an initial examination provided by purported employee Kyungsook Bu, FNP ("Bu") to patient L.C. identified by claim number 0611667064-01 on January 11, 2021 at the Kenilworth location, and the bill was mailed on or about its date of February 11, 2021.  ESM Rehab mailed to Allstate a bill totaling $646.11 for physical therapy services provided by Mostafa to patient L.C. from January 11, 2021 through February 4, 2021 at the Kenilworth location, and the bill was mailed on or about its date of February 10, 2021.  In support of the bill for PT services, ESM Rehab submitted a Referral for Physical Therapy dated January 11, 2021, printed on the letterhead of Bedford and signed by Bu.

392. The Defendant Riverside mailed to Allstate a bill totaling $200.68 for an initial examination provided by purported employee Se Young Oh, FNP ("Oh") to patient N.W. identified by claim number 0556608636-03 on August 19, 2019 at the Kenilworth location, and the bill was mailed on or about its date of September 6, 2019.  ESM Rehab mailed to Allstate a bill totaling $252.32 for physical therapy services provided by Mostafa to patient N.W. from August 20, 2019 through August 26, 2019 at the Kenilworth location, and the bill was mailed on or about its date of September 12, 2019.  In support of the bill for PT services, ESM Rehab submitted a Referral for Physical Therapy dated August 19, 2019, printed on the letterhead of Riverside and signed by Oh.

393. The Defendant Tremont mailed to Allstate a bill totaling $200.68 for an initial examination provided by nurse practitioner Kwon to patient C.O. identified by claim number 0563087337-01 on October 1, 2019 at the Kenilworth location, and the bill was mailed on or about its date of November 10, 2019.  ESM Rehab mailed to Allstate a bill totaling $372.82 for physical therapy services provided by Mostafa to patient C.O. from October 3, 2019 through

October 11, 2019 at the Kenilworth location, and the bill was mailed on or about its date of October 16, 2019.  In support of the bill for PT services, ESM Rehab submitted a Referral for Physical Therapy dated October 1, 2019, printed on the letterhead of Tremont and signed by Kwon.

394.  The Defendant Tristate mailed to Allstate a bill totaling $200.68 for an initial examination provided by purported employee Melissa Evans, FNP ("Evans") to patient D.W. identified by claim number 0510548365-01 on July 24, 2018 at the Kenilworth location, and the bill was mailed on or about its date of August 18, 2018.  ESM Rehab mailed to Allstate a bill totaling $364.20 for physical therapy services provided by Mostafa to patient D.W. from August 21, 2018 through September 4, 2018 at the Kenilworth location, and the bill was mailed on or about its date of September 14, 2018.  In support of the bill for PT services, ESM Rehab submitted a Referral for Physical Therapy dated July 24, 2018, printed on the letterhead of Tristate and signed by Evans.

C.    Illegal Referrals for Clinical Laboratory Services (P.H.L. § 238-a)

395.  As discussed throughout this Complaint, the Defendant Zaitsev is not only the owner and Managing Member of the Defendant Ridgewood; he is also the true, secret owner of several healthcare provider entities (the "Zaitsev PCs") nominally owned at relevant times by other licensed doctors, including the Defendants Sangavaram and Weissman.

396.  The Zaitsev PCs include all six Defendant PCs which are or were nominally owned by Sangavaram – namely Bedford, Riverside, Tremont, Tristate, Elmwood, and Molnar – as well as the related non-party Crosstown, which is nominally owned by Focazio.  At Zaitsev's direction and for his benefit, at least four of the Zaitsev PCs – Bedford, Riverside, Tremont, and

Tristate – have routinely referred patients to Ridgewood for unnecessary clinical laboratory services, including excessive drug testing, based on a pre-determined fraudulent billing protocol, rather than the patients' needs.

397. Even if Ridgewood's No-Fault billing to Allstate were otherwise proper, which it has not been, such billing is illegal to the extent it has been based on referrals of patients from the Zaitsev PCs. In light of Zaitsev's ownership of Ridgewood, the Zaitsev PCs are prohibited from making referrals to Ridgewood for clinical laboratory services under P.H.L. § 238-a(1), and Ridgewood is prohibited from billing Allstate for clinical laboratory services based on such referrals under P.H.L. § 238-a(2). Nonetheless, the Zaitsev PCs and Ridgewood have done both, for patient after patient, in most or all cases with the referring Zaitsev PC ordering "all" of the qualitative drug testing available, as well as "all" of the quantitative drug testing. For example:

a) Bedford referred patient K.C. identified by claim number 0604553222 to Ridgewood for both quantitative and qualitative screening as to all drug categories, by Toxicology Test Requisition form dated October 29, 2020.

b) Tremont referred patient B.E. identified by claim number 0561361940-02 to Ridgewood for both quantitative and qualitative screening as to all drug categories, by Toxicology Testing Requisition form dated January 21, 2020.

c) Crosstown referred patient N.F. identified by claim number 0544660608-06 to Ridgewood for both quantitative and qualitative screening as to all drug categories, by Toxicology Test Requisition form dated May 9, 2019.

d) Riverside referred patient J.M. identified by claim number 0557318029-02 to Ridgewood for both quantitative and qualitative screening as to all drug categories, by Toxicology Test Requisition form dated August 21, 2019.

398. Additionally, to the extent Ridgewood has billed for services provided to patients based on referrals made by the Defendant ASCs, any referrals to Ridgewood made by Accelerated or Barnert during while Zaitsev was also an owner of the relevant Defendant ASC are illegal, P.H.L. § 238-a(1), and any billing by Ridgewood for services resulting from such referrals is also illegal, P.H.L. § 238-a(2).

D.      Other Self-Referrals and Interrelationships

399.  Alladin has sometimes listed his own name as the referring provider on bills submitted to Allstate by his PCs, as though he had referred patients to himself for surgical and other services.  For example, Alladin PC mailed to Allstate a bill totaling $7,900.00 for facet injections provided to patient A.S. identified by claim number 0302868401-01 on December 6, 2014 by Alladin in an office setting or OBSP located at 2901 Baldwin Avenue, Baldwin, New York 11510, and the bill was mailed on or about its date of May 19, 2015.  Typed into Box 17 of the bill, as the "Name of Referring Provider or Other Source," is the name "Irfan A. Alladin," and the bill is purportedly signed by Alladin.

400.  In a similar example, Alladin PC mailed to Allstate a bill totaling $3,249.11 for consultation and EDX testing provided to patient D.F. identified by claim number 0395841521-02 by Alladin at the PC's main Bailey Avenue location on February 8, 2016, and the bill was mailed on or about its date of February 26, 2016.  Typed into Box 17 of the bill, as the "Name of Referring Provider or Other Source," is the phrase "Avenue Bailey," and the bill is purportedly signed by Alladin.

401. The Defendants Riverside and Tristate have been nominally owned by the Defendant Sangavaram since he took over in 2019 for the Defendant Weissman (a part owner of the Barnert ASC from April 1, 2014 to February 18, 2021) at the behest of their secret owner Zaitsev.  Riverside and Tristate have submitted bills to Allstate for pain management injections performed at the Defendant ASCs Accelerated and Barnert.  Several physicians, including without limitation the Defendants Gorman and Sangavaram, have appeared as a surgeon or attending physician on operative notes and reports for procedures billed by Riverside and

Tristate at both of the Defendant ASCs.  Additionally, the Defendant Weissman has performed pain management injection procedures as the purported owner of both PCs at the Accelerated ASC, though not at the Barnert ASC, in which he has held an ownership interest for most of the operational life of Riverside and Tristate.

402. For example, Riverside mailed to Allstate a bill totaling $735.23 for injections provided to patient N.V. identified by claim number 0547039651-02 by employee Gorman at the Defendant ASC Accelerated on July 24, 2019, and the bill was mailed on or about its date of August 13, 2019.  Accelerated also mailed a bill to Allstate for related facility fees totaling $5,334.10, and the bill was mailed on or about its date of October 25, 2019.  The bill for facility fees and two procedure reports submitted by Accelerated in support of its billing all indicate that Gorman was the attending physician.

403. Because Weissman was a part owner of Barnert during the entire period of his affiliation with Riverside and Tristate, they have only billed for his injection services as provided at the Accelerated ASC, so as to avoid any self-referral violation due to Weissman's ownership in its sister entity.  For example, Riverside mailed to Tristate a bill totaling $1,067.28 for trigger point injections, ESI, and epidurography provided to patient V.M. identified by claim number 0511898206-01, as performed by Riverside's nominal owner Weissman at the Accelerated ASC on January 9, 2019, and the bill was mailed on or about its date of February 8, 2019.

404. However, prior to Weissman's acquisition of an ownership stake in Barnert, and prior to the formation of Riverside and Tristate, he had routinely performed services at Barnert as well as Accelerated, as an employee of the Zaitsev-owned non-parties Interstate, MIMS, and Highland.  For example, non-party Highland mailed to Allstate a bill totaling $10,925.00 for facet injections provided to patient G.U. identified by claim number 0246555262-03 by

employee Weissman at the Barnert ASC on November 7, 2012, and the bill was mailed on or about its date of November 30, 2012.

405. The Defendant Gorman, who for much of the relevant time period has held the same 2.0% ownership share in Accelerated as Weissman has held in its sister ASC Barnert, had also provided services as an employee of Zaitsev's non-party predecessor PCs before he began providing similar services as an employee of Zaitsev's secretly owned Riverside and Tristate PCs. For example, referring again to patient G.U. and the injection procedure at the Accelerated ASC on November 7, 2012, non-party Highland mailed to Allstate a bill totaling $1,750.00 for related anesthesia services as provided by Gorman, and the bill was mailed on or about its date of November 30, 2012.

406. Unlike Weissman and his interest in Barnert, however, Gorman continued providing services at the Accelerated ASC for Riverside and Tristate even after he acquired a 2.0% ownership stake in Accelerated on or about February 13, 2015, likely owing to the fact that he was never a paper owner of Riverside and Tristate, as Weissman had been. For example, Riverside mailed to Allstate a bill totaling $1,067.28 for trigger point injections, ESI, and epidurography provided to patient N.V. identified by claim number 0547039651-02 by employee Gorman at Accelerated on October 23, 2019, with the Defendant Sangavaram signing as Riverside's owner, and the bill was mailed on or about its date of October 3, 2019.

407. Riverside has also submitted bills to Allstate for injections performed at the ASC operated by non-party CHC Surgical Center, LLC ("CHC"), located at 79 Bridge Street, Brooklyn, NY 11201. For example, Riverside mailed to Allstate a bill totaling $1,014.60 for a lumbar spine injection procedure provided to patient A.A. identified by claim number

0529415648-03 by Gorman at the CHC ASC on April 9, 2019, and the bill was mailed on or about its date of April 25, 2019.

408.  According to records obtained from the NYDOH, CHC is owned in part by non-party Frank Carone, Esq., who is also CHC's Managing Member.  In that capacity, Carone signed the lease agreement on behalf of CHC for use of the 79 Bridge Street premises occupied by the CHC ASC.  In addition to being CHC's Managing Member, Carone has also been an Executive Partner of the law firm of Abrams Fensterman, which has served as billing and/or collection counsel for several of the Defendants, including without limitation Ridgewood, Riverside, Tremont, and Tristate, Elmwood, Molnar as well as non-party Crosstown.  Each of these defendants has been truly owned by the Defendant Zaitsev, who is also a part owner of both of the Defendant ASCs Accelerated and Barnert.  Additionally, as noted above, Weissman stated in his *GEICO v. Zaitsev* Affirmation that Zaitsev had designated the law firm of Abrams Fensterman as the collection counsel for Riverside and Tristate.

409. The Defendants' needless transporting of patients to ASCs in New Jersey for surgical procedures has enabled more fraudulent billing than just the facility fees charged by the Defendant ASCs Accelerated and Barnert.  At Zaitsev's direction, his clinical laboratory Ridgewood has received numerous referrals of patients from other Defendants and related providers, including but not limited to the Zaitsev PCs under his true ownership and control. where the relevant patient testing sample was collected at Accelerated or Barnert.  In many of these instances, Ridgewood billed for performing toxicology screening and pre-operative testing using patient samples collected at Accelerated or Barnert, often on the date of a procedure.

410. For example, the Defendant Ridgewood mailed to Allstate two bills totaling $5,052.78 for drug screening provided to patient J.H. identified by claim number 0540627528-01

on July 17, 2019, and the bills were mailed on or about their date of July 30, 2019.  The relevant toxicology report of Ridgewood lists at the top of each page that the referring provider was the Defendant Gorman, and that the collection location for the patient's sample was the Defendant ASC Accelerated in Paterson, New Jersey.

411.  Similarly, the Defendant Ridgewood mailed to Allstate two bills totaling $4,962.78 for drug screening provided to patient V.M. identified by claim number 0511898206-01 on January 9, 2019, and the bills were mailed on or about their date of January 30, 2019.  The relevant toxicology report of Ridgewood lists at the top of each page that the referring provider was the Defendant Weissman, and that the collection location for the patient's sample was the Defendant ASC Accelerated in Paterson, New Jersey.

412. The Defendant Tristate has submitted bills to Allstate using the same billing address, 126 State Street, Hackensack, New Jersey 07601, as the service address listed on all of the bills submitted by the Defendant Ridgewood for laboratory services.  For example, Tristate mailed to Allstate a bill totaling $3,000.00 for anesthesia services provided to patient E.M. identified by claim number 0535572044-01 on September 11, 2019 at Accelerated, giving Tristate's billing address as 126 State Street in Hackensack, and the bill was mailed on or about its date of October 17, 2019.

413.  Tristate was initially incorporated on April 13, 2018 in Weissman's name and at another address, 351 Terhune Avenue, Passaic, New Jersey 07055, which is or was Weissman's residential address.  However, less than a year later, Tristate's corporate registration was revised at Zaitsev's direction by a Certificate of Amendment dated April 10, 2019, to reflect both Sangavaram's replacement of Weissman as Tristate's sole officer or director, and a change in its

principal business address to Ridgewood's address, 126 State Street, Hackensack, New Jersey 07601.

414.  Additionally, at his September 14, 2017 deposition in *Travelers v. Highland* – taken before the incorporation of Tristate – the Defendant Weissman (then an employee of Zaitsev's predecessor New Jersey providers) gave his business address as 126 State Street in Hackensack, New Jersey.  As previously noted, Tristate has submitted bills to Allstate listing the same as its billing address.

415.  The Defendants Tremont and Tristate, each of which is nominally owned by the Defendant Sangavaram, have both submitted bills to Allstate for services rendered at the same addresses, and in some cases for the very same patient.

416.  Tremont and Tristate, as well as the Defendants Bedford and Riverside, also nominally owned by Sangavaram, have submitted bills to Allstate for services rendered at another common address, 108 Kenilworth in Brooklyn.

417.  All four Defendant PCs which have seen patients at 108 Kenilworth – Bedford, Riverside, Tremont, and Tristate – have referred those patients for physical therapy services to ESM Rehab, which is owned by Mostafa, and which shares clinical space with Bedford, Riverside, Tremont, and Tristate at 108 Kenilworth.  In most or all cases, ESM Rehab provided physical therapy services to patients at the same 108 Kenilworth clinic where they were seen by the referring Defendant PC.

418.  Each of the four Defendant PCs at 108 Kenilworth uses the same "Referral for Physical Therapy Form," giving the same address at 108 Kenilworth and the same telephone and fax numbers, with only the letterhead modified to reflect whether the referral is made for Bedford, Riverside, Tremont, or Tristate.  These referrals are usually if not always made by an

employee nurse practitioner or physician's assistant, rather than by Weissman, Sangavaram, or any other physician.

419. Most if not all of the physical therapy referrals written by the Defendant PCs Bedford, Riverside, Tremont, and Tristate for patients at 108 Kenilworth have been directed to Mostafa and his PCs, especially ESM Rehab.  Likewise, most if not all of the bills submitted to Allstate by ESM Rehab and/or Mostafa for physical therapy services at 108 Kenilworth have been based on referrals of patients from Bedford, Riverside, Tremont, and/or Tristate.

420. Toxicology and other reports of the Defendant Ridgewood have also referenced the address at 108 Kenilworth as a collection location for patient samples, under the name "Kenilworth Tristate."  For example, Ridgewood mailed to Allstate a bundled bill totaling $884.80 for drug screening and a second, unbundled bill totaling $4,131.26 for drug screening as provided to patient M.B. identified by claim number 0569401870-03, as performed on December 5, 2019, and the Ridgewood bills were mailed on or about their date of December 17, 2019.  The related laboratory report of Ridgewood indicates that the sample for patient N.F. was collected by the Defendant Gorman at 108 Kenilworth, referring to the location as "Kenilworth Tristate."

421. Other patterns of misrepresentations and anomalies also exist in Ridgewood's billing submissions, further demonstrating its interrelationships with other Defendants – and indeed the interchangeability of referring PCs and licensed professionals from Ridgewood's perspective.  Many if not most of Ridgewood's referrals for drug testing come from PCs which are secretly owned by Ridgewood's managing member Zaitsev, including without limitation the Defendants Riverside and Tristate, and non-party Crosstown.

422.  For example, some of the reports submitted to Allstate in support of Ridgewood's billing for drug testing indicate that patient samples were collected by the Defendant Gorman at the clinic of non-party Harbor Medical Group, P.C. ("Harbor"), located at 205-20 Jamaica Avenue, Hollis, NY 11423.  However, there is no evidence whatsoever, whether in Harbor's submissions to Allstate or otherwise, that Gorman has ever worked at Harbor, or at this address. Nor is there is any evidence that these patients were ever seen by Gorman at any location, much less that he collected their samples.

423.  Similarly, some of Ridgewood's reports have indicated that patients' urinalysis samples were collected by non-party Weiss NP of "Crosstown Medical – Weissman," at 625 East Fordham.  Although Weiss has worked for Crosstown (as well as the Defendants Riverside and Tristate), the Defendant Weissman has not.  As with Gorman and Harbor, there is no evidence whatsoever that Weissman has ever worked at Crosstown, or at this address; or that these patients were ever seen by Weissman at any location.

424.  Other indications of the Defendant PCs' interchangeability can be found in their other submissions.  For example, the Defendant Bedford mailed to Allstate a No-Fault Application for Motor Vehicle No-Fault Benefits ("NF-2"), by or on behalf of patient C.M. identified by claim number 0629596493-01, on or about its date of June 18, 2021.  Box 12 of the NF-2 indicates that the treating provider was "Bedford Medical, PC (Old Tremont; Riverside)."

425.  On some occasions, one of the Defendant PCs have submitted an NF-2 for patients where there is otherwise no indication that the patients were ever seen by that provider, and where another related Defendant PC billed for services instead.

426.  For example, Box 12 of an NF-2 submitted to Allstate for patient T.Y. identified by claim number 0539321117-02 indicates that the treating provider was "Tristate Multi Specialty

144

Medical Services" at 3250 Westchester Avenue, Suite 205, Bronx, NY 10461. However, Tristate never billed for any services on this claim, and there is otherwise no evidence that the patient was ever seen by Tristate. Instead, the clinical consultations and other services usually performed by Tristate were billed as performed by the Defendant Riverside, using forms for its bills and reports which are virtually identical to those of Tristate.

427. Similarly, Box 12 of an NF-2 submitted to Allstate for patient D.W. identified by claim number 0539482851-01 also indicates that the treating provider was "Tristate Multi Specialty Medical Services" at 3250 Westchester Avenue in the Bronx. However, Tristate never billed for any services on this claim, and there is otherwise no evidence that the patient was ever seen by Tristate. Instead, the clinical consultations and other services usually performed by Tristate were billed as performed by non-party Parkway Medical Services, P.C. ("Parkway"), using forms for its bills and reports which are virtually identical to those of Tristate as well as Riverside.

428. Indeed, the interrelationships driving the schemes alleged herein are characterized by the Defendants' extensive sharing of patients, personnel, and practice locations. For instance, both of the Defendants Tristate and Riverside have billed for the services of non-party employee-anesthesiologist Copeland, in connection with injection procedures performed at the Defendant ASCs Accelerated and Barnert, and she has provided anesthesia for procedures performed by the Defendants Weissman, Sangavaram, and Zaitsev. Copeland's anesthesia services have been billed for by Zaitsev's secretly-owned Defendant PCs Riverside and Tristate, as well as their predecessor MIMS, and non-party Highland.

429. In addition to Copeland's direct relationships with these Defendants, she has also maintained for years other direct and indirect connections with owners of the Defendant ASCs,

and with other anesthesiologists having similar connections of their own.  Copeland's services have been billed for by the two anesthesiology provider groups, MEDICSURG and University Anesthesia, which have most often provided anesthesia at the Defendant ASCs on the claims at issue in this Complaint.

430.  MEDICSURG was incorporated in New Jersey on January 15, 2013, and University Anesthesia was incorporated in New Jersey on April 10, 2017.  University Anesthesia has substantially continued the operations of MEDICSURG as its replacement or successor.

431.  According to a letter mailed by University Anesthesia to Allstate on or about its date of April 1, 2017, in support of billing for services provided to patient R.I. identified by claim number 0477637250-02, Copeland is listed as one of the member-anesthesiologists for this provider.  Among the others listed are non-parties Chen, Terrance Winn, M.D. ("Winn"), and Mankikar (the group's Medical Director), and each of these physicians' services have also been billed for by the earlier-formed MEDICSURG group.

432.  Copeland's services have also been billed for by non-party Epic Pain Management & Anesthesia Consultants, LLC, a New Jersey provider formed on February 19, 2010 and owned by non-party Amit Goswami, M.D., who has frequently performed injections at the Defendant ASCs Accelerated and Barnert.  Goswami is also a 9.99% owner in each of the Defendant ASCs, giving him ownership shares in Accelerated and Barnert which are identical the interests held by Ridgewood's owner and managing member, Zaitsev.

433.  As set forth in the *GEICO I* complaint, non-party provider Interstate – Zaitsev's predecessor to the Defendant Tristate – submitted No-Fault billing for allegedly unnecessary anesthesia services, the vast majority of which were purportedly rendered by Copeland and the Defendant Gorman, related to routine pain management injections at ASCs in New Jersey.

146

Interstate's bills to GEICO typically consisted of charges between $1,750.00 and $2,100.00 per session, in each case under CPT Code 01992.

434. Non-party Chen has also purportedly provided anesthesia as an employee of Tristate and Riverside in connection with injection procedures performed at the Defendant ASCs Accelerated and Barnert, and he has also provided anesthesia for procedures performed by the Defendants Weissman, Sangavaram, and Zaitsev.  University Anesthesia has billed for Chen's services in connection with injections performed at the Defendant ASCs by the Defendant Alladin, the single-largest owner of both Accelerated and Barnert.  In addition to providing anesthesia, since at least 2021, Chen has himself performed injections at both of the Defendant ASCs, billing through his own provider entity, non-party Innovation Anesthesia & Pain Services, P.C. ("Innovation"), and in many if not most cases, the anesthesia for such procedures has been provided by University Anesthesia through one of Chen's fellow member-anesthesiologists.  Innovation was incorporated in New York on February 3, 2015 and was registered to do business in New Jersey as of June 10, 2015.

435. Winn, another member-anesthesiologist of MEDICSURG and/or University Anesthesia, is a part-owner (1.00%) of Barnert.  Like Copeland and Chen, Winn's services have also been billed for by at least two of the Defendant PCs, but unlike those two physicians, Winn has appeared on billing of Alladin's two PCs, namely the Defendants Alladin PC and Bailey. Winn has also provided services for University Anesthesia in connection with injection procedures performed at the Defendant ASCs by Chen and Innovation.

436. Winn and Mankikar also appear on the letterhead of electrodiagnostic (EDX) testing reports submitted in support of billing by the Defendant Bailey, along with its owner the

Defendant Alladin.  Additionally, Winn has performed injections at the Defendant ASCs as an employee of Alladin PC as well as Bailey.

437.  Another non-party physician appearing on Bailey's letterhead, Adnan Qureshi, M.D. ("Qureshi") has performed injections at the Defendant ASCs as an employee of the Alladin PC, and has provided patient consultations as an employee of both Alladin PC and Bailey.

438.  The services of Mankikar, purported Medical Director of University Anesthesia, have also been billed for by that provider entity, as well as by MEDICSURG, for anesthesia provided at the Defendant ASCs in support of injections as well as MUA.  Specifically, Mankikar has provided anesthesia for injection procedures performed by the Defendant ASCs' single largest owner Alladin, and for MUA performed by non-party Khait, who is himself a part owner of Barnert.

439.  The Defendant PCs have routinely billed Allstate for services rendered by nurse practitioners and physician's assistants whom they share with one or more other Defendant PCs or related non-party providers.  For example, non-party Rivka Weiss, NP ("Weiss") has performed services for patients of Crosstown, as well as of the Defendants Tristate and Riverside.  Those services have included consultations with the patients of these PCs at multiple service locations, including at the Defendant ASC Accelerated as well as non-party ASC Avicenna, and even injections for Crosstown at the MedAlliance OBSP.  Weiss has also referred patients and/or collected urine samples for drug testing to be performed at Ridgewood, for physical therapy and other non-surgical treatments, and for durable medical equipment (DME) and prescription drugs.  Weiss is also one of the defendants in *GEICO II*, where she was allegedly part of a fraudulent No-Fault scheme along with, *inter alia*, the Defendants Zaitsev,

Sangavaram, Weissman, Ridgewood, Tristate, Riverside, Tristate, and several other non-party nurse practitioners and physician's assistants employed by the Defendant PCs in this action.

440.  Another employee shared by Crosstown and the Defendant PCs is non-party nurse practitioner Lee, but whereas Weiss has worked for Riverside and Tristate, Lee has worked for Bedford and Tremont.  Nonetheless, Lee has likewise conducted consultations with patients of these PCs at the same locations, 108 Kenilworth and 625 East Fordham, and referred patients and/or collected urine samples for drug testing to be performed at Ridgewood, for physical therapy and other non-surgical treatments, and for DME and prescription drugs.

441.  Non-party Hyeong Young Lim, NP ("Lim") also performed similar services as an employee of Crosstown, and of the Defendant Tremont.

442.  Additionally, non-party physician's assistant Amanze has provided services to patients of Crosstown, and of the Defendants Tremont and Riverside.  Like Weiss, Amanze is one of the defendants in *GEICO II*.  Amanze has also provided patient consultations as an employee of non-party PCs Harbor and Parkway.

443.  Non-party nurse practitioner Kwon has also provided services to patients of the Defendants Tremont and Riverside, as well as for non-party PC Parkway.  Those services have included consultations with patients, and referrals for drug testing to be performed at Ridgewood, for physical therapy and other non-surgical treatments, and for DME and prescription drugs.

444. Non-party nurse practitioners Pullock and Mathew have provided services to patients of the Defendants Riverside and Tristate, and Pullock is also a *GEICO II* defendant. Among those services are consultations with patients, and referrals for drug testing to be performed at Ridgewood, for physical therapy and other non-surgical treatments, and for DME

and prescription drugs.  Like Amanze, Pullock has also provided patient consultations as an employee of non-party PCs Harbor and Parkway.

445.  Non-party physician's assistant Ovincy, another defendant in *GEICO II*, has also consulted with patients as an employee of the Defendant PCs Riverside, Tremont, and Tristate, at various locations including at the Accelerated ASC, at a clinic at 2510 Westchester Avenue, Bronx, NY 10461 ("2510 Westchester"), and at clinic at 2598 3rd Avenue, Bronx, NY 10464 ("2598 3rd Ave").  Non-party Crosstown has also billed for patient consultations and physical testing at the 2598 3rd Ave clinic, as provided by its owner, non-party Focazio.

446.  Non-party nurse practitioner Evans – yet another defendant in *GEICO II* – has performed services that were billed for by three Defendant PCs, namely Riverside, Tremont, and Tristate.  Like Weiss, Lee, and Lim, Evans has conducted consultations with patients at 108 Kenilworth, and has referred patients and/or collected urine samples for drug testing to be performed at Ridgewood, for physical therapy at non-party ESM Rehab, and for DME and prescription drugs.

447.  Non-party nurse practitioner Santa Maria – one more defendant in *GEICO II* – has consulted with patients as an employee of the Defendant PCs Tremont and Tristate, at various locations including at the 2510 Westchester clinic as well as the Defendant ASC Accelerated.

448.  Non-party Se Young Oh, NP ("Oh") has provided services to patients as an employee of the Defendant PCs Riverside and Tremont.  Like Weiss, Lee, Lim, and Evans, Oh has conducted consultations with patients at 108 Kenilworth, and has referred patients and/or collected urine samples for drug testing to be performed at Ridgewood, as well as making other referrals for tests and treatments, including without limitation for physical therapy at non-party ESM Rehab, and for MRIS and DME.

449.  Non-party nurse practitioner Bu has provided patient consultations and outcome assessment testing (OAT) at the 108 Kenilworth clinic as an employee of the Defendant PC Bedford.  Bu has also referred Bedford's patients for physical therapy at non-party ESM Rehab.

450.  Non-party chiropractor Jonghwi Kim, DC ("Kim") has billed Allstate for chiropractic services rendered at two clinical locations in New York as the owner of Kim Chiropractic, P.C. ("Kim PC") and JK Spine Health Chiropractic, P.C. ("JK Spine").  Kim PC has billed for providing services in a clinic at 2488 Grand Concourse, Unit 205, Bronx, NY 10458 ("2488 Grand Concourse"), and JK Spine has billed for services at 2510 Westchester.

451.  The Defendant Tristate as well as its predecessor PC, MIMS, have also billed for services purportedly provided at 2510 Westchester, and in some cases, Tristate or MIMS has billed for treating the same patients as JK Spine.  In many of these instances, JK Spine's owner Kim has signed prescriptions for durable medical equipment (DME) on the letterhead of Riverside or MIMS.  There is no evidence that Kim has ever been employed by or seen patients on behalf of Tristate, MIMS, or any of the Defendant PCs herein.

452.  For example, non-party DME supplier Healthy Support, Inc. ("Healthy DME") mailed to Allstate a bill totaling $844.13 for delivery on July 27, 2018 to the home of patient T.M. identified by claim number 0508559028-03 of a lumbar-sacral orthosis (LSO) under CPT code L0637, and the bill was mailed on or about its date of September 7, 2018.  In support of this bill, Healthy DME submitted to Allstate a Durable Medical Equipment Prescription on the letterhead of the Defendant Tristate dated July 25, 2018, specifically for an "LSO W/APL Control Fitted/ADJ," and the DME Prescription was purportedly signed by Kim, along with a stamp setting forth Kim's New York chiropractic license and NPI numbers.

453.  Non-party DME supplier BA2RO, Inc. ("BA2RO") mailed to Allstate a bill totaling $371.70 for delivery on August 8, 2017 to the home of patient J.S. identified by claim number 0466174554-02 of a cervical traction unit (CTU) under CPT code E0849, and the bill was mailed on or about its date of August 31, 2017.  In support of this bill, BA2RO submitted to Allstate a DME Prescription on the letterhead of non-party MIMS dated August 3, 2017, specifically for "Cervical Traction W/Pump," and the DME Prescription was purportedly signed by Kim, along with a stamp setting forth Kim's New York chiropractic license and NPI numbers.

454. Tristate's sister PC, the Defendant Riverside, has billed Allstate for services provided to patients at the 2488 Grand Concourse clinic, along with Kim's other PC, JK Spine the Kim PC.  As with Tristate and MIMS at 2510 Westchester, Kim has signed Riverside's DME prescriptions at 2488 Grand Concourse, despite the lack of any evidence that Kim has ever been employed by or seen patients on behalf of Riverside.

455. For example, non-party DME supplier Supportive Products Corp. ("Supportive DME") mailed to Allstate a bill totaling $1,652.63 for delivery on April 29, 2019 to patient I.M. identified by claim number 0542417928-01 of a cervical traction unit (CTU) under CPT code E0855, and of an LSO under CPT code L0632, and the bill was mailed on or about its date of May 28, 2019.  In support of this bill, Supportive DME submitted to Allstate: a DME Prescription on the letterhead of the Defendant Riverside dated April 4, 2019 for, *inter alia*, an "LSO-Lumbar Support," purportedly signed by the Defendant Weissman; and a DME Prescription on Riverside's letterhead dated April 18, 2019 for a "Cervical Traction W/Pump," purportedly signed by Kim, along with a stamp setting forth Kim's New York chiropractic license and NPI numbers.

## FIRST CLAIM FOR RELIEF

### (Common Law Fraud)

### (Against All Defendants)

456.  Allstate repeats and realleges the allegations set forth in paragraphs 1 through 455 of this Complaint with the same force and effect as if set forth fully herein.

457.  As part of the fraudulent scheme implemented by the Defendants, as set forth in detail in this Complaint, the Defendants made material misrepresentations and/or omitted material statements in submitting No-Fault claims to Allstate for payment.

458.  As set forth herein, the Defendants intentionally, knowingly, fraudulently, and with an intent to deceive Allstate and the public, omitted material facts and made various misleading statements (i) intending to hold out the Defendants as legal and lawfully operating professional entities licensed in the state where the services were provided when in fact they were not; (ii) intending to fraudulently induce claim payments, thereby inducing Allstate to make payments that the Defendants were not entitled to because of their illegal operation or because of the existence of an illegal referral arrangement and/or because the services were not provided as billed and/or because the findings and reports of the Defendants were fictitious; (iii) intending to fraudulently induce claim payments, thereby inducing Allstate to make payments by representing that the services had been provided by properly licensed doctors; (iv) misrepresenting the nature of services that had been administered; (v) misrepresenting that the referrals were necessary; (vi) misrepresenting that the services were provided by employees; (vii) misrepresenting the applicable fees for the services that were allegedly provided; (viii) intending to fraudulently induce claim payments, thereby inducing Allstate to make payments by representing that Defendants were being legally owned and lawfully operating as required by licensing

requirements where the services were provided when in fact they were not; and (ix) setting forth fictitious diagnoses and representations of services provided.

459.  As set forth herein, the Defendants intentionally, knowingly, fraudulently, and with an intent to deceive Allstate, their own patients and the general public, hid improper referral relationships and did not provide the services that were billed by making false representations of material facts, including, but not limited to, the following fraudulent misrepresentations:  (i) false and misleading statements that services had been provided and were provided by employees when the services were fictitious and were not provided as billed and were not provided by employees; (ii) false and misleading statements contained in each separate bill, medical record and report submitted to Allstate regarding the nature of service provided and/or the relationship between the Defendants, the shareholder-doctors, and entities to which referrals were made; (iii) false and misleading statements as to the details of the Defendants' operation, management, ownership and lack of compliance with State licensing requirements which not only defrauded Allstate but also endangered the welfare of the public; and (iv) false and misleading statements as to the details of the services administered to patients and the applicable fees.

460. The Individual Defendants, acting in concert with the Entity Defendants, participated in, conspired together, aided and abetted, and furthered the fraudulent schemes through a common course of conduct and purpose.

461. The Defendants concealed the fraudulent nature of their claims through their misrepresentations and material omissions. In addition to concealing the fraudulent nature of each individual claim, the Defendants also concealed the existence of the overall scheme to defraud. The Defendants' fraudulent concealment of their scheme to defraud prevented Allstate

from discovering or asserting, until now, the foregoing fraud, or the injury resulting therefrom to Allstate.

462. Allstate has no obligation to pay for health care services allegedly rendered by health care providers acting in the employ of a professional corporation or ambulatory surgery center, where, as here, the services were not provided by properly licensed providers, the services billed were not provided, the services were not provided as billed, the services were provided by independent contractors, the services were provided pursuant to an illegal referral scheme, the claimed injuries did not exist, the submitted claims are fraudulent in nature, the services were billed in violation of the fee schedule, the services were provided by entities that were not legally owned, controlled, and managed according to state licensing and operating requirements; and/or the services were provided as part of a scheme and pattern to bill unnecessary services in order to submit substantial billing to Allstate.

463. The Defendants knew the foregoing material misrepresentations to be false when made and made or facilitated these false representations with the intention and purpose of inducing Allstate to rely thereon.

464. Allstate did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts that Allstate was led to believe existed as a result of the Defendants' acts of fraud and deception, and which led to Allstate making payments to the Defendants and incurring expenses as a result.

465. Had Allstate known of the fraudulent content of the reports, the fictitious nature of the claimed injuries, the fictitious nature of the services that were represented to be provided, the referrals by financially related entities, the illegal kickbacks made to obtain referrals, the fact that the services had not been provided as billed, the fact that the fees billed were excessive and in

violation of the law, the fact that the services had not been provided by licensed providers in a state in which they were licensed, their illegal operation, management, ownership, and lack of compliance with state licensing requirements, and the fact that the services were provided by independent contractors, it would not have paid the Defendants' claims for No-Fault insurance benefits submitted in connection therewith.

466.  In reliance upon these false representations and/or omissions, during the six (6) years preceding this Complaint, Allstate has made payments to the Defendants and incurred additional costs totaling at least $1,096,864.26 as a result of the fraudulent billing.

467.  Allstate was thus injured as a proximate result and is entitled to recover the payments it made to the Defendants.  As a result of the fraud of the Defendants, Allstate should recover all of its payments and be reimbursed for the costs incurred as a result of the fraudulent billing.

468.  Allstate also requests punitive damages in the amount of $1,000,000, plus interest.


## SECOND CLAIM FOR RELIEF

### (Unjust Enrichment)

### (Against All Defendants)

469.  Allstate repeats and realleges the allegations set forth in paragraphs 1 through 468 of this Complaint with the same force and effect as if set forth fully herein.

470.  By reason of their wrongdoing, the Defendants have been unjustly enriched, in that they have received monies from Allstate that are the result of unlawful conduct, and that in equity and good conscience, they should not be permitted to keep.

471.  No contract exists between Allstate and the Defendants.  Allstate is not asserting any ground for recovery that arises from any contract.

472.  Allstate is therefore entitled to restitution from the Defendants in the amount by which the Defendants have been unjustly enriched.

## **THIRD CLAIM FOR RELIEF**

**(Violation of 18 U.S.C. § 1962(c))**
**(Association In Fact Enterprise)**

**(Against All Defendants)**

473.  Allstate repeats and realleges the allegations set forth in paragraphs 1 through 472 of this Complaint with the same force and effect as if set forth fully herein.

474.  At all times relevant to this Complaint, the Defendants Alladin, Gorman, Rahat, Sangavaram, Weissman, Zaitsev, Accelerated, Bailey, Barnert, Bedford, Alladin PC, Elmwood, Molnar, Ridgewood, Riverside, Tremont, Tristate, ABC Corps. 1-2 and John Does 1-2 constituted a separate associated in fact enterprise within the meaning of 18 U.S.C. § 1961(4), which is engaged in, and the activities of which affect, interstate commerce (the "Associated In Fact Enterprise").  Such enterprise was formed with the common purpose of engaging in fraudulent activities.

475.  At all times relevant to this Complaint, such Defendants were "persons" associated with an enterprise within the meaning of 18 U.S.C. §§ 1961(3) and 1965(c), with an existence separate and apart from the Associated In Fact Enterprise.

476. The Defendants Alladin, Gorman, Rahat, Sangavaram, Weissman, Zaitsev, Accelerated, Bailey, Barnert, Bedford, Alladin PC, Elmwood, Molnar, Ridgewood, Riverside, Tremont, Tristate, ABC Corps. 1-2 and John Does 1-2 conducted or participated, directly or

indirectly, in the conduct of the Associated In Fact Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).   The Defendants Gorman, Sangavaram, Weissman, ABC Corps. 1-2 and John Does 1-2 served as sham owners on paper of one or more of the Entity Defendants, including the Defendants Barnert, Bedford, Alladin PC, Elmwood, Molnar, Ridgewood, Riverside, Tremont and Tristate and enabled the fraudulent billing to take place.   The Defendant Zaitsev was a hidden owner of the Defendants Bedford, Elmwood, Molnar, Riverside, Tremont and Tristate and directed their operations and fraudulent billing. The Defendants Alladin, Rahat and Zaitsev were the actual owners of all of the Entity Defendants, each owning at least two of the Entity Defendants as set forth herein and they participated in and enabled all of the fraudulent billing.  All of these Defendants enabled and/or controlled the billing of the Entity Defendants which regularly billed for inflated charges intended to maximize billing even though they were not necessary and could have harmed the patients. Zaitsev and Ridgewood regularly billed substantial amounts for Laboratory testing that was not necessary.   Much of this testing, with the assistance of the other Defendants, was provided not only without necessity, it was often allegedly to provide information to clear patients for surgeries or other procedures with the results coming in long after the procedures had been performed.  This was a completely fraudulent sham.  Zaitsev and Ridgewood billed for this testing in numerous cases before Ridgewood was authorized to provide services in New York and before Ridgewood had authorization to proceed in New York from the New York Department of Health.   All of the Defendants participated in a scheme to bring New York residents to Accelerated and Barnert in New Jersey in order to bill and receive unnecessary facility fees that would not have been recoverable if the services were provides in offices and/or office-based surgery practices in New York.   The patients were subjected to anesthesia and

numerous risks including the risk of death for services that were unnecessary.  These services did not need to be provided in an ASC, they generally did not need to be provided under anesthesia and they were part of a pattern of subjecting patients to procedures that did not need to be performed at all.  The Defendant Rahat oversaw this scheme and the regular provision of unnecessary services and billing for unnecessary facility fees.  He oversaw the referral network from related provider Defendants with payoffs and financial incentives for the referring providers to make unnecessary referrals.   He fraudulently represented false ownership information of the ASC Defendants from the State of New Jersey, concealing disclosure of the actual ownership interests and delayed the disclosure that was made.  Each of the Defendants made or received improper referrals to financially related entities with the exception of Rahat who is not a licensed health provider.  He assisted and encouraged such referrals.  Each of the Defendants assisted and/or submitted the fraudulent billing. Each of the Defendants was aware that these claims would be sent to Allstate through the use of the mails and authorized the use of the mails to submit these claims.  The acts alleged herein constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961, to wit, in violation of 18 U.S.C. §§ 1341 & 1343:

      (a)     Such Defendants devised and executed a scheme and artifice to defraud Allstate of its money and property by means of false and fraudulent pretenses, representations and promises and by the concealment of material facts regarding the health care claims for payment;

      (b)     Pursuant to the scheme, such Defendants submitted to Allstate false and fraudulent claims and information in that such Defendants concealed the fact that the Defendants had financial relationships with their referring providers, and did not disclose these relationships;

      (c)     Pursuant to the scheme, such Defendants misrepresented to Allstate that the Defendants Accelerated, Barnert, Bedford, Elmwood, Molnar, Ridgewood, Riverside, Tremont and Tristate were properly licensed;

(d)     Pursuant to the scheme, such Defendants concealed from Allstate the fact that the services billed for were illegal self-referrals from providers that the Defendants had financial relationships with;

(e)     Pursuant to the scheme, such Defendants submitted to Allstate false and fraudulent claims and information in that such Defendants concealed the fact that the Defendants had cross-referral arrangements with their referring providers and did not disclose these relationships to its patients and obtain their consent;

(f)     Pursuant to the scheme, such Defendants submitted to Allstate false and fraudulent claims and information in that such Defendants falsely represented that Elmwood and Molnar had provided necessary testing administered by licensed health provider employees;

(g)     Pursuant to the scheme, such Defendants submitted to Allstate false and fraudulent claims and information in that such Defendants falsely represented that the testing that Elmwood and Molnar administered and other services all of the Defendants provided were medically necessary for the care of the patients;

(h)     Pursuant to the scheme, the Defendants submitted to Allstate false and fraudulent claims and information in that such Defendants falsely represented that it was necessary that the services that were provided in the Defendant ASCs be provided in ASCs and that the facility fees were medically necessary when in fact virtually all of the services did not need to be provided in an ASC and most of them did not need to be provided at all.

(i)     Pursuant to the scheme, such Defendants submitted to Allstate false and fraudulent claims and information in that such Defendants falsely represented that the services that the Defendants billed for had been administered by doctors acting within the scope of their licenses when in fact the services were administered beyond the scope of the Defendants' licenses or had not been administered at all,

(j)     Pursuant to the scheme, the Defendants Rahat, Zaitsev, Accelerated, Barnert, ABC Corps. 1-2 and John Does 1-2 submitted to Allstate false and fraudulent claims and information in that such Defendants falsely represented that the individuals performing MUA billed by the Defendant ASCs were surgeons and that chiropractors were permitted to perform these services within the scope of their license and that such services were necessary for the care of the patients when in fact such services could have caused grave injury to the patients;

(k)     Pursuant to the scheme, such Defendants falsely represented that the services they provided were medical necessary for the care of the patients and had been provided as billed.

(l)     For the purpose of executing this scheme and artifice to defraud, such Defendants submitted such false and fraudulent claims and information to Allstate and others by use of the mail and interstate wire facilities and caused Allstate to make

payments for said fraudulent claims by use of the mail and interstate wire facilities. Each of the Defendants was aware that these claims would be sent to Allstate through the use of the mails and authorized the use of the mails to submit these claims.

477. The Defendants Alladin, Rahat, Zaitsev, Accelerated, Barnert, Ridgewood, ABC Corps. 1-2 and John Does 1-2 have engaged in this scheme from 2012 and up to the present and continuing and the other Defendants have joined the scheme at various times between 2013 and 2020 and if the Court does not provide relief, the fraudulent enterprise will continue to seek to submit and collect fraudulent claims. Every single claim submitted by the Defendants associated with this enterprise has been fraudulent. This is a continuing illegal operation which has submitted numerous fraudulent claims to Allstate and other insurers.

478. The Defendants have mailed hundreds of false claims to Allstate, and a representative sample of such mailings is set forth in the factual section of this Complaint.

479. The Enterprise is distinct from, and has an existence beyond, the pattern of racketeering that is described herein, namely by recruiting, overseeing, and coordinating many professionals and non-professionals who have been responsible for facilitating and performing a variety of administrative and professional functions beyond the acts of mail fraud (i.e. the submission of the fraudulent bills to Allstate and other insurers), by providing benefits for the staff of the enterprise, by creating and maintaining files and other records and by negotiating and executing various lease agreements.

480. By reason of such Defendants' violation of 18 U.S.C. § 1962(c), Allstate was injured in its business or property within the meaning of 18 U.S.C. § 1964(c) and is therefore entitled to recover from such Defendants three times the damages sustained by Allstate and the costs of this suit, including reasonable attorneys' fees. During the four-year period preceding

this Complaint, Allstate has paid to these Defendants substantial claim amounts totaling at least $530,054.48.

481.  The Defendants concealed the fraudulent nature of these claims through their misrepresentations and material omissions.  In addition to concealing the fraudulent nature of each individual claim, the Defendants also concealed the existence of the overall scheme to defraud.

482.  Allstate was damaged by this scheme in that payments were made to the Defendants Accelerated, Bailey, Barnert, Bedford, Alladin PC, Elmwood, Molnar, Ridgewood, Riverside, Tremont, Tristate, ABC Corps. 1-2 and John Does 1-2 which would not have otherwise been made but for the fraudulent activities.

### FOURTH CLAIM FOR RELIEF

**(Violation of 18 U.S.C. §1962(d))**
**(Conspiracy)**

**(Against All Defendants)**

483.  Allstate repeats and realleges the allegations set forth in paragraphs 1 through 482 of this Complaint with the same force and effect as if set forth fully herein.

484.  The Defendants Alladin, Gorman, Rahat, Sangavaram, Weissman, Zaitsev, Accelerated, Bailey, Barnert, Bedford, Alladin PC, Elmwood, Molnar, Ridgewood, Riverside, Tremont, Tristate, ABC Corps. 1-2 and John Does 1-2 have conspired with each other to violate 18 U.S.C. § 1962(c).

485.  The Defendants Alladin, Gorman, Rahat, Sangavaram, Weissman, Zaitsev, Accelerated, Bailey, Barnert, Bedford, Alladin PC, Elmwood, Molnar, Ridgewood, Riverside, Tremont, Tristate, ABC Corps. 1-2 and John Does 1-2  each agreed to participate in a conspiracy

to commit the RICO violation by agreeing to conduct the affairs of the Associated In Fact Enterprise by means of a pattern of racketeering activity, including numerous acts of mail and wire fraud as set forth herein, and through the preparation and/or submission of fraudulent claim documents to Allstate including billing numerous unnecessary facility fees, unnecessary services provided after fraudulent referrals from related entities, unnecessary tests that were not provided as billed, unnecessary manipulation under anesthesia and other services provided under anesthesia without necessity which could have injured the patients  and through the submission of supporting sham invoices and the preparation and/or submission of fraudulent claim documents to Allstate.

486.  The purpose of the conspiracy was to obtain No-Fault payments from Allstate based on sham invoices and fraudulent claim documents.  Each of the conspirators was aware of this goal and agreed to take part in facilitating it.

487. Allstate has been injured in its business and property by reason of this conspiratorial conduct, in that they have paid substantial insurance benefits as a result of the unlawful conduct.

488.  By virtue of this violation of 18 U.S.C. § 1962(d), the Defendants Alladin, Gorman, Rahat, Sangavaram, Weissman, Zaitsev, Accelerated, Bailey, Barnert, Bedford, Alladin PC, Elmwood, Molnar, Ridgewood, Riverside, Tremont, Tristate, ABC Corps. 1-2 and John Does 1-2 are jointly and severally liable to Allstate for three times the damages that Allstate has sustained, plus the costs of this suit, including reasonable attorneys' fees.

489. The Defendants Alladin, Gorman, Rahat, Sangavaram, Weissman, Zaitsev, Accelerated, Bailey, Barnert, Bedford, Alladin PC, Elmwood, Molnar, Ridgewood, Riverside, Tremont, Tristate, ABC Corps. 1-2 and John Does 1-2 concealed their conspiratorial conduct, as

well as their overall scheme to defraud, from Allstate through their misrepresentations and material omissions.   This prevented Allstate from discovering or asserting, until now, the foregoing claim, or the injury resulting therefrom to Allstate.

## FIFTH CLAIM FOR RELIEF

### (New York Public Health Law § 238-a)

### (Against Defendants Zaitsev, Weissman, Ridgewood, Tristate, Riverside, John Doe 1, and ABC Corp. 1)

490.  Allstate repeats and realleges the allegations of paragraphs 1 through 489 of this Complaint with the same force and effect as if set forth fully herein.

491.  Section 238-a of the New York Public Health Law provides, in relevant part:

1.      (a) A practitioner authorized to order clinical laboratory services, pharmacy services, radiation therapy services, physical therapy services or x-ray or imaging services may not make a referral for such services to a health care provider authorized to provide such services where such practitioner or immediate family member of such practitioner has a financial relationship with such health care provider.

(b) A health care provider or a referring practitioner may not present or cause to be presented to any individual or third party payor, or other entity a claim, bill, or other demand for payment for clinical laboratory services, pharmacy services, radiation therapy services, physical therapy services or x-ray or imaging services furnished pursuant to a referral prohibited by this subdivision.

*      *      *

7.      If a referring practitioner or a health care provider furnishing clinical laboratory services, pharmacy services, radiation therapy services, physical therapy services or x-ray or imaging services or any other person or entity, collects any amounts that were billed in violation of this section, such referring practitioner and health care provider and other person or entity shall be jointly and severally liable to the payor for any amounts so collected.

492. The Defendants Zaitsev, Weissman, Tristate, Riverside, John Doe 1 and ABC Corp. 1 are practitioners as that term is defined under Section 238(11) of the New York Public Health Law.

493. The Defendants Zaitsev, Weissman, Tristate, Riverside, John Doe 1 and ABC Corp. 1 regularly made referrals to the Defendant Ridgewood, with which they had financial relationships, including referrals for clinical laboratory services.

494. The Defendant Ridgewood is a "health care provider" as that term is defined under Section 238(6) of the New York Public Health Law.

495. The Defendant Ridgewood had a "financial relationship" with Defendants Zaitsev, Weissman, Tristate, Riverside, John Doe 1 and ABC Corp. 1 as that term is defined under Section 238(3) of the New York Public Health Law, and routine referrals for clinical laboratory services were made to the Defendant Ridgewood for patients allegedly treated by Zaitsev, Weissman, Tristate, Riverside, John Doe 1 and ABC Corp. 1.

496. The referrals by the Defendants Zaitsev, Weissman, Tristate, Riverside, John Doe 1 and ABC Corp. 1 violate Section 238-a(1) and (9) of the New York Public Health Law.

497. In violation of Section 238-a(1)(b) of the New York Public Health Law, the Defendant Ridgewood has presented or caused to be presented to Allstate claims for payment for clinical laboratory services furnished pursuant to a prohibited referral.

498. During the six-year period preceding this Complaint, Allstate has paid substantial amounts to the Defendant Ridgewood totaling at least $345,053.91 for clinical laboratory services billed for in violation of Section 238-a of the Public Health Law and, pursuant to Section 238-a(7) of the Public Health Law, is entitled to recover such amounts from Defendants Zaitsev, Weissman, Tristate, Riverside, John Doe 1 and ABC Corp. 1, and from Ridgewood

which, as practitioners and as a health care provider, respectively, are jointly and severally liable to Allstate for the amounts Ridgewood received in violation of New York Public Health Law § 238-a.  Allstate is also entitled to an order declaring all amounts billed as violative of New York Public Health Law § 238-a and not eligible for payment.

## SIXTH CLAIM FOR RELIEF

**(New York Public Health Law § 238-a)**

**(Against Defendants Zaitsev, Sangavaram, Bedford, Riverside, Tremont, Tristate, John Doe 1, and ABC Corp. 1)**

499.  Allstate repeats and realleges the allegations of paragraphs 1 through 498 of this Complaint with the same force and effect as if set forth fully herein.

500.  The Defendants Zaitsev, Sangavaram, Bedford, Riverside, Tremont, Tristate, John Doe 1, and ABC Corp. 1 are practitioners as that term is defined under Section 238(11) of the New York Public Health Law.

501.  The Defendants Zaitsev, Sangavaram, Bedford, Riverside, Tremont, Tristate, John Doe 1, and ABC Corp. 1 regularly made referrals to non-party ESM Rehab PT, P.C. ("ESM Rehab") with which they had financial relationships including referrals for physical therapy services.

502.  ESM Rehab is a "health care provider" as that term is defined under Section 238(6) of the New York Public Health Law.

503.  ESM Rehab had a "financial relationship" with Defendants Zaitsev, Sangavaram, Bedford, Riverside, Tremont, Tristate, John Doe 1, and ABC Corp. 1 as that term is defined under Section 238(3) of the New York Public Health Law, and routine referrals for physical

166

therapy services were made to ESM Rehab for patients allegedly treated by Zaitsev, Sangavaram, Bedford, Riverside, Tremont, Tristate, John Doe 1, and ABC Corp. 1.

504.  The referrals to ESM Rehab by the Defendants Zaitsev, Sangavaram, Bedford, Riverside, Tremont, Tristate, John Doe 1, and ABC Corp. 1 violate Section 238-a(1) and (9) of the New York Public Health Law.

505.  In violation of Section 238-a(1)(b) of the New York Public Health Law, ESM Rehab has presented or caused to be presented to Allstate claims for payment for physical therapy services furnished pursuant to a prohibited referral.

506.  Allstate has paid substantial amounts to non-party ESM Rehab totaling at least $119,419.50 for physical therapy services in violation of Section 238-a of the Public Health Law and, pursuant to Section 238-a(7) of the Public Health Law, is entitled to recover such amounts from Defendants Zaitsev, Sangavaram, Bedford, Riverside, Tremont, Tristate, John Doe 1, and ABC Corp. 1 which, as practitioners, are jointly and severally liable to Allstate for the amounts paid to ESM Rehab, a health care provider, in violation of New York Public Health Law § 238-a. Allstate is also entitled to an order declaring all amounts billed as violative of New York Public Health Law § 238-a and not eligible for payment.

## SEVENTH CLAIM FOR RELIEF

### (Declaratory Judgment)

### (Against All Defendants)

507.  Allstate repeats and realleges the allegations of paragraphs 1 through 506 of this Complaint with the same force and effect as if fully set forth herein.

508. All of the Defendants made and/or received referrals from providers they had financial relationships with and did not properly disclose these relationships to the patients in violation of New York and New Jersey statutes.

509. All of the Defendants submitted claims in violation of the fee schedules that were applicable in violation of New York and New Jersey statutes.

510. The Defendants Accelerated and Barnert billed for facility fees when no such fees should have been recoverable because the services could have been provided in OBSPs or in an office setting.

511. The Defendants Bailey, Bedford, Ridgewood, Riverside, and Tristate failed to properly submit proof of claim in violation of the policies and the No Fault Regulations.

512. The Defendants Bailey, Bedford, Ridgewood, Riverside, and Tristate failed to verify their claims in violation of the policies and the No Fault Regulations.

513. The Defendants Bedford, Riverside, and Tristate have failed to appear for examinations under oath (EUOs) by Allstate.

514. The Defendants Tristate, Molnar, Elmwood and Riverside billed for the services of independent contractors in violation of the No Fault Regulations.

515. The Defendant Riverside billed for services performed in the State of New Jersey that it was not authorized to provide.

516. The Defendants Ridgewood, Elmwood, Molnar, and Tristate billed for services performed in the State of New York that they were not authorized to provide.

517. The Defendant Ridgewood provided clinical laboratory services to New York residents when it was not authorized to provide such services as a clinical laboratory.

518. Each of the Defendants billed for services that were not provided as billed.

519. The Defendants Bedford, Elmwood, Molnar, Riverside, Tremont, and Tristate are sham professional entities controlled by the Defendant Zaitsev and are not owned and controlled by the medical doctors who are their nominal owners on paper.

520. The Defendants Accelerated and Barnert are illegally licensed ASCs, and their claims of ownership are false.  The Defendants Zaitsev, Rahat and Alladin have controlled these entities.  They have listed numerous other owners and held them out to the State and to the public as legitimate owners, including the Defendants Weissman and Gorman.  These representations of ownership are a sham.  Multiple referring providers who Accelerated and Barnert claims to be owners are not actual owners of Accelerated and Barnert.  Their ownership is a deception created to provide cover for the payments by Accelerated and Barnert to their referring providers for referrals.  The filings and claims of ownership by the Defendant ASCs with the State of New Jersey and to Allstate are false and in violation of New Jersey law and the no-fault Regulations.  The Defendants Accelerated and Barnert have also been used interchangeably and are not separate entities.

521. Sangavaram was disciplined by the State of New Jersey which required that he practice with a practice monitor: a provision which provided some protection to the patients given Sangavaram's prior misconduct.  However, Sangavaram and Tristate illegally practiced and billed Allstate for services without a practice monitor.

522. The Defendants continue to submit assigned No-Fault claims to Allstate.

523. Allstate has and will be prejudiced without a judicial declaration that the Defendants are not entitled to payment of assigned first-party No-Fault benefits in any claims from Allstate due to:  (1) the Defendants' financial relationship with their referring providers in violation of Public Health Law §§ 238-a and/or 238-d and/or N.J.S.A. 45:9-22.5; (2) the

Defendants' failure to disclose their financial relationship with their referring providers to their patients pursuant to Public Health Law §238-d and/or N.J.S.A. 45:9-22.5; (3) the providing of services by Riverside in New Jersey and in violation of N.J.S.A. 14A:13-3; (4) the providing of services by Ridgewood, Elmwood, Molnar and Tristate in New York without authority; (5) the providing of laboratory services by Ridgewood to New York residents before it was authorized to do so;  (6) the billing facility fees by Accelerated and Barnert for services that should have been provided in OBSPs; (7) the violation of the fee schedule by all Defendants; (8) the failure of Bailey, Bedford, Ridgewood, Riverside and Tristate  to provide proof of claim in accordance with the policy and the No Fault Regulations; (9) the failure of Bailey, Bedford, Ridgewood, Riverside and Tristate to verify their claims in accordance with the policy and the No Fault Regulations; (10) the failure of Bedford, Riverside, and Tristate to appear for examinations under oath (EUOs) by Allstate; (11) the billing of health care services by Defendants Accelerated, Barnert, Bedford, Elmwood, Molnar, Riverside, Tremont and Tristate when they are sham professional entities; (12) the billing of medical services by Tristate, Molnar, Elmwood and Riverside when the services were provided by independent contractors; and (13) the billing and providing of services Sangavaram and Tristate without a practice monitor, and that the Defendants may not seek to assert a lien against any assignors.

524. There exists a real, actual and justiciable controversy between Allstate and the Defendants.

525.  Allstate has no adequate remedy at law.

## EIGHTH CLAIM FOR RELIEF

### (Permanent Injunctive Relief)

### (Against All Defendants)

526.  Allstate repeats and realleges the allegations set forth in paragraphs 1 through 525 of this Complaint with the same force and effect as if set forth fully herein.

527.  This is an actual case and controversy between the Defendants and Allstate regarding at least $16,196,392.49 in unpaid billing for the fraudulent insurance claims that have been submitted to Allstate.

528.  All of the Defendants who have billed Allstate for these insurance claims have no right to receive payment from Allstate on the unpaid billing because of the fraudulent and unlawful billing detailed herein.

529.  Accordingly, Allstate requests that the Court permanently enjoin all of the Defendants from seeking payment for any pending bills submitted to Allstate.


**WHEREFORE**, Allstate demand Judgments against the Defendants named in each Claim for Relief, jointly and severally, as follows:

(a)     On Allstate's First Claim For Relief for fraud, the damages that Plaintiffs have sustained as a result of the Defendants' conduct which are in excess of $1,096,864.26, the exact amount to be determined at trial, plus one million dollars ($1,000,00.00) punitive damages, plus a declaratory judgment decreeing that Allstate has no obligation to pay pending No-Fault claims submitted by the Defendants;

(b)     On Allstate's Second Claim For Relief for unjust enrichment, the amount by which the Defendants were unjustly enriched, the exact amount to be determined at trial;

(c)     On Allstate's Third and Fourth Claims For Relief under RICO, three (3) times the damages that Allstate has sustained as a result of the improper conduct which are in excess of $530,054.38, the exact amount to be determined at trial, plus Allstate's costs in this suit, including reasonable attorneys' fees;

(d)     On Allstate's Fifth Claim For Relief, under Section 238-a of the New York Public Health Law, the damages that Plaintiffs have sustained as a result of the Defendants' conduct which are in excess of $345,053.91, the exact amount to be determined at trial;

(e)     On Allstate's Sixth Claim For Relief, under Section 238-a of the New York Public Health Law, the damages that Plaintiffs have sustained as a result of the Defendants' conduct which are in excess of $119,419.50, the exact amount to be determined at trial ;

(f)     On Allstate's Seventh Claim For Relief, a declaratory judgment decreeing that Allstate has no obligation to pay pending or future No-Fault claims submitted by the Defendants; and

(g)     On Allstate's Eighth Claim For Relief, a permanent injunction decreeing that Allstate has no obligation to pay pending No-Fault bills submitted by the Defendants, and permanently enjoining the Defendants from seeking payment on such claims.

Dated:  August 17, 2023
          New York, New York

SHORT & BILLY, P.C.

By: _____

Andrew S. Midgett
Skip Short
217 Broadway Suite 300
New York, New York 10007
(212) 732-3320

*Attorneys for Allstate*